# EXHIBIT 5

Page 1

```
 1          UNITED STATES DISTRICT COURT
 2       FOR THE WESTERN DISTRICT OF MICHIGAN
 3  _____
 4  BRUCE CRAIGIE and
 5  BARBARA CRAIGIE,
 6       Plaintiffs,        Case No. 1:15-cv-00441
 7  v                       Hon. Janet T. Neff
 8
 9  NATIONSTAR MORTGAGE, LLC,
10  a limited liability company, and
11  JOHN DOES 1-5,
12       Defendants.
13  _____
14
15       30(B)(6) DEPOSITION OF:  AARYN RICHARDSON
16
17
18
19
20  DATE:   April 26, 2016
21  TIME:   10:05 a.m.
22  LOCATION:  Dykema Gossett, PLLC
23          300 Ottawa Avenue NW
24          Grand Rapids, Michigan
25  REPORTER:  Lori J. Cope, RPR, CSR-4113
```

Page 2

```
 1  APPEARANCES:
 2
 3       DREW, COOPER & ANDING, P.C.
 4       BY:  Theodore J. Westbrook (P70834)
 5          Aldrich Place, Suite 200
 6          80 Ottawa Avenue NW
 7          Grand Rapids, MI  49503
 8          (616) 454-8300
 9          twestbrook@dca-lawyers.com
10             On behalf of the Plaintiffs
11
12       DYKEMA GOSSETT PLLC
13       BY:  Laura C. Baucus (P56932)
14          39577 Woodward Avenue
15          Suite 300
16          Bloomfield Hills, MI  48304
17          (248) 203-0796
18          lbaucus@dykema.com
19             On behalf of the Defendants
20
21
22
23
24
25
```

Page 3

```
 1  ALSO PRESENT:
 2
 3       DYKEMA GOSSETT PLLC
 4       BY:  Elisa J. Lintemuth (P74498)
 5          300 Ottawa Avenue NW
 6          Grand Rapids, MI  49503
 7          (616) 776-7500
 8          elintemuth@dykema.com
 9             Co-Counsel on behalf of Defendants
10
11  ALSO PRESENT:
12  Barbara Craigie
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                I N D E X
 2  WITNESS:                    PAGE
 3  AARYN RICHARDSON
 4  Examination by Ms. Westbrook        7
 5
 6
 7
 8            E X H I B I T S
 9  NO.  PG.  IDENTIFICATION
10  39  18  Re-Notice of Deposition
11  40  28  Nationstar Mortgage CTS Notices
12  41  79  10-31-13 Letter to Mr. Craigie
13  42  96  2-21-14 Letter to Mr. Craigie
14  43  119  HAMP Foreclosure Certification by Servicer for Non-GSE
15          Accounts Document
16  44  138  Making Home Affordable Program Handbook for Servicers of
17          Non-GSE Mortgages
18  45  162  3-5-15 Letter to Ms. Craigie
19  46  167  Answer to Plaintiffs' First Set of Discovery Requests to
20          Defendant Nationstar Mortgage, LLC
21  47  184  Objections to Topics Related to Re-notice of Rule
22          30(b)(6) Deposition of Defendant Nationstar Mortgage, LLC
23
24
25
```

Page 5

1          April 26, 2016
2          Grand Rapids, Michigan
3          10:05 a.m.
4          ***
5       (Ms. Lintemuth not present.)
6          AARYN RICHARDSON,
7     after having been duly sworn, was examined and
8     testified as follows:
9          MR. WESTBROOK:  Before we begin I just would like to
10    place an objection on the record.  This deposition was first
11    noticed on March 28th, 2016.  The notice consisted of 15
12    topics.  The deposition was set for Wednesday, April 20, 2016.
13    At Nationstar's request the deposition was re-noticed on April
14    18, 2016 for today.  The re-notice of deposition identified
15    the same 15 topics as the original March 28th, 2016 notice.
16    On April 22, 2016, two business days prior to the noticed
17    deposition date, which is today, Nationstar's counsel for the
18    first time stated objections to the noticed topics in a
19    document entitled Objections to Topics Related to Re-notice of
20    Rule 30(b)(6) Deposition of Defendant Nationstar Mortgage,
21    LLC.  These objections indicated that the witness would not be
22    prepared to and/or allowed to testify regarding certain
23    topics.  The plaintiffs regard these objections as both
24    meritless and untimely and reserve all rights to seek relief
25    including sections for any failure by Nationstar to produce a

Page 6

1     sufficiently prepared witness and/or any action by Nationstar
2     or its counsel to limit the scope of this deposition based on
3     any objection to the noticed topics.
4          MS. BAUCUS:  Laura Baucus, Counsel for Nationstar.
5     To clarify, Nationstar did request a six-day adjournment of
6     this deposition, which is not unusual.  At no time did we
7     waive or otherwise limit our objections.  Our objections, in
8     fact, are consistent with the judge's previous rulings on
9     motions to compel and out of courtesy we advised opposing
10    counsel what they are prior to the deposition.  That being
11    said, with communication with opposing counsel prior to this
12    date our understanding is that this deposition will continue.
13    We do believe that plaintiffs will get the information that
14    they desire through this witness even subject to the
15    objections.  And at the end of the deposition if plaintiffs'
16    counsel does not believe that sufficient information was
17    provided, we will address that at that time.
18         EXAMINATION
19    BY MR. WESTBROOK:
20    Q.  All right.  With that out of the way, let's begin.
21         Could you please state your name and spell your last
22    name for the record.
23    A.  Sure.  It's Aaryn Richardson, R-i-c-h-a-r-d-s-o-n.
24    Q.  We just met for the first time a moment ago.  Is that
25    correct?

Page 7

1  A.  Yes.
2  Q.  Have you had a chance to meet with counsel to discuss the
3     deposition process?
4  A.  Yes.
5  Q.  Have you been deposed before?
6  A.  Yes, I have.
7  Q.  So you are familiar with some of the ground rules, that verbal
8     responses are necessary and so forth.  Right?
9  A.  Yes.
10 Q.  You are familiar with the oath that has been administered,
11    which is the same one that would be administered to you in a
12    court of law.  Correct?
13 A.  That's correct.
14 Q.  And you're aware that it is important that we receive truthful
15    and accurate answers from you to the best of your ability.
16    Right?
17 A.  Yes.
18 Q.  How many times have you been deposed in the past?
19 A.  Hard to say.  I don't remember exactly.  I would say -- I
20    don't know -- 10 to 15 times.  That's a real rough estimate.
21 Q.  Over the course of how many years?
22 A.  A little over two years.
23 Q.  Have you ever testified in connection with claims against
24    Nationstar under the Fair Debt Collection Practices Act?
25 A.  Testified at a deposition?

Page 8

1  Q.  Yes.
2  A.  I want to say yes, but I don't remember.
3  Q.  Have you ever testified in connection with claims against
4     Nationstar under the Real Estate Settlement Procedures Act or
5     RESPA?
6  A.  Yes.
7  Q.  How many times have you testified?
8  A.  I don't remember.  More than one, but I don't know how many.
9  Q.  What percentage of the time are you engaged in
10    litigation-related work for Nationstar?
11 A.  Well, I'm not sure exactly what you mean by litigation
12    related, but all of the loans that I am assigned to are
13    involved in some form of litigation.
14 Q.  All right.  Have you ever testified at trial?
15 A.  Yes, I have.
16 Q.  How many times?
17 A.  Again, I don't remember, but probably 10 or 15 times.
18 Q.  Do you recall what courts you have testified in?
19 A.  You mean whether they were state or federal, or the particular
20    jurisdiction?
21 Q.  The particular jurisdictions.
22 A.  I could -- I don't know if I would remember them all, but I
23    could probably get pretty close.  Do you want all of the
24    jurisdictions?
25 Q.  The ones that you remember, yes.

Page 9

1 A.   I have -- and I don't remember all of the county names, but a
2       number of these were in state court in Florida, which, in
3       fact, I know for certain I'm not going to remember all of the
4       counties, but they were counties around -- various counties in
5       the Panhandle related to judicial foreclosures.  I have
6       testified in Fort Lauderdale, West Palm Beach, Tampa, Orlando,
7       and maybe in counties in that area.  I have given testimony in
8       state court in California, in Orange County, in Sacramento
9       County.  There may be more counties than that.  I just can't
10      remember off the top of my head.  And also in New York state
11      court.  I can't remember the counties.  New Jersey state
12      court.  I think that's all as far as I can remember.
13 Q.   Any federal courts?
14 A.   Yes, some of those counties I have mentioned there were
15      federal court appearances.
16 Q.   Has there been any unifying theme as far as the subject of
17      your testimony in those cases?
18 A.   I would say the one consistent theme is that the borrowers
19      were in default.  Other than that, the facts and the
20      circumstances in the claims all varied.
21 Q.   Were these cases in which Nationstar was the plaintiff or the
22      defendant, or both?
23 A.   Both.
24 Q.   Now, for the purposes of today's deposition, which is a Rule
25      30(b)(6) representative deposition, have you been asked by

Page 10

1       Nationstar to appear and give testimony on its behalf?
2 A.   I have, yes.
3 Q.   Did you speak with counsel prior to today's deposition?
4 A.   Yes.
5 Q.   When did counsel first make contact with you about this
6       deposition?
7 A.   About the deposition?  Oh, I don't know, several weeks ago.
8 Q.   And how did they contact you?
9 A.   I think our initial conversation was by email.
10 Q.   And was this inside counsel or outside counsel?
11      MS. BAUCUS:  Counsel, you are very, very close to
12      attorney-client privilege.  I would put my objection to
13      attorney-client privilege on the record at this point.
14      Communications with inside and outside counsel are both
15      protected.
16      MR. WESTBROOK:  To clarify, I'm not asking about any
17      communications.  I'm not asking about the content of any
18      communications.  I am asking about the fact of communications.
19 BY MR. WESTBROOK:
20 Q.   And with that clarification, was your first contact from
21      inside counsel or outside counsel?
22 A.   I think it was from inside counsel.
23 Q.   All right.  What's the name of the inside counsel that
24      contacted you?
25 A.   Don't remember.

Page 11

1 Q.   Have you spoken with just one or more than one inside counsel
2       for Nationstar?
3 A.   Actually, now that I think about it, I think that the first
4       communication came from a paralegal.
5 Q.   All right.  Do you know where they were located?
6 A.   I don't recall if this particular paralegal is located at our
7       office in Dallas or somewhere else.
8 Q.   And did you also speak to outside counsel at some point --
9 A.   Yes.
10 Q.   -- about this deposition?
11 A.   Yes.
12 Q.   How many times have you spoken to outside counsel?
13 A.   I know we have had a number of conversations.  We had a lot of
14      conversations just for scheduling, so I don't know.  It would
15      be hard to say.  I don't remember.
16 Q.   **Can you give an estimate of how long in total you spoke with**
17      **outside counsel?**
18      **MS. BAUCUS:  Objection, attorney-client privilege.**
19      **MR. WESTBROOK:  Again, to clarify, I'm not asking**
20      **about the content of any discussions.  I am asking about the**
21      **fact of the discussions.**
22      **MS. BAUCUS:  You are asking about the length of any**
23      **discussion.  That is privileged information how long I spoke**
24      **with my client.**
25      **MR. WESTBROOK:  It is not privileged information.**

Page 12

1 **If you are instructing the witness not to answer, you can make**
2 **that instruction on the record.**
3      **MS. BAUCUS:  I am instructing my witness not to**
4 **answer.**
5      **MR. WESTBROOK:  I object to that instruction.  That**
6 **is not information protected by attorney-client privilege.**
7 BY MR. WESTBROOK:
8 Q.   Have you reviewed any documents in preparation for this
9       deposition?
10 A.   Yes, I have.
11 Q.   What documents have you reviewed?
12 A.   Well, I reviewed -- obviously there are two loans that are
13      sort of the subject matter here, so when I say documents,
14      these are documents for both of the loans, but that would
15      include the collection history profile that Nationstar
16      maintains as part of its business records, the detailed
17      transaction history.  I reviewed a number of pieces of
18      correspondence between the borrowers and Nationstar in this
19      case, which include like loan modification applications,
20      things along those lines.  I want to say I took maybe a
21      cursory look at the note and mortgage.  And then there is
22      server computer data that we maintain, you know, that pertains
23      to this loan that kind of just shows the general status of the
24      loan, things along those lines.  I reviewed that information.
25      I reviewed the notice of deposition.  I reviewed our responses

Page 13

1     to interrogatories. I reviewed signed declarations from
2     Nationstar. I think that's everything, but I can't remember
3     exactly.
4  Q.  Apart from inside and outside counsel, did you speak to anyone
5     else within Nationstar in preparation for the deposition?
6  A.  No.
7  Q.  Do you have an understanding of what this lawsuit is about?
8  A.  I think so.
9  Q.  What's your understanding?
10 A.  Well, I should say that I know -- I didn't review the
11    complaint, and so I didn't -- you know, in terms of the
12    specific claims, I don't know all of the details, but I know
13    that the sort of meat and potatoes of the claims surround loss
14    mitigation applications that were submitted by the borrowers
15    around the time that the foreclosure sale occurred on the Lake
16    Drive property and sort of facts and circumstances surrounding
17    that. And then also issues or claims connected to the
18    borrowers' attempts to reinstate their delinquent loan on
19    the -- is it Lakeshore? I cannot remember the other
20    address.
21 Q.  Scenic Drive.
22 A.  Scenic Drive. I keep wanting to call it Lakeshore for some
23    reason.
24 Q.  The one is Lake Drive and the other Scenic Drive, which is
25    confusing, so I understand.

Page 14

1  A.  And so their attempts to reinstate and/or get information
2     about reinstatement, et cetera. And then also I believe that
3     the borrower, Mrs. Craigie, is claiming that she -- her
4     information was forged on the mortgage or deed of trust in
5     this case. I think that's -- yeah, I guess that's pretty much
6     it. That's my understanding.
7  Q.  You are currently a Nationstar employee. Is that right?
8  A.  Yeah.
9  Q.  What is your title?
10 A.  Litigation resolution analyst.
11 Q.  How long have you been in that position?
12 A.  I began in this position -- excuse me, I began in this
13    position at the beginning of March of 2014.
14 Q.  Were you employed prior to March of 2014?
15 A.  At Nationstar?
16 Q.  Anywhere.
17 A.  Yes.
18 Q.  Was that at Nationstar?
19 A.  No.
20 Q.  Where were you employed prior to March of 2014?
21 A.  I was employed with a law firm in Denver, Colorado by the name
22    of Bloom, Murr, Accomazzo & Siler.
23 Q.  What was your position there?
24 A.  I was employed as an associate attorney.
25 Q.  And how long were you at that law firm?

Page 15

1  A.  I was there from October of 2012 until May of 2013.
2  Q.  And were you employed prior to October of 2012?
3  A.  Yes, I was.
4  Q.  And where were you employed?
5  A.  I worked for a different law firm in Denver. The name of that
6     firm was Franke Greenhouse. Those are two last names, not one
7     person's name. And I was employed there from the -- that firm
8     is no longer in business, but I was employed there from
9     February of 20- -- roughly February of 2012 to October 2012.
10    The firm went out of business shortly thereafter.
11 Q.  Were you employed prior to February of 2012?
12 A.  Yes, I was.
13 Q.  Where were you employed?
14 A.  I was employed as a deputy district attorney for the 6th
15    Judicial District in Colorado, and I worked there from October
16    of 2008 until February of 2012.
17 Q.  Were you employed prior to October of 2008?
18 A.  Prior to October of 2008 I was in school and I did work a
19    couple of different jobs or held positions or internships
20    during that time.
21 Q.  When you say school, are you referring to law school?
22 A.  That's correct.
23 Q.  Which law school did you attend?
24 A.  University of Denver.
25 Q.  Are you currently a licensed attorney?

Page 16

1  A.  Yes, I am.
2  Q.  What states?
3  A.  Colorado only.
4  Q.  As a litigation resolution analyst, could you give me just a
5     brief summary of what your job duties entail.
6  A.  Sure. Let me preface it by saying that I am not employed in
7     an attorney capacity at Nationstar even though I am an
8     attorney. I don't practice for them or for anybody. So I am
9     assigned to -- sort of broadbrush, I'm assigned to loans that
10    are both in default and are involved in some form of
11    litigation. My job is to -- I say broadbrush because a lot --
12    you know, there can be a lot of variance in the circumstances
13    for these different types of loans. So, put broadly, my job
14    is to bring -- attempt to bring resolution to those
15    loans. So that can come in a lot of different forms.
16    Sometimes it's working with the various parties to craft, you
17    know, creative settlement agreements, loan workouts of various
18    sorts including modifications or other types of options that
19    might be available. I'm also -- it also can be participating
20    in the litigation process, if need be, such as giving
21    testimony at a deposition like this or on occasion, as we have
22    already discussed, giving testimony at a trial.
23 Q.  Do you have a direct supervisor?
24 A.  I do.
25 Q.  Who is your direct supervisor?

Page 17

1  A.  AJ Loll.
2  Q.  Could you spell that last name, please.
3  A.  L-o-l-l.
4  Q.  And what is AJ Loll's position?
5  A.  He is vice president over litigation.  I think litigation
6      support is his correct title.
7  Q.  Are there any Nationstar employees who report directly to
8      you?
9  A.  No.
10          MR. WESTBROOK:  I would like to mark this Exhibit
11     39, please.
12         (Marked for Identification:  Exhibit 39.)
13 BY MR. WESTBROOK:
14 Q.  You have just been handed Exhibit 39, which is entitled
15     Re-notice of Taking Federal Rule of Civil Procedure 30(b)(6)
16     Deposition of Defendant Nationstar Mortgage, LLC.  Do you
17     see that?
18 A.  Yes.
19 Q.  Is this a document that you have seen before?
20 A.  Yes, it is.
21 Q.  And have you reviewed this document?
22 A.  Yes, I have.
23 Q.  Have you been asked by Nationstar to testify on its behalf
24     regarding each of the subjects stated in the notice?
25 A.  Yes.

Page 18

1  Q.  Are you prepared to do so today?
2  A.  Well, I think subject to the objections, yes.
3  Q.  Understood.  You can just hang on to that.
4  A.  Okay.
5  Q.  Topic number 1 is defined as Nationstar's loss mitigation
6      policies and procedures in place from 2013 to present.  Do you
7      see that?
8  A.  Yes.
9  Q.  Were you asked by Nationstar to be prepared to testify on
10     Nationstar's behalf regarding that topic?
11 A.  No, I was not.
12 Q.  Are you prepared to testify regarding Nationstar's knowledge
13     of this topic?
14 A.  No, I'm not.
15 Q.  Do you have any familiarity with Nationstar's loss mitigation
16     policies and procedures in place from 2013 to present?
17 A.  Yes, I do.
18 Q.  How did you obtain that understanding?
19 A.  Based on my work prior to my involvement in this case.
20          MR. WESTBROOK:  First of all, I would like to place
21     an objection on the record to the production of a witness who
22     is not capable and not prepared to testify regarding the
23     entirety of topic number 1.  That objection being stated, I
24     will proceed with certain questions along those lines with the
25     understanding that this witness is incapable of testifying on

Page 19

1      behalf of Nationstar regarding this topic.
2          MS. BAUCUS:  To counter that objection I would like
3      to say that this witness is fully prepared to testify as to
4      any and all loss mitigation related to these accounts that are
5      actually at issue in this lawsuit and he is here fully
6      prepared and willing to testify with regard to the relevant
7      topics here.
8  BY MR. WESTBROOK:
9  Q.  With respect to what your counsel just stated, she stated, and
10     I'm paraphrasing here, and hopefully I get this accurately,
11     she stated that you have prepared to testify on Nationstar's
12     behalf regarding loss mitigation policies and procedures that
13     would be applicable to the loans at issue in this case.
14          MS. BAUCUS:  Correction, I said loss mitigation
15     activities with regards to the loans in this case.
16          MR. WESTBROOK:  All right.
17 BY MR. WESTBROOK:
18 Q.  With that clarification, did what your counsel -- is what your
19     counsel said accurate?
20 A.  Yes.
21          MR. WESTBROOK:  Again, I have to place on the record
22     an objection to what I view as a unilateral modification of
23     the notice topics to change them from Nationstar's loss
24     mitigation policies and procedures to Nationstar's loss
25     mitigation activities in a particular instance.

Page 20

1          MS. BAUCUS:  Counsel, we have already addressed this
2      with the court in the motion to compel.  We are here prepared
3      with regard to the actual account at issue in this lawsuit.
4      Your objections are noted.  Our objections are noted.  But we
5      would like to continue the testimony, we are ready and willing
6      to testify with regard to the matters that are actually
7      relevant here, what happened with the two loans for Mr. and
8      Mrs. Craigie at issue in this lawsuit.
9          MR. WESTBROOK:  I am reserving all rights to file
10     motions to compel and for sanctions and for any other
11     appropriate relief.
12 BY MR. WESTBROOK:
13 Q.  Now, you are prepared to testify regarding Nationstar's loss
14     mitigation activities from 2013 and 2014 with regard to what's
15     called the Craigie loans.  Is that right?
16 A.  That's correct.
17 Q.  Did you do anything to prepare to testify on Nationstar's
18     behalf regarding that topic?
19 A.  Yes.
20 Q.  What did you do?
21 A.  I reviewed the documents that I previously testified to.
22     Yeah, I guess that's probably it above and beyond whatever
23     knowledge base I already had on the subject matter.
24 Q.  And did you speak to anyone aside from counsel?
25 A.  No.

Page 21

1 Q.  Do you have an understanding of who within Nationstar is
2    responsible for managing Nationstar's loss mitigation policies
3    and procedures?
4         MS. BAUCUS:  Objection, relevance.
5 A.  I don't think that it's a person.  And I don't -- but I don't
6    know who those persons are.
7 BY MR. WESTBROOK:
8 Q.  Is there a department?
9 A.  There is a loss mitigation department.  Yes, there is.
10 Q.  Do you know where that department is located?
11 A.  I don't think that it's located all in one place, but there
12    are portions of it that are located in Dallas where I work.
13 Q.  Do you know if there are written documents that explain
14    Nationstar's loss mitigation policies and procedures?
15 A.  Yes, there are.
16 Q.  Do you know if there are different loss mitigation policies
17    and procedures for different types of loans serviced by
18    Nationstar?
19 A.  Yes, there are.  There are a lot of different policies and
20    procedures on the loss mitigation subject depending on a
21    number of different factors.  One of those is the type of
22    loan.
23 Q.  All right.  What are other factors -- what are other factors
24    that come into play in different sets of loss mitigation
25    policies and procedures?

Page 22

1         MS. BAUCUS:  Counsel, I've already put my objections
2    on the record.  If you have any questions about loss
3    mitigation activities with regard to these accounts or any
4    matters relative to these accounts, he is ready and willing to
5    testify.  He will not be testifying per the court's order to
6    general policies and procedures.
7         MR. WESTBROOK:  We have a different understanding of
8    the court's ruling.  At the same time this is a Rule 30(b)(6)
9    deposition, I understand the objection to his testifying on
10    Nationstar's behalf regarding certain topics or parts of
11    certain topics, but he is also an individual and he can
12    testify as to his individual knowledge.
13         MS. BAUCUS:  He is not here pursuant to a subpoena
14    individually.  He's here being presented as Nationstar's
15    30(b)(6) witness and as such he is limited to that type of
16    testimony.  A subpoena for a witness will be treated
17    differently and, of course, that would have to be taken in
18    Dallas.
19         MR. WESTBROOK:  We will proceed to ask questions.
20    If you instruct him not to answer, that's your prerogative.  I
21    would like to proceed.
22 BY MR. WESTBROOK:
23 Q.  Aside from the type of loan, what are some of the factors that
24    come into play in determining which loss mitigation policies
25    and procedures would apply?

Page 23

1 A.  There are -- there are a number.  I am trying to recall
2    exactly what some of those would be.  It could be depending on
3    the type of loss mitigation program we are talking about.
4    There are individual policies and procedures depending on the
5    type of -- for even different types of loan modifications, for
6    a different sort of what we would call liquidation options.
7    Different states -- sometimes different states.  And for
8    different -- different loan statuses or conditions that the
9    loan may be in.  I am sure there are more than that, but those
10    are just things that are off the top of my head.
11 Q.  Are you familiar with the Home Affordable Modification Program
12    or HAMP?
13 A.  Yes, I am.
14 Q.  What is HAMP?
15 A.  HAMP, generally speaking, is a government-created loan
16    modification program in which individual lenders may or may
17    not participate, and it involves -- there are two -- within
18    the general HAMP umbrella there are different loan
19    modification programs that exist under that umbrella in which,
20    you know, a borrower may or may not qualify for with the
21    ultimate goal of helping the borrower stay in their home and
22    avoid foreclosure.  It's a foreclosure avoidance program.
23 Q.  Do some of the lenders that Nationstar works with participate
24    in HAMP?
25 A.  Some do.

Page 24

1 Q.  Others don't?
2 A.  That's correct.
3 Q.  With respect to loans serviced by Nationstar for lenders who
4    participate in HAMP, does Nationstar then participate in HAMP
5    as well?
6 A.  Nationstar administers any loan modification programs that the
7    investor for -- you know, who owns this loan or any loans --
8    whatever loan modification programs they participate in,
9    Nationstar administers.  That's probably not a very clear
10    answer.  Sorry.
11 Q.  I understand it I think.
12 A.  Okay.
13 Q.  Are Nationstar's loss mitigation policies and procedures
14    different for HAMP-eligible versus nonHAMP-eligible loans?
15 A.  I'm not sure if I'm able to answer that question only because
16    we are talking about different types of loan modification
17    programs, and so necessarily the rules of those programs
18    differ, and so the programs are different.  So there would be,
19    I suppose, different procedures.
20 Q.  Thinking back to the late 2013 time frame, did Nationstar in
21    that time frame have a policy of pursuing loss mitigation
22    options other than foreclosure when a homeowner was in default
23    on a mortgage loan?
24         MS. BAUCUS:  Objection.
25         Counsel, do you have any questions regarding the

Page 25

1    plaintiffs' accounts at question?

2          MR. WESTBROOK:  I have many questions regarding

3    those.

4          MS. BAUCUS:  Well, move on to those because we are

5    not discussing policies and procedures outside the accounts at

6    issue in this lawsuit.

7          MR. WESTBROOK:  Are you instructing him not to

8    answer the question?

9          MS. BAUCUS:  Absolutely.  Pursuant to the court's

10   order policies and procedures have already been argued about.

11   The court ruled we do not have to produce policies and

12   procedures.  It is improper to discuss these questions outside

13   the accounts at issue in this case.

14         MR. WESTBROOK:  Let's go off the record.

15         (Off the record 10:38 to 11:11 a.m.)

16   BY MR. WESTBROOK:

17   Q.  When we left off I had asked a question about Nationstar

18       policies and procedures regarding loss mitigation in the 2013

19       time frame and your counsel instructed you not to answer.  Do

20       you recall that?

21   A.  Yes, I do.

22         MR. WESTBROOK:  At this point I'm going to state a

23   reservation of rights to ask further questions about

24   Nationstar's policies and procedures regarding loss mitigation

25   regarding loan modification in the 2013 to 2014 time frame

Page 26

1    regarding the types of loans at issue in this case with

2    respect to the plaintiffs, Barbara and Bruce Craigie, with the

3    understanding that were I to ask those questions in advance of

4    the planned hearing with Magistrate Judge Carmody this

5    afternoon that those questions would be met with instructions

6    not to answer.  With that understanding, I will move forward

7    with a different line of questioning.

8    BY MR. WESTBROOK:

9    Q.  Do you have Exhibit 39 in front of you there still?

10   A.  Yes, I do.

11   Q.  Okay.  Great.  If you could turn to the second numbered page.

12       At the top is number 7.  Are you with me?

13   A.  Yes.

14   Q.  Topic 7 reads any and all foreclosure pre-sale checklists,

15       foreclosure-related affidavits, and any other pre-foreclosure

16       documents prepared during 2011 through 2014 and relating to

17       loans serviced by Nationstar for which Plaintiff Bruce Craigie

18       was listed as the borrower.  Do you see that?

19   A.  Yes.

20   Q.  Were you asked by Nationstar or its counsel to testify on

21       behalf of this topic?

22   A.  Yes, I was subject to whatever objection.

23         MS. BAUCUS:  Objection on the record consistent with

24   the discovery motion we have with the court that these are not

25   actual documents supported by the affidavit submitted by

Page 27

1    Nationstar to the court.

2    BY MR. WESTBROOK:

3    Q.  Are you prepared to testify regarding Nationstar's knowledge

4       of this topic?

5    A.  Yes, but just with the understanding of the information that

6       we submitted in an answer to this question -- or in the

7       objection about they are not -- here is my concern.  You asked

8       me are you knowledgeable about pre-sale checklists and

9       foreclosure affidavits when we submitted information saying

10      there isn't an actual written checklist or affidavit.  So,

11      subject to the information about that and about the entries in

12      the collection history profile, yes, I am prepared to discuss

13      those things.  I just don't want to say that I'm prepared to

14      discuss a document that doesn't exist is my only concern.

15   Q.  Understood.

16         MR. WESTBROOK:  I would like to mark this document

17   Exhibit 40, please.

18         (Marked for Identification: Exhibit 40.)

19   BY MR. WESTBROOK:

20   Q.  Exhibit 40 has a cover page on it that says Nationstar

21       Mortgage CTS notes.  Do you see that?

22   A.  Yes.

23   Q.  And then, turning to the next page, it appears to be a

24       computerized printout.  Is that fair?

25   A.  Yes.

Page 28

1    Q.  And at the top it says Nationstar Mortgage, LLC collection

2       history profile.  Right?

3    A.  That's correct.

4    Q.  Do you recognize the form of this document?

5    A.  Yes, I do.

6    Q.  What is it?

7    A.  What is the document?

8    Q.  Yes.

9    A.  It's the collection history profile that is created by

10      Nationstar.

11   Q.  With respect to a particular loan?

12   A.  Yes.

13   Q.  And in this instance in the upper left it says Bruce Craigie

14      1625 Lake Drive SE East Grand [sic] Michigan 49506.  Right?

15   A.  Yes.

16   Q.  Is that an indication of the -- there is also a loan number.

17      Right?

18   A.  That's correct.

19   Q.  That's an indication of what loan these notes would relate to.

20      Right?

21   A.  Yes.

22   Q.  That initialism CTS, what does that stand for?

23   A.  The one that is on the cover page?

24   Q.  Yes.

25   A.  I don't know.  I didn't make that.

Page 29

1  Q.  All right.  Is there a name for this type of information?

2  A.  I refer to it as the collection history profile.  Some people

3      may also call it the servicing notes.

4  Q.  Is there a computer system that produces these notes?

5  A.  Yes.

6  Q.  Do you know what that system is called?

7  A.  Yes, I do.

8  Q.  What is it called?

9  A.  It's called LSAMS, L-S-A-M-S.  It's an acronym and they told

10     us on like day one what it stood for, but nobody ever calls it

11     by its full name and I don't remember what it was.

12 Q.  Fair to say there are a lot of different initialisms and

13     acronyms used in your industry?

14 A.  That's fair.

15 Q.  What kind of information is contained in the collection

16     history profile or account notes?

17 A.  Broadly speaking, it is the place where activity that takes

18     place relative to a particular loan is documented.  And any

19     number of activities could be documented there.  And some of

20     the information is input by individuals, people.  Some of it

21     are entries that are made by computer.

22 Q.  In terms of what information is contained in notes like these,

23     would that information include instances in which a Nationstar

24     employee has contact with a borrower?

25 A.  That's correct.

Page 30

1  Q.  Would there be information about loss mitigation contained in

2      the account notes?

3  A.  That's correct.

4  Q.  Information about foreclosure activity?

5  A.  Yes.

6  Q.  Now, with respect to this particular loan, this loan number

7      596863530, with respect to this 1625 Lake Drive property, are

8      you aware that foreclosure proceedings took place with respect

9      to that property?

10 A.  Yes.

11 Q.  If you could turn with me, please, to page 44.  There is a

12     page number in the upper right.  And just so we are clear on

13     how this is formatted, does it generally proceed in

14     chronological order where earlier dates are at the top and

15     later dates are at the bottom?

16 A.  Let me look and see here.  Yes.  That appears to be the case.

17     I say that only with some hesitation because I have seen this

18     printed before where it was in reverse chronological order.  I

19     don't know how that happens, but I have seen it done that way

20     before too.

21 Q.  Sure.

22            This particular document, at least as it has been

23     produced here, appears to begin in October, October 17th,

24     2009, on the first page, and then the end of the report is

25     dated 3-26-2015.  Did I read that correctly?

Page 31

1  A.  That sounds right, but let me just -- 3-16 -- sorry,

2      3-26-2015, yes, so that's correct.

3  Q.  All right.  So looking at page 44, and there is a series of

4      different dated entries down the page.  Right?

5  A.  That's correct.

6  Q.  I would like you to look at the second row here, which starts

7      with initials of HMCF.  Do you see that?

8  A.  Yes.

9  Q.  Do you have an awareness of what that code means, the HMCF

10     code?

11 A.  Yes.

12 Q.  What does it mean?

13 A.  So for clarity maybe it would be easier for me just to kind of

14     explain not necessarily what -- part of answering your

15     question will explain how this works.  It might just be easier

16     for questions going forward and to answer this existing -- the

17     question you just posed.

18 Q.  Go ahead.

19 A.  So when an individual is entering information into LSAMS, for

20     the sake of ease and for the sake of uniformity, there are

21     sort of pre-populated or -- I don't know -- prefabricated

22     entries that exist in LSAMS to indicate that a certain

23     activity has taken place.  So when the person goes to make an

24     entry, they don't have to type HAMP FC certification complete,

25     they type in the code HMCF and it auto populates HAMP FC

Page 32

1      certification complete.  So any time you see that code, that

2      code is going to -- the entry of that code will populate the

3      larger title you will see.  For instance, if you look at the

4      entry just above that, PRDM equals -- it would create the

5      prerecorded dialer message long title, and then the individual

6      can enter in other notes beneath that if they would like to,

7      beneath that specific entry.

8  Q.  All right.  Is there a way to tell which part of an entry --

9      let's just take a hypothetical and assume that an entry has

10     both that sort of precoded entry and additional notes input by

11     a person.  Is there a way to tell which is precoded and which

12     is input specifically by the person?

13 A.  Yes.

14 Q.  How can you tell?

15 A.  Okay.  So let's go to the entry right beneath that, so this

16     active foreclosure - request new demand.  That is an auto

17     populated entry.  But the notes underneath, please redemand

18     this file as restart is needed, that entry is something that

19     was written individually by -- it's a customized entry written

20     by a person.

21 Q.  Okay.  Is it the positioning or is it the formatting, in this

22     instance lower case, for the specifically input information?

23 A.  I don't know about the upper case versus lower case.  I think

24     most of the auto whatever you want to call them, the title

25     entries, are typically all caps.  I feel like the minute I say

Page 33

1    they are all caps we will find one that isn't, but typically
2    it is.  But I would say to be as clear as possible it's
3    positionally.  The customized comments or notes are always
4    going to be underneath the heading entry.
5  Q.   All right.  Going to this entry that begins HMCF it appears to
6    be dated 2-11-13.  Right?
7  A.   Yes.
8  Q.   It says HAMP FC certification complete.  Did I read that
9    right?
10  A.   That's right.
11  Q.   What does HAMP FC certification complete mean?
12  A.   So as part of the foreclosure process when a property is
13    getting closer to a foreclosure sale an individual will go in
14    and there is a series of sort of -- I don't know if you want
15    to call them reviews of the loan that take place.  And once
16    they are -- and the purpose of that HAMP FC certification
17    review is to determine if there has been HAMP solicitation, if
18    the loan qualifies, and if there is any loss mitigation
19    activity pending on the file, and if they are -- and whether
20    or not the foreclosure process should be put on hold as a
21    result of qualifying loss mitigation activity.  So this
22    indicates that that review took place.
23  Q.   When a review indicated by this notation, HAMP FC
24    certification complete, gets placed, are there any documents
25    created?

Page 34

1  A.   And actually, sorry, I need to clarify my previous answer.
2    This particular entry, while it says HAMP, it really applies
3    more broadly to just loss mitigation activity occurring on the
4    loan.  So it may not necessarily be specific to a HAMP --
5    HAMP program in terms of the review.
6  Q.   The FC stands for foreclosure.  Right?
7  A.   Correct.
8  Q.   The HAMP FC certification as it's called here, is that a
9    document?
10  A.   No.
11  Q.   Can you tell from this entry who made this entry?
12  A.   Yes.  Well, I can't tell their entire name, but I can tell
13    that it's a person and their first initial is T and their last
14    name is Johnson.
15  Q.   So there is a code there TJohnson3.  Right?
16  A.   Correct.
17  Q.   That represents a Nationstar employee.  Am I right?
18  A.   Yes.
19  Q.   Beneath that there is it looks like another code that says
20    KS1034.  What is that?
21  A.   I don't know what that is, but that section relates to
22    identifying a person or persons who have worked on the loan.
23    So I don't know if -- I don't know.  I have not seen that
24    particular configuration or notation of an individual done
25    that way.

Page 35

1  Q.   Do you know if it's the identification of a Nationstar
2    employee?
3  A.   I don't know.
4  Q.   This entry, HAMP FC certification complete, indicates that
5    some action was performed?
6  A.   That's correct.
7  Q.   What action?
8        MS. BAUCUS:  Objection, asked and answered.
9  A.   That's what I was telling you a moment ago.  So this indicates
10    to me that a review of the loan had taken place to determine
11    if there was any pending loss mitigation activity that was
12    happening at the time such that the foreclosure process should
13    be put on hold.
14  BY MR. WESTBROOK:
15  Q.   Does this note reflect any result of that review?
16  A.   No, it just says that it was completed.
17  Q.   So it indicates that a review was performed, but it doesn't
18    indicate whether -- it doesn't indicate whether the
19    foreclosure should proceed or not proceed?
20  A.   That's correct.
21  Q.   What is the purpose of making the entry HAMP FC certification
22    complete?
23  A.   To notate the file that the review occurred.
24  Q.   Is there any documentation of the review?
25  A.   You mean in terms of whether or not the -- what the outcome of

Page 36

1    the review was?
2  Q.   Anything having to do with the review other than this note.
3  A.   The only -- the only thing that I know of other than this note
4    is there is a notation in our LPS system which says whether or
5    not the loan file was placed on hold or whether or not it
6    moved forward to foreclosure.
7  Q.   What is the LPS system?
8  A.   That LPS system is a tool that -- it is a web-based program
9    which is used for Nationstar to communicate with its outside
10    foreclosure counsel.  It also -- and in that system it keeps a
11    number of timelines relative to the foreclosure process and
12    then it also notes various sort of pass/fail steps that have
13    to be taken prior to the foreclosure.
14  Q.   Other information that might be entered into the LPS
15    system related to the entry HAMP FC certification complete, do
16    you know of any other place or system of documents that would
17    house information related to the HAMP FC certification?
18  A.   I do not.
19  Q.   Do you know of anyone else who would have greater knowledge
20    than yourself regarding the entry HAMP FC certification
21    complete and what it means?
22  A.   No.
23  Q.   Moving -- let me go back.
24        Do you have an understanding of how this HMCF or
25    HAMP certification complete is used by Nationstar?

Page 37

1  A.  Yes.

2  Q.  How is it used?

3  A.  Once the review is completed by the person at Nationstar they

4     make an entry into LSAMS indicating that the review is

5     complete.

6  Q.  Is there a particular department within Nationstar that's

7     responsible for performing HAMP FC certifications?

8  A.  There is a department that's responsible for making that

9     entry, and I want to say it's the foreclosure department, but

10    I can't remember specifically.

11 Q.  Are you aware that a law firm called Trott Law acted as

12    foreclosure counsel for Nationstar in connection with the Lake

13    Drive foreclosure?

14 A.  That sounds right.  I didn't spend a lot of time looking into

15    that, but that's consistent with my recollection.

16 Q.  All right.  And still on page 44 here, this page appears to

17    have entries that range in date from February 10th, 2013 to

18    February 22nd, 2013.  Is that accurate?

19 A.  Yes.

20 Q.  Now, I'll ask you to assume for the purposes of this question

21    that Trott Law's records indicate that they received a

22    foreclosure referral from Nationstar on February 18, 2013.  Is

23    there any indication in these notes that Nationstar referred

24    the loan for foreclosure on that date?

25 A.  There are a number of notes relative to the subject of

Page 38

1     foreclosure.  There is nothing that's listed on this page that

2     definitively tells me that it was referred to foreclosure as

3     of a certain date.

4  Q.  Is a notation normally made in the servicing notes on the date

5     a loan is referred by Nationstar for foreclosure?

6  A.  I have seen references to referrals to foreclosure on other

7     loans before, so I can't say across the board if it's -- if

8     it's always notated or not.  I have seen evidences where it's

9     not been notated, so I guess I would say that I have seen both

10    scenarios.

11 Q.  All right.  Moving down the page I'm looking at an entry

12    that's dated February 19, 2013.  It begins with the code RFCF.

13    Are you with me?

14 A.  Yes.

15 Q.  And the text is referral checklist fail items needed INT.  Do

16    you see that?

17 A.  I do.

18 Q.  What is a referral checklist?

19 A.  I know that there is -- prior to a loan going to foreclosure

20    somebody in the foreclosure department -- it is my

21    understanding it is the foreclosure department -- will

22    complete a review of the loan file to determine that it is

23    proper to be referred to foreclosure and then is responsible

24    for initiating that process of getting it to foreclosure

25    counsel, et cetera.  And so there is a review process that is

Page 39

1     completed.  In terms of a checklist I have never -- I'm not

2     aware of any checklist document that exists.

3  Q.  So to your understanding there is a department or a set of

4     employees that is responsible for doing some kind of review of

5     the account to determine whether a foreclosure is a correct

6     course of action?

7  A.  Maybe I should clarify because I don't think it is a question

8     of whether or not it's a correct course of action, per se, but

9     whether or not the file is ready.  Ready in the sense that all

10    of the documents and everything necessary, assignments,

11    anything that needs to be completed, that we have everything

12    on hand that we need to put the -- you know, move forward with

13    the foreclosure, that it's com- -- the file is complete and

14    ready to be handed over to foreclosure counsel.  Not whether

15    or not it's appropriate to go to foreclosure counsel in the

16    sense of do we want to foreclose on this person or not.

17    That's not the kind of decision they are making.  It's really

18    whether or not this document packet is complete and ready to

19    go over to foreclosure counsel or does something else need to

20    be executed or, you know, obtained or something along those

21    lines.

22 Q.  All right.  Are those personnel working from a list of items

23    that are needed in order to approve the checklist?

24 A.  There are -- yes.  I mean, in a sense there are a number of

25    items that need to be in place before the loan can be

Page 40

1     forwarded to -- the file can be forwarded to foreclosure

2     counsel.

3  Q.  Now, is there a documented list of the items that are needed

4     for a referral checklist?

5  A.  I have never reviewed any document.  I believe -- I want to

6     say that there is some sort of procedure that's -- that exists

7     that governs that, that process.

8  Q.  Do you know if the list is stored in electronic form rather

9     than paper document form?

10 A.  Because I have never seen it, I can't tell you.

11       MS. BAUCUS:  Object to the extent it

12    mischaracterized the witness saying there was a list.  He has

13    said there is some type of procedure.  He has never seen a

14    list.

15 BY MR. WESTBROOK:

16 Q.  Now, that entry, referral checklist fail, what does it mean

17    for a referral checklist to fail?

18 A.  Usually that would mean that there is some part of the packet

19    that still needs to be finished or it's in some way incomplete

20    or something else needs to be done.

21 Q.  All right.  That's consistent with the note that follows that

22    says items needed.  Right?

23 A.  It does say items needed.  Yes.

24 Q.  The lettering underneath it says INT.  Do you know what that

25    stands for?

Page 41

1  A.  I don't.  I have not seen that shorthand before.

2  Q.  The very next item on the document starts FCEX, it is dated

3      February 19, 2013, and then the narrative is foreclosure

4      exception review added 08 due to 41 PMTS DLQ.  Do you see

5      that?

6  A.  Yes.

7  Q.  What does that entry mean?

8  A.  I did see this before and I attempted to conduct some research

9      on this, however, I wasn't able to get a conclusive answer.

10     But, to the best of my ability, you know, from what it looks

11     like to me, that the 08 code was added to the loan.  This is

12     what I would interpret.  However, the coding on this loan has

13     since changed and so there is no longer an 08 code or any of

14     these codes on this loan.  So I can't tell if that was added

15     as of that time.  Our system doesn't track our coding by

16     certain dates unless there is a note made like this.  So

17     that's what I read this to believe -- or read this to say.

18 Q.  All right.  The phrase foreclosure exception review, what does

19     that mean?

20 A.  I have not seen that particular entry before.  I don't know.

21     I don't think that this is one that we are currently using

22     anymore.  I am not as familiar with it.  Frankly, I am more --

23     this entry -- the added 08 section below it really tells me

24     more than just the title caption.  So I -- but I don't know

25     definitively.

Page 42

1  Q.  All right.  Is there any -- I mean, let me back up.

2          Here we are talking about the early 2013 time frame.

3          Right?

4  A.  Yes.

5  Q.  Is there any means that anyone within Nationstar might have of

6      looking back at these codes, the FCEX code, the longhand form

7      foreclosure exception review, and interpreting what those

8      meant in the 2013 time frame?

9  A.  I don't know, but I can tell you that the person, if they were

10     to review this, would be doing the same thing I am doing.  And

11     the foreclosure exception review portion is, frankly, not

12     important.  What's important is what is written beneath it.

13     This added 08, this is what somebody actually did.  And this

14     08 code, I read this to believe that an 08 code was added to

15     the account.  So a code -- codes are added to the account

16     to do -- to indicate some sort of status change on the

17     account.  So, for instance, a code 91 on the account indicates

18     that it's involved in litigation.  There are a bunch of -- a

19     whole host of codes and they are status codes that tell you

20     what the current status of the loan is.  So I read this to say

21     that an 08 code was added to the loan.

22 Q.  And that 08 code, you don't know what that code means?

23 A.  You know, it's sort of embarrassing because I see 08 codes on

24     loans relatively often, but there are a number of codes.  I'm

25     sure we can get you that information.

Page 43

1  Q.  All right.  So there may be a list of codes somewhere or a

2      database of codes, something like that, that would indicate

3      what the 08 code stands for?

4  A.  Yes.

5  Q.  All right.  Turning to the next page, page 45, and looking

6      about halfway down the page there is an entry that is dated

7      February 27, 2013 that starts with the code FILE, F-I-L-E.

8      Are you with me?

9  A.  Yes.

10 Q.  It says file reviewed.  Do you see that?

11 A.  Yes.

12 Q.  It says file reviewed, and then underneath in lower case

13     letters it says awaiting missing mod docs.  Right?

14 A.  That's right.

15 Q.  That first part, file reviewed, what does that mean?

16 A.  It means that somebody reviewed the file.

17 Q.  Does it indicate why the file was reviewed?

18 A.  Nope.

19 Q.  Is there a way of determining from adjacent entries or

20     anything above or below it why the file was reviewed?

21 A.  The only way to determine that would be to look at what is

22     written beneath file reviewed, which says awaiting missing mod

23     docs, which indicates to me that the file was reviewed to

24     determine the status of the loss mitigation efforts.

25 Q.  Other than a situation in which Nationstar is awaiting missing

Page 44

1      modification documents, are there other situations in which

2      that file reviewed narrative would be used in the notes?

3  A.  I feel like I have just typically seen it when it comes to

4      reviewing loss mitigation efforts on the file.  I suppose

5      there could be other circumstances, but that's all I can think

6      of.

7  Q.  Do you know if that narrative file reviewed is exclusively

8      used when foreclosure proceedings have already started or

9      not?

10 A.  Well, because I only review loans that are in default and

11     typically after the foreclosure process has begun, that's --

12     that's the only context I have ever reviewed them in or seen

13     them in.  I don't know if they are used on performing loans.

14     I guess I have never seen it.

15 Q.  The note in lower case awaiting missing mod docs, can you tell

16     from that entry whether a modification application had been

17     submitted by the borrower?

18 A.  I am reading it the same way you are.  It just says awaiting

19     missing mod docs.  That indicates to me that there are -- you

20     know, that there are missing mod -- modification -- mod docs

21     from -- oh, I see what you are asking.  Sorry.  Let me

22     clarify.

23          That would indicate to me that there had been some

24     submission by the borrower and that it was either missing

25     documents or the documents were incomplete in some way and

1    that we were waiting on them to be sent in.

2 Q.   Okay.

3 A.   Corrected documents.

4 Q.   Turning to page 47 if you would.  There is a few dated 3-18 --

5      there is two dated 3-18-13.  I'm looking at the one that

6      starts LRVW.  Are you with me?

7 A.   Yes.

8 Q.   The text says loan reviewed by manager - see comments, and

9      then underneath in lower case it says reviewed file for agents

10     activity.  Do you see that?

11 A.   Yes.

12 Q.   What does it mean for a loan to be reviewed by a manager?

13 A.   That means that a manager typically in loss mitigation will

14     take a look at the loan and they could review it for any

15     number of reasons, but it just indicates that a manager has

16     reviewed the loan.

17 Q.   Can you tell from this complete entry the reason for this loan

18     being reviewed by a manager on 3-18-2013?

19 A.   It says reviewed file for agents activity.  That's what it

20     says.

21 Q.   And are you able to interpret what that means?

22 A.   Never seen that entry before.  I mean in any other context.

23     I'm not sure what they are referring to in terms of agents.

24 Q.   Foreclosure counsel would be considered an agent of

25     Nationstar.  Is that right?

1          MS. BAUCUS:  Objection, calls for a legal

2      conclusion.

3 A.   I don't know.  Like I said before, I don't know what they are

4      referring to in terms of agents, so I don't know if that was

5      referring to foreclosure counsel or not.

6 BY MR. WESTBROOK:

7 Q.   Can you tell what information is -- or do you know what

8      information would be reviewed during the loan review by a

9      manager?

10 A.   No, I guess I don't.

11 Q.   The top line of the entry reads in full loan reviewed by

12     manager - see comments.  Right?

13 A.   Correct.

14 Q.   What does see comments refer to?

15 A.   The information that's entered below the heading, so in this

16     case reviewed file for agents activity, would be what it's

17     referring to.

18 Q.   Is it your testimony that see comments refers to nothing other

19     than the narrative that's directly below it?

20 A.   Yes.

21 Q.   There is no other set of comments in some other system that is

22     referred to by the see comments entry?

23 A.   That's correct.

24 Q.   In other instances in the notes document we see a line in all

25     caps and then occasionally a line underneath it that's

1      generally not in all caps.  Is that fair?

2 A.   That's fair.

3 Q.   It doesn't always say see comments, does it?

4 A.   That's correct.

5 Q.   Why does it say see comments here?

6 A.   I can only interpret that for the obvious reason, that it

7      wants you to look at the comments below the header.

8 Q.   There appear to be two different, for lack of a better term,

9      employee codes to the left on this particular entry on

10     3-18-2013.  Am I correct about that?

11 A.   That's correct.

12 Q.   There is TJohnson3.  We have seen that a few times in this

13     document already.  Right?

14 A.   Yes.

15 Q.   Then directly under that RColeman.

16 A.   Yes.

17 Q.   Can we tell from this who is responsible for making this

18     entry?

19 A.   My understanding is that it would be -- as far as I know it is

20     TJohnson.  I'm not sure in this instance what RColeman -- I

21     guess I don't -- let me rephrase.  I don't know definitively

22     what each of their respective roles were in terms of making

23     this entry.  I don't know if one is a supervisor over the

24     other.  I'm not certain.

25 Q.   All right.  Is it fair to say that either the employee

1      represented by TJohnson3 or the employee represented by

2      RColeman made this entry?

3 A.   Yes.

4 Q.   One of them entered that notation see comments.  Right?

5 A.   They entered -- they entered the entire -- one of them was

6      responsible for this entire entry, which includes the portion

7      see comments.

8 Q.   All right.  And without asking these people what see comments

9      means, can you interpret what see comments means?

10          MS. BAUCUS:  Objection, asked and answered.

11 A.   Didn't you already ask me this question?  I mean, I can answer

12     it again if you would like, but the most obvious answer is

13     that it refers the person to the information that is listed

14     below the header where in this case it says reviewed file for

15     agents activity.

16 BY MR. WESTBROOK:

17 Q.   Has any of your job responsibility ever included working

18     directly with the computer systems that generate these

19     collection history profiles?

20 A.   Yes.

21 Q.   Is that in your current position?

22 A.   Yes.

23 Q.   Have you ever made entries into this system?

24 A.   Yes, I have.

25 Q.   Have you ever made entries into the system regarding loan

Page 49

1    reviews?
2  A.  Loan -- the loan reviewed by manager?
3  Q.  Right.
4  A.  No.
5  Q.  Have you ever made the entry see comments?
6  A.  No.  That -- maybe I can be a little clearer just for the sake
7     of any more questions you might have.  That loan reviewed by
8     manager, when the person inputs the code LRVW it populates
9     loan reviewed by manager - see comments.  That auto populates.
10    Then the person can write beneath the note.  So I have never
11    done an entry.  I have never typed in the LRVW which populates
12    loan reviewed by manager - see comments.  I have never done
13    that before.
14  Q.  Now, is it your testimony that that loan reviewed by manager -
15    see comments is auto populated when the LRVW code is entered,
16    is that based on your understanding that specific inputs by a
17    Nationstar employee always appear on the following line?
18  A.  That's correct.
19  Q.  Moving down two entries, there is one dated 3-19-13.  Again,
20    it says file reviewed and then underneath in lower case loan
21    in review for loan mod.  Do you see that?
22  A.  Yes, I do.
23  Q.  What does loan in review for loan mod mean?
24  A.  That there is -- that there is loss mitigation activity
25    occurring on this loan that is in progress.

Page 50

1  Q.  Now, this particular entry at least doesn't tell us what the
2     result of the review was, right, if there was one?
3  A.  That's correct.
4  Q.  All right.  Turning to the next page, which is page 48, the
5     very top entry is dated 3-27-13.  Do you see that?
6  A.  Is this the loan reviewed by manager entry?
7  Q.  Yes.
8  A.  Yes, I see it.
9  Q.  It says loan reviewed by manager - see comments.  We have seen
10    one just like that just a moment ago, but underneath it has
11    different language that says file should have response on
12    title and flood by 3/29 the latest.  If not escalation needed.
13    Do you see that?
14  A.  Yes, I do.
15  Q.  Do you have an understanding of what that notation means?
16  A.  Obviously this is shorthand, so I can't tell in detail what
17    was occurring, but I read this as there being some sort of
18    issue with either title insurance or something having to do
19    with the title.  And in terms of flood -- here is my
20    hesitation.  The most clear answer to this that I can tell, my
21    interpretation would be that there was some outstanding issue
22    with title and/or flood, probably insurance, that needed to be
23    resolved by a certain date.  However, there is also a -- well,
24    that will be my complete answer.
25  Q.  All right.  The very next entry is also dated 3-27-13 and has

Page 51

1     the code OIFR.  Are you with me?
2  A.  I'm sorry, what date is this?
3  Q.  3-27-13.
4  A.  Yes.
5  Q.  That says OCC independent foreclosure review.  Do you see
6     that?
7  A.  Yes.
8  Q.  What does OCC independent foreclosure review mean?
9  A.  This is a review that is completed of the loan file to
10    determine its current status and whether or not it is
11    appropriate to move forward to foreclosure.  This usually has
12    to do with a review of the loss mitigation status on the loan.
13  Q.  Do you know what the initials in OCC stands for?
14  A.  I don't recall.
15  Q.  Do you know of anyone else at Nationstar who would know the
16    answer to that?
17  A.  I don't know, but I'm sure we could probably find out.
18  Q.  Can you tell who conducted this OCC independent foreclosure
19    review?
20  A.  No, other than the entry is made by TJohnson3.
21  Q.  OCC independent foreclosure review, to your understanding,
22    that something that is performed internally at Nationstar?
23  A.  To my knowledge, yeah.
24  Q.  Do you know if there are any policies or procedures that
25    govern how an OCC independent foreclosure review was supposed

Page 52

1     to be performed?
2  A.  I don't know.  I have not made an attempt to review any
3     policies or procedures relative to that subject.
4  Q.  You don't have any independent understanding yourself?
5  A.  That's correct.  Well, I'm trying to remember.  My
6     recollection is that this has to do with -- that this is a
7     loss mitigation review, a review of the loan file to determine
8     if there is -- if it's appropriate to move forward with
9     foreclosure and if there is any mitigation happening on the
10    file it's my recollection, but, frankly, I haven't come across
11    this entry or anything related to it in some time.
12         MS. BAUCUS:  Continuing objection on policies and
13    procedures.  I don't need to raise it every time.
14         Let's take a five-minute break.
15         MR. WESTBROOK:  All right.
16         (Off the record 12:02 to 12:13 p.m.)
17  BY MR. WESTBROOK:
18  Q.  Before we leave that particular line we were on just a moment
19    ago, the 3-27-13 line that said OCC independent foreclosure
20    review, is there a way of telling from this entry or this
21    document what the result of that foreclosure review was?
22  A.  I am able to determine what the status of the loan was as of
23    that time, but I am not able to -- based on looking at this
24    document, but I am unable to determine, per se, what the
25    outcome of any review was.

1  Q.  Is there another document that could be consulted to determine

2      what the result of the foreclosure review was?

3  A.  No.

4  Q.  Another computer system?

5  A.  No.

6  Q.  Is the result of an OCC independent foreclosure review

7      recorded by any means other than this entry in the notes?

8  A.  To my knowledge, no.

9  Q.  What is the purpose of the entry OCC independent foreclosure

10     review then?

11 A.  Just to notate that it took place.

12 Q.  No other evidence of it taking place other than this line of

13     OCC independent foreclosure review?

14 A.  Yes, that's fair.

15 Q.  So a Nationstar employee does a foreclosure review, there is

16     some measure of work involved in that, but there is no

17     evidence of them having performed that work other than someone

18     entering a line in the notes?

19         MS. BAUCUS:  Objection, assumes facts not in

20     evidence and compound question, form.

21         Go ahead and answer if you can.

22 A.  Yes, that's fair.  I mean in terms of that being the only

23     place that there would be an entry.

24 BY MR. WESTBROOK:

25 Q.  I see on this entry next to the right of the narrative OCC

1      independent foreclosure review is the letter N.  Do you see

2      that?

3  A.  I do.

4  Q.  Do you have an understanding of what that stands for?

5  A.  No, I don't, but I can tell you that I don't think that its

6      appearance is material.

7  Q.  Some entries have an N to the right of them and some don't.

8      Is that fair?

9  A.  That's fair.

10 Q.  But you are not aware of what it means?

11 A.  That's correct, but I can also tell you that I don't need it

12     to determine what a particular entry means or doesn't mean.

13 Q.  If you turn, please, with me to page 52, at the very bottom of

14     the page is an entry dated 5-28-13 that starts FTKB.  Are you

15     with me?

16 A.  Yes.

17 Q.  The narrative says FT underwriting to processing all in caps,

18     underneath that 1, tax return with all schedules signed by the

19     borrower.  This apparently goes on to the next page.  2,

20     updated P&L to make sure she is able to contribute to the

21     mortgage (Jan-April or possibly May 2013).  Did I read that

22     correctly?

23 A.  Yes.

24 Q.  The entry FT underwriting to processing, what does that

25     mean?

1  A.  This indicates that this is a note from the underwriting

2      department to a person in loss mitigation indicating that

3      there are -- the packet received by the borrower has been

4      reviewed by the underwriting department or I should say

5      examined by the underwriting department, and there are

6      inadequacies with it which are listed below.

7  Q.  Okay.  That first initials, FT, do you know, does that have a

8      particular meaning?

9  A.  This is not -- I don't know exactly.  I mean this was a First

10     Tennessee loan.  I don't know.  We don't use this -- this

11     particular heading isn't used anymore, so I'm not sure if

12     that's what its purpose was at the time, but, nevertheless,

13     this is a note from the underwriting department.

14 Q.  All right.  Now, at page 53 just two entries down there is one

15     dated 5-29-12 that begins NHMD.  Are you with me?

16 A.  Yes.

17 Q.  It says non-HAMP missing doc notice sent.  Did I read that

18     correctly?

19 A.  Yes, that's correct.

20 Q.  Do you have an understanding of what that entry means?

21 A.  Yes, I do.

22 Q.  What's your understanding?

23 A.  That a notice would have gone out to the borrower from

24     Nationstar at or about that date and time -- or I should say

25     at or about that date that would have informed the borrower

1      that we had received their application for a loan

2      modification, but it had missing documents or the documents

3      she submitted weren't adequate in some form and would have

4      informed her of what the problems were and what she needed to

5      send in.

6  Q.  And that first hyphenated term, non-HAMP, does that indicate

7      to you that the modification program that was being discussed

8      was not the Home Affordable Modification Program, but rather a

9      different type of modification program?

10 A.  Yes.

11 Q.  Are you familiar with the Bank of New York Mellon Trial Period

12     Program?

13 A.  I am aware that that was what the borrower in this case was

14     being reviewed for, but I haven't spent any time going through

15     the particulars of the program.

16 Q.  To your understanding was that program a non-HAMP program?

17 A.  Yes.

18 Q.  That entry, non-HAMP missing doc notice sent, has the code for

19     TJohnson3 and then underneath it it has XX.  Do you see

20     that?

21 A.  I do.

22 Q.  Do you know what that XX entry stands for?

23 A.  I do not.

24 Q.  Do you know if it is an employee code or a systemic code?

25 A.  I am not aware of it being either of those things.

Page 57

1 Q.  All right.  Turning to page 55, nearly at the bottom of the
2      document there is an entry dated 7-02-13.
3 A.  Yes.
4 Q.  That begins VACP.  The entry says vacant property notes.
5      Received email from Trott Law REQ, R-E-Q, sale date INSP,
6      I-N-S-P, order placed by/SG.  Do you see that?
7 A.  Yes.
8          MS. BAUCUS:  I'm sorry, I am not seeing it.  Can you
9      tell me what page you are on again.
10         MR. WESTBROOK:  55.
11         MS. BAUCUS:  Okay.  And where on the page?
12 BY MR. WESTBROOK:
13 Q.  July 2nd, 2013.
14 A.  I think it's under the redaction.
15         MS. BAUCUS:  How do you not -- your copy is not
16     redacted?
17         MR. WESTBROOK:  This copy is not redacted.
18         MS. BAUCUS:  Okay.  So where did you get that copy?
19         MR. WESTBROOK:  This was produced pursuant to
20     subpoena prior to this case being started.
21         MS. BAUCUS:  Hmm.  Okay.  Well, I object to
22     attorney-client privilege.
23 BY MR. WESTBROOK:
24 Q.  All right.  This vacant property notes, do you know what that
25     stands for?

Page 58

1 A.  It is a heading that is -- it's a heading.  It's an entry
2      heading, which I would expect notes to follow to explain the
3      purpose of its entry.
4 Q.  Do you have any understanding as to what that entry vacant
5      property notes refers to independent of what is underneath
6      it?
7 A.  Typically they would -- I'm hesitating only because it seems
8      so obvious to me, but maybe it's not.  So I would expect
9      beneath that there to be notes about a property which is
10     vacant.  That's what I would expect to see.
11 Q.  All right.  You don't have any understanding that this
12     property, 1625 Lake Drive, was actually a vacant property, do
13     you?
14 A.  No, I don't have any knowledge about it being vacant.
15 Q.  All right.  The note underneath looks like received email from
16     Trott Law maybe requesting sale date INSP order placed.  Do
17     you have an understanding of what that means?
18         MS. BAUCUS:  Objection, attorney-client privilege.
19         THE WITNESS:  Am I allowed to answer?
20         MS. BAUCUS:  Do you have any understanding?  Let me
21     see this.  Excuse me.  I don't have a full copy in front of
22     me.
23         Okay.  I have to go off the record.
24         MR. WESTBROOK:  Well, I have a question pending.
25         MS. BAUCUS:  I'm speaking with my client about

Page 59

1      attorney-client privilege.  There has been some error in
2      production here, so I need to clarify what occurred here
3      before we can respond.
4          MR. WESTBROOK:  I think what has occurred is the
5      privilege has been waived by production of this document
6      without any redactions in it.  Therefore, I don't think there
7      is a privilege that attaches to it.  With that being said, go
8      ahead.
9          (Off the record 12:26 to 12:26 p.m.)
10         MS. BAUCUS:  Back on the record.  Objection to
11     attorney-client privilege.  I am instructing my client not to
12     answer any questions about the redacted entry from
13     Nationstar's production, which is on page Nationstar 00343.
14         MR. WESTBROOK:  This document isn't redacted.  It
15     was produced with the words received email from Trott Law
16     request a sale date inspection order placed by/SG.  I object
17     to the instruction not to answer.  If there is any
18     attorney-client privilege involved in this it has been waived.
19     I suppose we will move on.
20 BY MR. WESTBROOK
21 Q.  The next page, page 56.  The first entry on the page is dated
22     7-10-13.  It has the prefix LRVW.  Do you see that?
23 A.  Yes.
24 Q.  The text entry says loan reviewed by manager - see comments.
25     Underneath it says REC OCC sent to, it looks like,

Page 60

1      L-H-o-h-m-a-n to complete.  Do you see that?
2 A.  Yes.
3 Q.  Do you have an understanding of what the narrative underneath
4      that first line below that's not in all caps, what that
5      means?
6 A.  Yes.
7 Q.  What does it mean?
8 A.  That this particular manager sent or, I guess, received the --
9      my understanding is that this is the -- this is the OCC
10     review, that it was received and sent to LHohman to complete,
11     for that person to complete that task, to complete the review.
12 Q.  All right.  And that term OCC, you don't have an understanding
13     of what that stands for?
14 A.  I -- this is one of these foreclosure reviews that's
15     completed.  I don't remember what the term stands for.
16 Q.  All right.  The following --
17 A.  I am sure we can find out.
18 Q.  The following entry is also dated 7-10-13.  It says CSVC and
19     then the entry is OCC checklist complete.  Do you see that?
20 A.  Yes.
21 Q.  And is it your understanding that there is a document or an
22     electronic set of information that is referred to as an OCC
23     checklist?
24 A.  No, I'm not aware of any such document.
25 Q.  Does it appear that this entry was made by someone who goes by

Page 61

1    the code LHohman, L-H-o-h-m-a-n?
2  A.  Yes.
3  Q.  Other than an entry made in the notes OCC checklist complete,
4    is there any evidence of an OCC checklist having been
5    completed?
6  A.  No.
7  Q.  Moving two entries down there is one dated 7-15-13.  It starts
8    FTFD.  Do you see that?
9  A.  FTFD, yes.
10  Q.  Yes.  It looks like it says FTN FC review was denied.  Do you
11    see that?
12  A.  Yes.
13  Q.  What does that entry mean?
14  A.  I read this to be First Tennessee foreclosure review was
15    denied.  There was some -- there was a review of the loan that
16    was completed and that it was not -- it was not allowed to
17    move forward to foreclosure sale or further in the foreclosure
18    process.
19  Q.  All right.  To your understanding is there any other
20    documentation, aside from the entry here in these notes, that
21    would evidence a foreclosure review?
22  A.  No.
23  Q.  Is there an indication here in the notes as to why the
24    foreclosure review was denied?
25  A.  No.

Page 62

1  Q.  Do you know if there is an indication anywhere else that would
2    indicate why the foreclosure review was denied?
3  A.  There may be information in LPS which would, that indicates
4    why the sale date was postponed or the foreclosure process was
5    placed on hold.  I don't know.  I didn't -- I didn't look for
6    this particular date.
7  Q.  All right.  Looking at the following page, which would be 57,
8    near the bottom there is an entry dated 8-19-13 that starts
9    MISC.  Are you with me?
10  A.  MISC, yes.
11  Q.  The narrative there looks like FC OCC review RCVD and it looks
12    like completed in LPS.  Do you see that?
13  A.  Yes.
14  Q.  What does FC OCC review received and completed in LPS mean?
15  A.  I read that as a notation indicating that this foreclosure
16    review process had been completed again and was indicated as
17    completed in LPS.
18  Q.  What does it mean for the FC OCC review to be completed?
19  A.  As I mentioned earlier there are -- throughout this -- you
20    know, throughout the stage that -- throughout the period that
21    a loan is in foreclosure, particularly if it's hanging in
22    foreclosure for an extended period of time, there will be
23    multiple reviews completed to determine if it is okay for this
24    loan to move forward to foreclosure sale.  This to me
25    indicates that this review was completed, and that was the

Page 63

1    purpose of the review.
2  Q.  All right.  Does completed indicate one way or another whether
3    the -- what the result of the review was?
4  A.  No, I'm not able to determine that from that entry.
5  Q.  Okay.  Now, you mentioned that there is another system called
6    LPS before.  Right?
7  A.  That's correct.
8  Q.  What kind of information is housed in the LPS system?
9  A.  The LPS system is a foreclosure tool.  It's a program -- it's
10    a web-based program that organizes and tracks essentially the
11    foreclosure process and is a communication between Nationstar
12    and its foreclosure counsel.  Only those two entities have
13    access to it and it allows them to exchange information and
14    communication about the foreclosure process.
15  Q.  Other than for communicating between Nationstar and its
16    foreclosure counsel, are there any other uses to which
17    Nationstar puts the LPS system?
18  A.  No.
19  Q.  Is information from the LPS system used internally at
20    Nationstar?
21  A.  It is used by Nationstar personnel, yes.
22  Q.  Have you reviewed any LPS records in preparation for this
23    deposition?
24  A.  I have looked at the LPS information pertaining to this
25    particular one, yes, I have.

Page 64

1  Q.  And what information did you review?
2      MS. BAUCUS:  Objection, LPS is subject to
3    attorney-client privilege.  It is communications between
4    Nationstar and its foreclosure counsel.
5      I am instructing my client not to answer that
6    question.
7  BY MR. WESTBROOK:
8  Q.  LPS contains data compiled by Nationstar.  Right?
9      MS. BAUCUS:  Objection, attorney-client privilege.
10    I am directing my client not to answer that
11    question.
12  BY MR. WESTBROOK:
13  Q.  LPS contains information compiled by Nationstar with respect
14    to potential foreclosures on loans.  Right?
15      MS. BAUCUS:  Objection, attorney-client privilege.
16    I am directing my client not to answer.
17  BY MR. WESTBROOK:
18  Q.  Can you tell me why you consulted the LPS system in
19    preparation for this deposition?
20      MS. BAUCUS:  Objection, attorney-client privilege.
21    I am directing my client not to answer any questions
22    regarding LPS.  It is a communication system between
23    Nationstar and its counsel.
24  BY MR. WESTBROOK:
25  Q.  Is there any factual information contained within the LPS

Page 65

1  system?
2        MS. BAUCUS:  Objection, attorney-client privilege.
3  Directing my client not to answer.
4        MR. WESTBROOK:  It probably goes without saying, but
5  I object to the instruction not to answer questions regarding
6  whether there is factual information and what that factual
7  information contained within the LPS system is.  I am going to
8  reserve all rights in that respect.
9  BY MR. WESTBROOK:
10 Q.  Looking at page 58, there is an entry near the bottom that's
11     dated 9-06-13 and the narrative below the date says case open
12     since Aug, August, 2012 for mod review missing docs.  Do you
13     see that?
14 A.  Yes.
15 Q.  What does this entry mean?
16 A.  This entry means that there has been a loss mitigation process
17     open since August of 2012 and that it's current status is that
18     there are missing documents.
19 Q.  Can you tell what the function of this entry is.
20 A.  To indicate that the file was reviewed and what the result of
21     that review was relative to the status of the loss mitigation
22     process or loan modification process.
23 Q.  Now, the purpose for making an entry like this is to
24     communicate information within Nationstar.  Right?
25        MS. BAUCUS:  Objection, that assumes facts not in

Page 66

1  evidence.
2        Go ahead and answer.
3  A.  The purpose of this entry is to indicate that an action took
4     place.
5  BY MR. WESTBROOK:
6  Q.  Right.  But what's the necessity of indicating that that
7     action took place?  It is supposed to be used by someone else
8     later on.  Right?
9        MS. BAUCUS:  Objection, assumes facts not in
10    evidence.
11       Go ahead and answer.
12 A.  I don't think that there is a -- it's not information that is
13    waiting on somebody else to take action.  It's simply so that
14    somebody who is looking at this loan can determine what
15    actions took place relative to this loan.  And in this case
16    they could determine that the file was reviewed and what the
17    status of the loan modification application was as of that
18    date.
19 BY MR. WESTBROOK:
20 Q.  All right.  There is also a parenthetical in this entry that
21    says G-a-m-e-C-h-n-g-r-s.  It looks like a shorthand form of
22    GameChangers.  Do you see that, that word?
23 A.  Yes, I do.
24 Q.  Do you know what that means?
25 A.  GameChangers is a program that is used by our loss

Page 67

1  mitigation/collections department and -- but I don't have
2  access to that program.  I have not -- I never worked in that
3  department.  I have never been trained on that program.  I
4  don't know the significance of an ID number in terms of that,
5  use of that program, but I do know that that program is used
6  by those departments.
7  Q.  Do you know what kind of information is contained in the
8     GameChangers system?
9  A.  Because I have never used it, I can't say, you know,
10    comprehensively, you know, what all -- what all information is
11    contained in it except for I know generally it is used for
12    collections efforts.
13 Q.  Do you know who has access to that, to the GameChangers
14    system?
15 A.  I don't.  I don't have a comprehensive departmental or
16    personnel list of who would have or not have access to it
17    other than to say that I know what its general purpose is.  I
18    know that those departments, as I mentioned earlier, have
19    access to it.  Outside of that I don't know who has access to
20    it.  I do not have access to it.
21 Q.  All right.  Is it fair to assume that if there -- in these
22    notes if there is a GameChangers ID with an ID code behind it
23    that there is some kind of entry in the GameChangers system
24    related to this loan?
25 A.  That's fair.

Page 68

1  Q.  But as you sit here today you don't know what that entry might
2     be based on the code?
3  A.  I would say that I don't.  I don't know.  Based on the code I
4     can't tell definitively and I also can't say that any
5     information that is contained in GameChangers isn't also
6     information that is listed in LSAMS.
7  Q.  It may or it may not be.  Right?
8  A.  That's correct.
9  Q.  Do you know if there is any kind of list or guide to what the
10    GameChangers ID codes mean?
11 A.  I don't know.  Like I mentioned, I have not been trained to
12    use that program.
13 Q.  Moving to page 59.  Midway down the page there is an entry
14    that is dated 9-24-13.  It starts with CSVC.  And the
15    narrative underneath says RCVD OCC checklist - - EMLD to
16    NJohnson.  Are you with me?
17 A.  I am.
18 Q.  It looks to me like it is received OCC checklist emailed to
19    NJohnson.  Am I off base there?
20 A.  No, that is fair.
21 Q.  NJohnson, to your understanding is that an employee code for a
22    Nationstar employee?
23 A.  Yes.
24 Q.  And we have discussed what an OCC checklist is before.
25    Right?

Page 69

1  A.  Correct.

2  Q.  And it was your testimony that OCC checklist is not a

3      document.  Right?

4  A.  That's my understanding, yes.

5  Q.  It appears that this entry is indicating that something called

6      an OCC checklist was emailed to someone called NJohnson.

7      Right?

8          MS. BAUCUS:  Objection, argumentative and assumes

9      facts not in evidence.

10 A.  Again, I can see what you are saying, so just that this

11     individual received the OCC checklist and it says emailed to

12     NJohnson.

13 BY MR. WESTBROOK:

14 Q.  All right.  If somebody received an OCC checklist it would

15     indicate that there is something that is represented by an OCC

16     checklist.  Right?

17         MS. BAUCUS:  Objection, assumes facts not in

18     evidence.

19 A.  I don't know.  Again, I would be guessing.  I could -- because

20     of how this shorthand works and how I have seen things exist

21     in Nationstar before, it could be as simple as that the email

22     was sent to this other individual with notice to complete the

23     review process and that this person received notice that it

24     needed to be completed and sent that to NJohnson so that they

25     would complete it.  As you will note it was completed, the

Page 70

1      entry after that, in LPS.

2  BY MR. WESTBROOK:

3  Q.  Right.  Okay.  Have you reviewed any -- any emails in

4      connection with your preparation for the deposition?

5  A.  Some.

6  Q.  Do you know if you reviewed an email dated 9-24-2013?

7  A.  I do not recall emailing -- or reviewing an email from that

8      time.

9  Q.  Do you know if an email dated 9-24-13 was produced in this

10     litigation?

11 A.  I do not.

12 Q.  Are you aware of Nationstar's policy for retention of

13     emails?

14 A.  No, I'm not.

15 Q.  Does Nationstar have document retention policies and

16     procedures?

17 A.  I would presume, but I don't -- I didn't review those.  I

18     didn't review them prior to coming today.

19 Q.  Are Nationstar's document retention policies something that

20     you would have access to?

21 A.  If they exist, then I would have access to them.

22 Q.  Do you know if Nationstar actually has document retention

23     policies and procedures?

24 A.  As I indicated, I would only -- it's only an assumption.  I

25     haven't made any attempt to review those -- to locate or

Page 71

1      review those.

2  Q.  All right.  A couple of lines down there is another entry that

3      is also dated 9-24-13 that also has that code CSVC.  In this

4      one the --

5  A.  Can I clarify one thing --

6  Q.  Sure.

7  A.  -- from a prior answer.  Earlier at the beginning of the

8      deposition I mentioned that the code when entered populates a

9      heading.  There is one exception to that.  CSVC.  CSVC will

10     not populate a heading and allows the individual just to type

11     in notes without a heading.

12 Q.  Okay.

13 A.  So you will see CSVC here where there is no heading and there

14     is just sort of comments beneath.  So I didn't want to be

15     inconsistent in that information, so that is one exception to

16     the otherwise across-the-board rule of how it works.

17 Q.  Okay.  That's helpful.  I am starting to put things together.

18     The CSVC, I am guessing here, maybe you can confirm this, does

19     that stand for customer service?

20 A.  Yes.

21 Q.  So for the CSVC entries then what appears there in that top

22     line is something that somebody entered specifically.

23     Right?

24 A.  Right.

25 Q.  Okay.  The line that I am talking about here, and I'm going to

Page 72

1      ask you about, says OCC will be a fail due to open BoNY Trial.

2      Do you see that?

3  A.  I do.

4  Q.  What does this entry mean?

5  A.  I read this entry to mean that the review of the file as part

6      of the foreclosure review will not pass.  It will not be

7      allowed to move forward in the foreclosure process because

8      there is an open -- this open BoNY Trial is sort of shorthand

9      for there is active loss mitigation on the file.

10 Q.  All right.  BoNY standing for Bank of New York.  Right?

11 A.  Correct.

12 Q.  A little further down the page there is an entry -- one of a

13     few entries dated 9-27-13.  I'm looking at the first one that

14     has the prefix CSVC and the narrative is open case since Aug

15     2012M missing docs and FC sale date 01/08/14.  Do you see

16     that?

17 A.  I do.

18 Q.  What is your interpretation of that line?

19 A.  This indicates to me that as of this date, September 27, 2013,

20     there is an entry showing that there has been an open loss

21     mitigation process going since August of 2012.  Its current

22     status is that there are missing documents and that there is a

23     foreclosure sale date for the 1st of August [sic] of 2014.

24 Q.  Well, 01/08/14 would seem to me to indicate January.

25 A.  What did I say, August?  Sorry, I meant January.

1 Q. You are on European dates.

2 A. Yeah, right. Yes.

3 Q. The next page, page 60, looking at a line that is dated

4    10-10-13, begins with CSVC that says no open case, FC sale

5    date 01/08/14. Are you with me there?

6 A. Yes.

7 Q. What does no open case mean here?

8 A. This means that the loss mitigation case that has been opened

9    is no longer open and that the foreclosure sale date is still

10   set for the 1st -- I'm sorry, for January 8th, 2014.

11 Q. Okay. The following line there, also dated 10-10-13, it says

12   NDNL, and then the narrative is non-HAMP denial notice sent.

13   Do you see that?

14 A. That's correct.

15 Q. And is this what it appears to be? By that I mean is this an

16   indication that a notice was sent to the borrower of denial of

17   a modification request?

18 A. That's correct.

19 Q. And specifically a non-HAMP modification request. Right?

20 A. That's correct.

21 Q. Do you know if there is a document that exists that is a

22   notice sent to the borrower in this instance of the denial of

23   the modification request on that date, 10-10-13?

24 A. Yes.

25 Q. There is one?

1 A. Yes.

2 Q. Have you reviewed it?

3 A. Yes, I have.

4 Q. Let's go to the next page, 61, the fourth entry down dated

5   10-28-13 LMFS. First, that code LMFS, do you have an

6   understanding of what that means?

7 A. I don't know for certain. I know that based on its

8   association these are Remedy entries, and Remedy being a

9   program that we use to process loan modification applications.

10   So Remedy will -- not to be overly simple here, but Remedy

11   talks to LSAMS and can make entries into the LSAMS collection

12   history profile when certain activities have been done. And

13   so, you know, in terms of the code it enters or how exactly it

14   interfaces in making the entries, I'm not an expert about

15   that, but this is an entry from Remedy.

16 Q. Is Remedy a software system that is used by Nationstar?

17 A. Yes.

18 Q. Do you know if that is software that is licensed by Nationstar

19   for its use inhouse or if it is provided by a vendor?

20 A. My understanding is that it is a software program that is --

21   that Nationstar does use, but I'm aware of other loan

22   servicers that use it as well, so it is not unique to

23   Nationstar.

24 Q. Sure. Is there information that is housed within the Remedy

25   system?

1 A. Yes.

2 Q. What kind of information is housed within the Remedy system?

3 A. Well, I'm going to -- for the ease of discussion I will not

4   mention things that are also included in LSAMS because there

5   is some duplication. Remedy talks to LSAMS. LSAMS talks to

6   Remedy. So excluding information that would already be

7   available in LSAMS, Remedy -- its, I would say, primary usage

8   is to process loan modification applications. So it houses

9   information in terms of like the borrower's financial

10   information that they submit to be considered for a loan

11   modification, which includes, you know, income documents,

12   expense documents, things along those lines. It also tracks

13   individual loan modification programs for which the borrower

14   is being considered and it tracks missing documents, and it

15   also shows the current status of the loan modification

16   application. Now, let me just clarify earlier. This is --

17   that is information that is housed in Remedy, however, the

18   missing documents status, the at least receipt of income

19   documents and the modification packet and approval or not

20   approval of a loan modification, those things are also noted

21   in LSAMS. Sorry. That's something where there is some

22   overlap.

23 Q. Sure. Okay. With respect to how Nationstar makes use of the

24   Remedy system, does the Remedy system assist in making

25   determinations whether to accept or reject a modification

1   application?

2 A. Broadly speaking, yes, it assists in that effort.

3 Q. I'm trying to be clear on what I'm asking. What I'm trying to

4   understand is whether Remedy takes the inputs, you know, the

5   income information, the expense information, all of the

6   different information that you have just discussed that is

7   contained in Remedy, does it then apply a formula and

8   determine whether a modification should be approved or not?

9 A. It depends on the modification program.

10 Q. All right. So the answer may be yes with respect to certain

11   modification programs and no with respect to other

12   modification programs?

13 A. Yeah, that's -- I think that's fair. Yeah, I think that's a

14   fair assessment. We are talking very broadly here. There is

15   a lot of modification programs we administer and as part of

16   that there are a lot of tests, if you will, that have to be

17   run on the loan modification. Some of that can be done

18   through Remedy, some cannot. So it would just really depend

19   on the individual program you are talking about.

20 Q. All right. Focusing in on the case that we are talking about

21   here, the 1625 Lake Drive property, does the fact that there

22   is this Remedy entry or set of entries from 10-28-13, does

23   that indicate that Remedy was being used to crunch, for lack

24   of a better phrase, crunch the numbers and make a

25   determination on a modification?

Page 77

1   A.   No, it does not indicate that.

2   Q.   Okay.  It does indicate that Remedy was being used for some

3       purpose.  Right?

4   A.   It indicates that income and expense financials have been

5       received from the borrower and uploaded into Remedy.

6   Q.   Okay.  Looking at the entry, it is 10-28-13 still and it's

7       prefaced by a code LFS2.  Are you with me?

8   A.   Yes.

9   Q.   And the narrative says trial plan - suppress late fees.  Do

10      you see that?

11  A.   Yes.

12  Q.   What does that entry mean?

13  A.   My understanding is that it is some indication having to do

14      with the nonapplication of late fees to the loan during a

15      period of time.  I'm not certain if it begins at that time or

16      not, but, generally speaking, that is what it is for.

17  Q.   All right.  Does this entry trial plan indicate that there was

18      a trial modification put into place?

19  A.   It does not indicate that.

20          MR. WESTBROOK:  Why don't we go ahead and take a

21      lunch.

22          MS. BAUCUS:  Yes.  Sounds good.

23          (Off the record 1:02 to 1:40 p.m.)

24  A.   Okay.  Sorry, I was thinking about this over the break and I

25      mentioned it to her, but I had testified that there was

Page 78

1       overlap between the information that is contained in Remedy

2       and the information that is contained in LSAMS, and then I

3       sort of separated out in probably not very clear fashion or

4       attempted to separate out what is just in Remedy.  Really that

5       information I was thinking in my head was limited to the

6       financials, the breakdown of the financials, but until we came

7       to this entry I had not thought about the fact that that

8       information was also included in LSAMS, so all of that just to

9       say minus the -- minus the, you know, breakdown of a loan

10      modification program, the particulars, everything else that

11      would be in Remedy is going to be in LSAMS.  So I just wanted

12      to kind of iron that detail out.

13  BY MR. WESTBROOK:

14  Q.   All right.  I'm going to have you set aside Exhibit 40 just

15      for a moment.  We will return to it.

16          MR. WESTBROOK:  I would like to mark this as Exhibit

17      41, please.

18          (Marked for Identification:  Exhibit 41.)

19  BY MR. WESTBROOK:

20  Q.   The document you have just been handed, it appears to me to be

21      a letter from Nationstar dated October 31st, 2013.  Do you see

22      it?

23  A.   Yes, I do.

24  Q.   Near the upper right there is a loan number 0596863530.

25      Directly underneath that number is says BoNY Trial Period

Page 79

1       documents.  Do you see that?

2   A.   Yes.

3   Q.   The first line after the greeting dear Bruce Craigie, it says

4       thank you for sending in the documents needed to evaluate your

5       request for the BoNY Trial Period.  However, we are missing

6       the following required documents.  And then there is a list of

7       documents.  Is that fair?

8   A.   That's correct.

9   Q.   Now, this document seems to indicate that the application

10      process for the BoNY Trial Period had been started with

11      respect to this particular loan as of October 31st, 2013 or

12      before.  Right?

13  A.   Yes.  It would have been a little bit before that, yes.

14  Q.   What is the BoNY Trial Period?

15  A.   That is the particular loan modification program that the

16      borrowers were eligible to be considered for as of that

17      date.

18  Q.   All right.  Do you know what the requirements were for

19      obtaining BoNY Trial Period modification?

20  A.   What the requirements are?  Document requirements?

21  Q.   All requirements.  Any requirements.

22  A.   In terms of -- maybe I should break down the difference so

23      that I can maybe draw some distinction.  So there are document

24      requirements that are needed to verify the financial situation

25      of the borrower to determine if they would be eligible for a

Page 80

1       loan modification program, so I would classify that as

2       document requirements.  Those are pretty uniform across the

3       board no matter what loan modification program you are

4       applying for.  In terms of the BoNY Trial -- or the BoNY Trial

5       Period Modification Program, in terms of its requirements, I

6       don't know all of the particulars of that program.  I don't --

7       I don't know what the rule guidelines are, what the program

8       limits are.  I didn't review any of that information prior to

9       coming today.

10  Q.   You mentioned the phrase rule guidelines.  What are rule

11      guidelines?

12  A.   I would say rule guidelines or the program -- program rules or

13      program guidelines, I guess I should clarify, sorry, are

14      the -- is the framework that -- of a particular loan

15      modification program.  For instance, the HAMP Tier 1

16      Modification Program involves a number of goals that it is

17      trying to accomplish and then it has restrictions on what can

18      be done to accomplish those goals.  Those -- and that's

19      relatively complex -- somewhat complex, I should say.  And

20      things can vary depending on a number of factors in a

21      particular loan.  So I call those program rules or program

22      guidelines.  I'm not familiar with the particular details of

23      the program rules or program guidelines for the BoNY Trial

24      Period Modification Program.

25  Q.   Are there documents, whether electronic or paper or otherwise,

Page 81

1    that actually provide what the program guidelines are for the
2    BoNY Trial Period Modification Program?
3  A.   I can't say definitively because I haven't looked at them.  I
4    would expect there could be something, but I have not actually
5    viewed it myself.
6  Q.   You mentioned the phrase program limits.  What does that
7    mean?
8  A.   We will just say that that is -- I was using that term
9    interchangeably with program rules or program guidelines.
10 Q.   All right.  With respect to the BoNY Trial Period Modification
11   Program, do you know if there was any internal requirement
12   under that program to reach a decision of modification prior
13   to completing a foreclosure sale?
14 A.   Could you ask that question one more time.
15 Q.   With respect to the BoNY Trial Period Modification Program, do
16   you know if there was any internal requirement to reach a
17   decision on the modification prior to completing the
18   foreclosure sale?
19 A.   I'm not aware of any requirement regarding making decisions on
20   packets that have been submitted that is unique to the BoNY
21   Trial Period Modification Program.  My understanding is that
22   that is a rule that is uniform to all loan modifications that
23   Nationstar administers.
24 Q.   What is the rule uniform to Nationstar?
25 A.   When and if a modification packet is reviewed and then

Page 82

1    subsequently approved or not approved and how that fits into
2    the foreclosure time frame.
3  Q.   Okay.  So that does or does not depend on what type of
4    modification program is being looked into?
5  A.   It does not.
6  Q.   All right.  So was there an internal requirement in Nationstar
7    that a decision on a modification must be made prior to
8    completing a foreclosure sale?
9  A.   It depends on a number of factors.
10 Q.   Okay.  What are the factors?
11 A.   When, how far before -- well, first of all, was a complete
12   loan modification packet received is probably the first
13   question.  If not, then Nationstar is not going to be able to
14   review a loan modification packet for approval or not
15   approval.  If a complete loan modification packet has been
16   received, it depends on the number of days before the
17   foreclosure sale occurs on whether or not Nationstar will
18   postpone the foreclosure sale or not.
19 Q.   And do you know what the -- what the timing is there, what
20   number of days affects that decision?
21 A.   I believe it is if the loan -- a complete loan modification
22   packet is received outside of 37 days prior to the
23   foreclosure, then Nationstar will put the foreclosure sale on
24   hold and review the loan modification -- complete loan
25   modification packet, and render a decision.  If the packet,

Page 83

1    complete packet is received within 37 days, then Nationstar is
2    not under an obligation to review that packet for approval or
3    nonapproval.  And I guess I should say it's not under an
4    obligation to forestall the foreclosure sale as part of that
5    review process.  I need to clarify that answer.
6  Q.   Now, in connection with modification plans, including the BoNY
7    Trial Period Modification Plan, Nationstar -- it appears at
8    least that Nationstar, when it determines that there are
9    missing documents, documents that it needs to evaluate the
10   modification request, it will send a letter like Exhibit 41.
11   Is that a correct assumption?
12 A.   It -- yes, it will send a letter.  It also will communicate
13   that by telephone typically.
14 Q.   And that letter indicating to the borrower that there are
15   missing documents, documents that are needed, will that letter
16   show a date by which the documents need to be sent?
17      MS. BAUCUS:  Objection to the extent that the
18   questions are calling for a hypothetical generally, form of
19   question.
20 A.   This letter does contain a date by which the documents need to
21   be submitted, but also in my experience these letters
22   typically contain a date by which the documents should be sent
23   in.
24 BY MR. WESTBROOK:
25 Q.   Now, how does Nationstar determine what time frame to set for

Page 84

1    that deadline for responding with the documents, the missing
2    documents?
3  A.   I believe it is typically 30 days.
4  Q.   Is that regardless of when a foreclosure sale is scheduled?
5  A.   As far as I know, yes.
6  Q.   Okay.  Let me give you a concrete example.  Let me give you a
7    more concrete example.  Let's assume that, taking the example
8    of October 31st, 2013, this document appears to show a
9    deadline of November 29, 2013.  Fair?
10 A.   Yes.
11 Q.   Now, is Nationstar's decision to use that 11-29-2013 date,
12   would that be affected by, for example, the scheduling of the
13   foreclosure sale in early December of 2013?
14      MS. BAUCUS:  Objection, the question is vague and
15   compound, form.
16 A.   Is the question whether or not the foreclosure date would be
17   affected?
18 BY MR. WESTBROOK:
19 Q.   Whether or not the request for documents by a certain date
20   would be affected by the proximate nature of the scheduled
21   foreclosure sale.
22 A.   I don't know the answer to that question.  I'm not certain.
23 Q.   All right.  What you have told me is that Nationstar treats
24   submission of modification packets differently depending on
25   whether they are received within 30 or 37 days of a scheduled

1    foreclosure sale. Right?

2           MS. BAUCUS: Objection, that mischaracterizes the

3    dates, the timelines, that he provided.

4  A.  I think actually what I -- to clarify, I don't think that

5    my -- I think that my clarified testimony was not that the

6    application is, per se, handled differently, but the

7    foreclosure date is not moved if it's -- if the packet -- if

8    the complete packet is received within 37 days.

9  BY MR. WESTBROOK:

10  Q.  Right. But the timing of the requested submission of

11    documents, my question is whether that is affected by the

12    scheduling of the sale as of what date that foreclosure sale

13    is scheduled for if there is one?

14  A.  And I understand that that's your question, but you pointed --

15    you said -- your testimony earlier was, and then you kind of

16    went through it, that the foreclosure -- that the loan

17    modification program is handled differently depending on

18    whether or not it's within the 37 days or not. And I don't

19    think that my testimony was that it's handled differently, it

20    is just that the foreclosure is either going to be put on hold

21    or it's not depending on when it's received. So that's all I

22    was trying to clarify.

23  Q.  All right.

24  A.  I know that doesn't ultimately answer your question. I just

25    wanted to clarify that.

1  Q.  All right. So let me try and understand another -- and this

2    is going to be a hypothetical question, but I'm trying to

3    understand how it works. If a modification is being

4    discussed, as in a modification case has been opened with

5    Nationstar, and there is a scheduled foreclosure sale, in this

6    time frame, 2013, 2014, did Nationstar take into account the

7    scheduling of the foreclosure sale and the timing of it when

8    it determined when document deadlines would be?

9           MS. BAUCUS: Objection, calls for speculation.

10  A.  And I think maybe I wasn't clear. I thought I did my best to

11    answer that. I don't know.

12  BY MR. WESTBROOK:

13  Q.  All right. Do you know if there is any policy or procedure

14    document that will speak to that?

15  A.  I don't know.

16  Q.  Do you know if there is anyone else who would know the answer

17    to that question?

18  A.  No.

19  Q.  All right. Going back to Exhibit 40 and looking at page 62.

20    There is an entry that is dated 11-25-13. The header is CSVC.

21    Are you with me?

22  A.  Yes.

23  Q.  And I'm reading the line that says valid OCC fail. See

24    comments. Mod case opened 10-28-13. Still need the initial

25    FINS package to submit for review. OCC will fail. Do you see

1    that?

2  A.  Yes, I do.

3  Q.  Do you know what that phrase valid OCC fail means?

4  A.  Yes.

5  Q.  What does it mean?

6  A.  This is an indication that a review was completed of the loan

7    file and its status in foreclosure and whether or not it could

8    proceed to foreclosure sale. This indicates that it could not

9    proceed because of its current loss mitigation status and that

10    status is detailed further.

11  Q.  All right. Now, this is a CSVC entry, meaning that this was

12    specifically typed by someone. Right?

13  A.  Correct.

14  Q.  It also contains the language see comments. Right?

15  A.  That's correct.

16  Q.  Do you have an understanding of what that phrase see comments

17    means in this context?

18  A.  Again, that you look to the -- you look to the information

19    that is provided below which explains why the OCC fail is

20    occurring.

21  Q.  Now, to your understanding there is no other repository or way

22    of accessing comments aside from what's shown here in the

23    notes?

24  A.  That's correct.

25  Q.  There is no separate document that might contain comments with

1    respect to this valid OCC fail entry?

2  A.  That's correct.

3  Q.  It mentions the initial FINS package. FINS has a specialized

4    meaning here, doesn't it? What does it mean?

5  A.  That's technically short for -- it's like financial

6    information or what we call financials, but basically that is

7    the -- to put it in regular people terms, that would be the

8    request for modification assistance packet.

9  Q.  All right. So is this indicating then that there is an

10    incomplete package has been submitted as of this date?

11  A.  That's -- that's essentially fair. They have some information

12    from the borrower, but it looks like very little or actually

13    it looks like they are still looking for a complete packet.

14  Q.  But a modification case has been opened as of this date,

15    10-28-13. Is that fair?

16  A.  That's correct.

17  Q.  And that has caused the OCC to fail meaning that the

18    foreclosure will occur. Right?

19  A.  Correct.

20  Q.  Just the following entry there, it's dated 11-25-13, also

21    preceded by CSVC, and it says OCC U/D in LPS. Do you see

22    that?

23  A.  Yes, I do.

24  Q.  What does OCC U/D in LPS mean?

25  A.  This indicates to me that the OCC review was updated in the

Page 89

1    LPS system.

2  Q.  All right.  So the information contained in the OCC review had

3    been in LPS but it was updated as of this date?

4  A.  Yes.  So there is -- as I mentioned earlier, there are a

5    number of -- when a case -- when a loan has been sitting in

6    foreclosure for awhile it's going to go through periodic

7    checkups, if you will, to see if it is ready to go, march

8    towards a foreclosure sale.  So there are a number of these

9    checks in LPS and so this information just would have been

10    noted in the LPS system so that foreclosure counsel will be

11    aware of it.

12  Q.  And what information is contained in the OCC?

13  A.  Haven't we talked about this already?  I have to tell you

14    again I don't know.  All I know generally is that it is a

15    review of the loan to determine if it's ready to move forward

16    to a foreclosure sale.  For the most part we are talking about

17    a review of its loss mitigation status to determine if it

18    should -- the foreclosure sale should be placed on hold or

19    not.

20  Q.  All right.  So the OCC is a document.  Right?

21        MS. BAUCUS:  Objection, asked and answered.

22  A.  I never said it was a document.  In fact --

23  BY MR. WESTBROOK:

24  Q.  It contains information though.  Right?

25        MS. BAUCUS:  Objection, asked and answered.  The

Page 90

1    client's testimony is already stated many times on the record

2    about what this process is and that it is not a document.

3  A.  Yeah, I thought that I had made that pretty clear.  It is not

4    a document.

5  BY MR. WESTBROOK:

6  Q.  What is not clear to me is it says OCC, you say U/D, which

7    means updated, in LPS.  That means something, some type of

8    information had to exist for it to be updated.  Right?

9        MS. BAUCUS:  Objection, assumes facts not in

10    evidence.

11  A.  I guess I don't understand what you are saying, but there is

12    some sort of information and then that information is

13    changed.

14  BY MR. WESTBROOK:

15  Q.  That's what updated means.  Right?

16  A.  I suppose updated could mean maybe a lot of different things.

17    What I'm telling you that it is, is that the status of the OCC

18    review is put into LPS.  So this says U/D for updated.  I know

19    how it works and information is not changed, but there is a

20    new review spot on the timeline and it would indicate this

21    particular status.

22  Q.  So to your understanding there is not, for example, an OCC

23    checklist that is loaded into LPS?

24        MS. BAUCUS:  Objection, asked and answered.  I'm

25    going to direct my client not to answer any further questions

Page 91

1    on this topic.  You are becoming argumentative and combative

2    with this particular witness.  He has answered this same

3    question now at least a half a dozen times.

4        MR. WESTBROOK:  I would like an answer.

5        MS. BAUCUS:  I am directing him not to answer any

6    further questions that are duplicative of six others you have

7    asked.

8        MR. WESTBROOK:  That is not the same question.  It

9    was very clear.  And that is not a permissible instruction not

10    to answer.

11        MS. BAUCUS:  We would like to finish this deposition

12    today, Counsel.

13        MR. WESTBROOK:  Yeah, I would love to.  Stop the

14    speaking objections.

15  BY MR. WESTBROOK:

16  Q.  Next page, page 63.  An entry dated 12-02-13 preceded by CSVC.

17  A.  Yes.

18  Q.  And I'll read my interpretation.  You can correct me if I am

19    wrong.  All right?

20  A.  Okay.

21  Q.  It says received zip file from borrower, unable to print the

22    docs to put the package together, emailed borrower to advise

23    we had to have as a PDF.  Does my interpretation of that

24    shorthand seem to jive with your own?

25  A.  Excellent.  That is correct.

Page 92

1  Q.  Thank you.  All right.  Do you have an understanding of what

2    that entry means?

3  A.  Yeah, the borrower submitted a financial packet in the form of

4    a zip file or zipped file.  I am not a tech guy, but basically

5    it is a format in which you can put a lot of files together,

6    it compresses the size, makes it easier to email.  Apparently

7    the loss mitigation folks didn't have the ability to open a

8    zipped file to retrieve the docs so that a package could be

9    submitted and that they emailed the borrower to advise of the

10    problem and to have them resent as just a regular PDF.

11  Q.  All right.  Turning to page 65.  I'm looking at an entry

12    two-thirds of the way down the page that is dated 2-04-14 and

13    the prefix or the code next to it is LFS2.  Are you with me?

14  A.  LFS2, yes.

15  Q.  It says trial plan - suppress late fees.  It appears to be a

16    Remedy entry.  Is that fair?

17  A.  That's correct.

18  Q.  And we discussed this before, is your understanding of this,

19    this trial plan entry, the same as how you testified with

20    respect to a different entry that said trial plan

21    previously?

22  A.  It's the same.

23  Q.  All right.  And to your understanding that means something

24    about how late fees are going to be handled on the account?

25  A.  That's my understanding as of this date.  At or about this

1    time a new trial -- a new loan modification case was opened.

2 Q.  All right.  The next line down, also dated 2-04-14, is a CSVC

3    entry.  It says per management instruction this loan is

4    eligible for HAMP.  Case opened.  FINS.  Need new mod package.

5    Do you see that?

6 A.  Yes.

7 Q.  What does this mean?

8 A.  This means that as of this date the individual making this

9    entry was informed that this borrower is now eligible to apply

10   for a HAMP modification.  In other words, as we discussed

11   previously, the borrowers were not -- were not eligible to

12   apply for a HAMP modification before this time.

13 Q.  So the status had changed such that the borrowers might have

14   been eligible for a HAMP modification whereas previously they

15   had not been eligible for HAMP.  Is that right?

16 A.  Yes.  Eligible to apply, yes.

17 Q.  Do you see any indication in these notes that the non-HAMP

18   modification program case was closed?

19 A.  There was a -- I would have to look at a later date here.

20   There is a letter on 2- -- I can't say.  Well, let me just

21   strike my -- what I was going to say.

22       There is no indication here that the non-HAMP

23   modification case was closed.

24 Q.  Do you have an understanding as to what happened to the

25   modification information that the borrower had sent up to this

1    point?  By this point I mean February 4th, 2014.

2 A.  To my knowledge, and let me just go back and look through the

3    notes, I don't know.  So the borrower sent in that zip file

4    and I don't -- and she was told to -- or he or she was told, I

5    can't remember who it was we were speaking of here, that they

6    needed to resubmit in a proper format.  I don't think that we

7    ever received those documents and so I don't think that there

8    was any information to do anything with.

9 Q.  All right.  Looking at the bottom of page 65 there is an entry

10   that is dated February 21st, 2014.  The code is INS1.  Do you

11   see that?

12 A.  I do.

13 Q.  It looks like this is also an entry made by Remedy.  Is that

14   fair?

15 A.  Uh-huh, yes.

16 Q.  It says letter - FIN1.  Right?

17 A.  That's correct.

18 Q.  Does this indicate that a letter was sent to the borrower on

19   this date?

20 A.  Yes, it does indicate that a borrower -- or the letter was

21   sent to the borrower at or about that time.

22 Q.  All right.  Do you know if there was, in fact, a letter sent

23   on or about that time with respect to the potential

24   eligibility for a HAMP program modification?

25 A.  Yes, there was -- I knew that we -- I don't remember off the

1    top of my head, but I do know we sent a financial packet to

2    the borrower in February.  I cannot remember if we also sent a

3    letter indicating that the non-HAMP process was being closed

4    out.  I can't remember if we sent one of those or not, but I

5    do know that we sent a new financial packet in February.

6 Q.  All right.  If Nationstar had informed by letter or by

7    telephone -- had informed the borrower that the non-HAMP

8    modification case had been closed, would that fact show up in

9    the notes?

10 A.  Typically if a letter goes to the borrower that letter is

11   notated in the customer service notes.  I see that we had

12   attempted on many occasions to call the borrower.  It doesn't

13   indicate that there was a connected phone call around this

14   time to let them know that that process was being closed out.

15   Quite a few phone calls, but it doesn't look like we got a

16   call from them back or connected with them during this time to

17   advise that the process was being closed.  But typically, yes,

18   there was a note that there would be a letter.

19 Q.  All right.

20       MR. WESTBROOK:  I would like to mark this as Exhibit

21   42, please.

22       (Marked for Identification: Exhibit 42.)

23 BY MR. WESTBROOK:

24 Q.  Exhibit 42 appears to be a Nationstar letter regarding loan

25   number 596863530 dated February 21st, 2014.  Do you see

1    that?

2 A.  I do.

3 Q.  Have you seen this document before?

4 A.  Yes, I have.

5 Q.  Did you review it in preparing for this deposition?

6 A.  Yes, I did.

7 Q.  After the greeting the first paragraph reads we have received

8    your inquiry for the Making Home Affordable Modification

9    Program.  Did I read that correctly?

10 A.  Yes.

11 Q.  And the following paragraph, I will read it in full if

12   you will bear with me, it says please find enclosed the

13   following documents that must be completed in full and

14   returned to Nationstar Mortgage in order for us to begin the

15   evaluation process.  Please note that during the evaluation

16   period, your home will not be referred to foreclosure or if

17   your loan has previously -- has been previously referred to

18   foreclosure, we will halt the foreclosure process upon receipt

19   of a complete application.  A complete application must be

20   received by Nationstar Mortgage in order for us to begin the

21   evaluation process.  No foreclosure sale will be conducted and

22   you will not lose your home during the evaluation.  Please

23   note if your property is located in Nevada, the foreclosure

24   process will be halted upon receipt of initial application,

25   regardless of completeness.  In order to be considered for

Page 97

1   this program, these documents must be received by 03-08-2014.
2   Do you see that?
3 A.   Yes.
4 Q.   So from this paragraph am I correct in saying that there are
5   two evaluations that are to occur with respect to the
6   modification documents?  There is one for determining whether
7   the application is complete.  Right?
8 A.   Yes.
9 Q.   And there is one for determining whether the request for
10   modification will be granted.  Right?
11 A.   Well, let me just tell you that I think there are two, we will
12   call it, examinations, but in terms of the language that is
13   used in this paragraph they are referring specifically to --
14   there is reference to an evaluation process and that
15   evaluation process that's referenced here will be -- is the
16   one that is completed after a complete application had been
17   received.  But there is -- but prior to that time somebody is
18   going to look at the packet and determine if it is complete.
19 Q.   All right.  Now, during this time frame, and I'm referring to
20   early 2014, was it Nationstar's procedure that foreclosure
21   sales could be completed during the period in which a
22   submitted modification package was being evaluated for
23   completeness?
24       MS. BAUCUS:  Objection, requesting general policies
25   and procedures is the subject of prior discussions.  Also the

Page 98

1   question is compound, so objection as to form.
2 A.   The -- again, it depends on when the application had been
3   received.  If an application -- if an -- I'm sorry, was this
4   an incomplete packet, is that what you said?
5 BY MR. WESTBROOK:
6 Q.   Well, that's the question.  During the period in which the
7   package is being examined for whether it is complete or not.
8 A.   Okay.  Let's talk about it two ways.  Let's talk about it
9   first in terms of outside of the 37 days and then let's talk
10   about it within the 37 days.  Outside of the 37-day period if
11   a packet is received and it is determined that it is
12   incomplete, the foreclosure date is not going to be moved.
13   That initial examination of the packet typically takes between
14   one and two days to determine if it's complete.  That's if a
15   complete -- and if it's determined that it is complete and,
16   again, we are on the outside of the 37 days, then the
17   foreclosure process will be halted until the review is
18   complete and a decision is rendered.  If we are inside the
19   37 days, whether the packet is complete, not complete, during
20   the review process, any of that, Nationstar is not going to
21   move the foreclosure date.
22 Q.   Now, Exhibit 42, which as we have said is dated February 21st,
23   2014, the second paragraph, the last sentence says in order to
24   be considered for this program these documents must be
25   returned by March 8th of 2014.  Right?

Page 99

1 A.   That's correct.
2 Q.   Now, do you have an understanding of what the date was that
3   the foreclosure sale was scheduled for this property as of
4   February 21st of 2014?
5 A.   I know that -- I believe that the ultimate sale date was the
6   1st or 2nd of April.  I'm not certain what it was as of the
7   date that this letter went out.
8 Q.   All right.  If I told you that it was April 4th of 2014, would
9   you have any reason to disagree with that?
10 A.   April 4th?
11 Q.   April 2nd.
12 A.   April 2nd.  As of the date that this letter went out?
13 Q.   Yes.
14 A.   As I said, I don't know.  I don't necessarily -- I'm not
15   saying you are being dishonest about it, I just haven't
16   independently verified it.  But for the purposes of discussion
17   I can take your representation.
18 Q.   Understood.  I will assume that is true --
19 A.   Okay.
20 Q.   -- for the purposes of my next several questions.
21 A.   Okay.
22 Q.   But I believe it to be true.  Now, this date, March 8th, 2014,
23   is less than 37 days from that scheduled foreclosure date of
24   April 2nd, 2014.  Is that fair?
25 A.   Yes.

Page 100

1 Q.   So if I'm understanding you correctly on Nationstar's
2   procedure for whether foreclosure sales were put off based on
3   received modification packages, if the borrower have had
4   returned the complete modification package as of March 8th,
5   2014, the scheduled sheriff's sale for April 2nd, 2014 would
6   still proceed.  Right?
7       MS. BAUCUS:  Objection, calls for speculation based
8   on assumptions and facts not in evidence and calls for just
9   general policies and procedures subject to prior objections.
10 A.   If the borrower had submitted a loan modification packet as of
11   the 8th of March, it would be within the 37-day window and it
12   would not cause the foreclosure date to be moved.
13 BY MR. WESTBROOK:
14 Q.   Okay.  Do you know if there was any policy or procedure in
15   place at Nationstar that HAMP modification documents should be
16   requested from borrowers less than 30 days in advance of a
17   scheduled foreclosure sale?
18       MS. BAUCUS:  Objection, subject to my prior
19   objections with regard to seeking questions related to general
20   policies and procedures and no relevance to this specific
21   account.  I'm instructing my client not to answer until the
22   judge rules at the 3:15 call.
23 BY MR. WESTBROOK:
24 Q.   I think I know what your answer is going to be to this, but I
25   want to ask it anyway in case I haven't phrased it correctly

Page 101

1    before, Exhibit 42 is a letter regarding a HAMP modification

2    case.  Is that fair?

3 A.  Sure.

4 Q.  Would you agree with me that this HAMP modification case was

5    begun at a time when there had been no determination regarding

6    the BoNY Trial Period Modification request?

7 A.  It was -- yes.  Well, let me clarify.  It -- this case was

8    opened prior to the closing of the BoNY Trial Modification

9    case.  This letter was sent out, I want to say it was right

10   around the exact same time, because this is obviously later in

11   the month of February, but bear in mind that we had not

12   received any documents to consider for the BoNY Trial

13   Modification Plan.

14 Q.  Just reflecting back on Exhibit 40, page 65, I just want to

15   compare the dates.  We discussed this line before, but it's

16   from February 4th, 2014.  It starts CSVC and it says per

17   management instructions this loan is eligible for HAMP.  Case

18   opened.  FINS.  Need new mod package.  We looked at that

19   before.  Right?

20 A.  Yes.

21 Q.  And so that's dated February 4th, 2014.  And then Exhibit 42,

22   which is the HAMP letter that is sent to the borrower, that is

23   dated February 21st, 2014.  Right?

24 A.  That's correct.

25 Q.  Do you know of any reason why it would take 17 days for

Page 102

1    Nationstar to send out this HAMP letter after having made the

2    determination that the loan might be eligible for HAMP?

3 A.  I do not.

4 Q.  Do you know if there is any policy or procedure that speaks to

5    that issue?

6 A.  Based on my knowledge I do not believe that there is any

7    policy or procedure that speaks to that.

8 Q.  Do you know if there is anyone else within Nationstar who

9    would have a better understanding of why it took 17 days for

10   Nationstar to send out the HAMP letter after determining that

11   the loan might be eligible for HAMP?

12 A.  The only person that may know is the people whose name entries

13   are next to that note.

14 Q.  Okay.  It could be the employee who is signified by TJohnson3.

15   Right?

16 A.  Yes.

17 Q.  It could be the employee who is signified by in NUperesa,

18   N-U-p-e-r-e-s-a.  Right?

19 A.  That's correct.

20 Q.  All right.  And staying with Exhibit 40 and flipping to page

21   66, the fifth entry down dated February 25th, 2014 has the

22   prefix PRSF and the narrative is pre-sale checklist failed -

23   valid hold report.  Do you see that?

24 A.  Yes.

25 Q.  What is a pre-sale checklist?

Page 103

1 A.  Again, this is the -- one of these -- once the home gets

2    within a certain time period of -- as the time frame marches

3    closer and closer to the foreclosure sale date, various checks

4    are going to be completed, reviews are going to be completed

5    of the status of the loan to determine if it is -- if it is,

6    you know, ready to move forward to foreclosure sale.  So this

7    indicates to me that there is a hold placed on the loan at

8    that time indicating that it shouldn't be going forward to

9    foreclosure --

10 A.  All right.

11 A.   -- foreclosure sale.

12 Q.  Do you know if there is a difference between an OCC checklist

13   and a pre-sale checklist?

14 A.  My understanding is that functionally they are about the same.

15   They are -- this is a review of whether or not the loan is

16   able to go forward to foreclosure.

17 Q.  Do you know if there are different criteria being reviewed in

18   connection with an OCC checklist versus a pre-sale

19   checklist?

20 A.  I'm not aware.

21 Q.  And what is a hold report?

22 A.  It's really just whether or not there is a hold on the

23   foreclosure process or something that would cause a hold.

24   Typically, again, here we are talking about some sort of

25   active loss mitigation.

Page 104

1 Q.  All right.  So this indicates that a hold was placed on the

2    foreclosure process?

3 A.  This indicates that there -- when they did the review, there

4    was something -- there was something on the file indicating

5    that there should be a hold on the foreclosure process.

6 Q.  All right.  And that hold is a -- does that hold report cause

7    the pre-sale checklist failure or the other way around?

8 A.  The hold would cause it not to be able to go past the pre-sale

9    review.

10 Q.  All right.  Is it your understanding that --

11 A.  I'm sorry, I should say cause the failure.

12 Q.  Is it your understanding that there is no document that

13   embodies a hold report?

14 A.  That's correct.

15 Q.  Is it your understanding that there is no document that

16   embodies a pre-sale checklist?

17 A.  That's correct.

18 Q.  Do you know if there are any entries made in the LPS system

19   regarding hold reports?

20      MS. BAUCUS:  Objection.  LPS is subject to

21   attorney-client privilege including entries thereon.  I am

22   instructing my client not to answer.

23 BY MR. WESTBROOK:

24 Q.  Do you know if pre-sale checklists are entered into the LPS

25   system?

Page 105

1    MS. BAUCUS:  Same objection to communications
2    regarding LPS.  That is subject to attorney-client privilege.
3 BY MR. WESTBROOK:
4 Q.  I may have covered this already, but I want to be sure.  If a
5    modification case is closed is there a notation made in the
6    account notes?
7        MS. BAUCUS:  Objection, asked and answered.
8 A.  Sometimes.
9 BY MR. WESTBROOK:
10 Q.  Are there specific types of situations in which a -- the
11    closure of a modification case would not be reflected in the
12    notes?
13 A.  I cannot think of a specific occasion.  All that is to say is
14    that it is often reflected in the notes, but not always.  And
15    also that we are talking about, you know, different --
16    different periods in time and different types of entries that
17    are used in different periods of time.  So in the 2013 era,
18    early 2014, I would say it was less common for there to be
19    notations about things like that whereas now it's more
20    common.
21 Q.  All right.  Do you have an understanding as to why the BoNY
22    Trial Period Modification process that was begun with respect
23    to the 1625 Lake Drive property, why that modification case
24    was closed?
25 A.  Which modification case?

Page 106

1 Q.  The BoNY Trial Period Modification case that immediately
2    preceded the HAMP modification case.
3 A.  Okay.  So the one that was opened in October?
4 Q.  Correct.
5 A.  It was closed for missing documents.
6 Q.  All right.  Are there other reasons that a modification case
7    can be closed?
8 A.  Sure.
9 Q.  What are the other reasons?
10 A.  They are not -- there is a review that is completed and they
11    are denied a modification.  That would close out a -- that
12    would close out a case.
13 Q.  You indicated that the BoNY Trial Period Modification case was
14    closed due to missing documents.  Right?
15 A.  Yes.
16 Q.  How do you know that?
17 A.  Two ways.  One, I can see by looking in the collection history
18    profile that when the process was opened, when the letter was
19    sent to the borrower indicating that there were missing
20    documents.  I can see that the borrower sent in the zip file
21    we talked about that we couldn't open.  So we had communicated
22    to the borrower to resend the documents.  I see no entries
23    that there were any missing -- of the missing documents
24    submitted or reviewed, et cetera.  Further, I can also see
25    from looking in Remedy the final status of the case which

Page 107

1    indicated, if I am not mistaken, that it was closed for
2    missing documents.
3 Q.  Can you show me where in the notes that Remedy entry is.
4 A.  As I mentioned, I didn't see any notes indicating that the
5    case was closed in LSAMS.
6 Q.  But you have seen something that indicates that the case was
7    closed for missing documents?
8 A.  That's my recollection.  I know -- I know that that is the
9    case, that we did close it for missing documents because no
10    documents were ever submitted, but I'm trying to remember what
11    the exact status of the tag was in Remedy for this loan, and I
12    don't -- I want to say it was missing documents, but I can't
13    be for certain.
14 Q.  Did you review Remedy data outside of the LSAMS report that we
15    are looking at here in preparation for the deposition?
16 A.  Yes, I did.
17 Q.  Do you know whether the Remedy data that you reviewed was
18    produced in this litigation?
19 A.  I don't know.  I don't think so outside of whatever is also
20    included in LSAMS.
21 Q.  Do you have any understanding why the Remedy data would not be
22    produced in this litigation?
23 A.  Well, typically the data that is in Remedy is mirrored in
24    LSAMS.  So that's the only thing I can think of.
25 Q.  Here we don't see an entry that discusses the closure of the

Page 108

1    BoNY Trial Period Modification case.  Right?
2        MS. BAUCUS:  Objection, asked and answered.
3 A.  Yeah, that's what I had previously testified to.
4 BY MR. WESTBROOK:
5 Q.  All right.  So there is no indication in the LSAMS report that
6    we are looking at here, Exhibit 40, that indicates that the
7    BoNY Trial Period Modification case was closed due to lack of
8    documents.  Right?
9        MS. BAUCUS:  Objection, asked and answered.
10 A.  I'm sorry, didn't I just say that?
11 BY MR. WESTBROOK:
12 Q.  It was a different question.
13 A.  Okay.  Maybe I misunderstood the way you asked it a second
14    time.  Could you ask it again.
15 Q.  I am trying to confirm that this LSAMS report doesn't show us
16    the reason why the BoNY Trial Period Modification case was
17    closed.
18        MS. BAUCUS:  Objection, asked and answered several
19    times.
20 A.  I disagree to that characterization.  This report, as I
21    indicated, shows that we sent a missing documents letter to
22    the borrower, that the borrower submitted a format of
23    documents that we could not read, that was communicated to
24    her, she was told or he was told to resubmit.  We never
25    received any more documents.  And we know -- and the

Page 109

1    process -- you know, we don't have anything in here saying
2    that the case was closed, but I can tell you from the totality
3    of the information that's kept in this collection history
4    profile as to why that -- why there was no decision made on
5    that BoNY Trial Modification plan and what the ultimate
6    outcome would have been because there were missing documents.
7    But there is nothing in here that says case closed missing
8    documents.
9  BY MR. WESTBROOK:
10 Q.   Okay.  When a borrower submits documents in connection with a
11      modification request does that fact always show up in notes?
12 A.   Yes.
13 Q.   Whereas a decision or a notation regarding the closure of the
14      case may not show up in the notes?
15 A.   Sometimes it does, sometimes it does not.  Typically yes, but
16      this era of -- at this time it was more common that there
17      would not be a notation.
18 Q.   But you testified a moment ago that the Remedy system may
19      contain notations regarding the fact of closure in the
20      modification process or case?
21 A.   There is a screen in Remedy which shows the -- any cases that
22      were open, any modification cases that were opened that
23      pertained to this particular loan, when they are opened, when
24      they are closed, and the last status of the modification.
25 Q.   All right.  Now I know your testimony has been that the

Page 110

1    statement that the modification case -- the BoNY Trial Period
2    Modification case does not appear in the report that is
3    Exhibit 40, but is there an entry in Exhibit 40 that reflects
4    the borrower being notified that the BoNY Trial Period
5    Modification case was closed?
6  A.   As I testified to earlier, I don't see an entry that a letter
7       went out, but I can see -- I don't know -- two dozen phone
8       calls around that time that went to the borrower attempting to
9       contact them regarding this loss mitigation effort.  I see
10      numerous messages left.  I even see an advisal to some
11      third-party entity on January 22nd, 2014 that advised that
12      individual of the missing documents, I don't know if this is
13      the housing counselor, whoever the borrower was using at that
14      time.  So I know that there were a number of calls that went
15      out.  It doesn't look like there was any connection made to
16      the borrower indicating that, you know, we are closing this
17      plan out.  I don't see that.  I don't see that note in here.
18 Q.   And those reports of --
19 A.   Sorry.  Closing this case out.  I'm sorry.
20 Q.   And those calls -- those indications of calls, left message to
21      call, et cetera, that we see on page 65, there is a series of
22      those.  Right?
23 A.   Yes.
24 Q.   You can't tell what those relate to.  Right?
25 A.   Those are -- those are calls that -- I mean, they don't say --

Page 111

1    they don't say the purpose of the call in here, but it is
2    common practice for a company when we are waiting for -- when
3    the house is in -- you know, is headed to foreclosure and
4    there is a loss mitigation packet that we have -- are waiting
5    on receiving, our loss mitigation department will actively do
6    everything we can to try to reach out to the borrower to get
7    them to submit the missing documents.
8  Q.   Can you tell with certainty that those messages related to the
9       BoNY Trial Period Modification case?
10 A.   Typically due to various regulatory constraints messages to
11      call us back do not typically leave content like that on
12      there, only for the borrower to call Nationstar back.
13 Q.   Sure.  But can you tell that that is what prompted these
14      outgoing calls?
15 A.   As I just mentioned, it doesn't say the purpose of the call,
16      but I can tell you what our practice is during this time and,
17      considering everything that is going on, I believe these calls
18      to be for retrieving the missing loss mitigation documents.
19 Q.   This may seem obvious but I have got to ask the question.  If
20      these outgoing calls related to the BoNY Trial Period
21      Modification case, then they didn't -- they weren't prompted
22      then by the starting of a HAMP program case.  Right?
23         MS. BAUCUS:  Objection, calls for speculation.
24 A.   The calls that are listed on page 64 predate the determination
25      on this loan that there was going to be a HAMP, that that

Page 112

1    borrower was then eligible for HAMP modification.  So, no, I'm
2    not inclined to believe that any of those calls on 64 or on
3    page 65 that predate the February 4th entry have anything to
4    do with the HAMP modification claim.
5  BY MR. WESTBROOK:
6  Q.   All right.  Looking at page 66 of Exhibit 40 there is an entry
7       dated March 7th, 2014 and then there is immediately after it
8       an entry dated March 10, 2014.  Right?
9  A.   Yes.
10 Q.   There is no entry that is dated March 8th, 2014.  Right?
11 A.   That's correct.
12 Q.   Should there be an entry for March 8th, 2014 if Nationstar
13      received modification-related documents from the borrower on
14      that date?
15         MS. BAUCUS:  Objection, calls for speculation, form.
16 A.   I would expect to see -- if documents had been received on the
17      8th, depending on when on the 8th they were received, I would
18      expect to see an entry that they were uploaded into the Remedy
19      system somewhere around that time period, within a day or
20      so.
21 BY MR. WESTBROOK:
22 Q.   There is an entry on March 11, 2014.  It is labeled BDCT.  Bid
23      complete and uploaded to LPS.  Do you see that?
24 A.   Yes.
25 Q.   What does this mean?

Page 113

1 A.   There is -- the bid department or bid team will evaluate a
2     loan that is headed to foreclosure sale and make a
3     determination about what the bid will be at the foreclosure
4     sale.  That is -- this entry indicates that that process was
5     completed and that information was put into LPS.
6 Q.   The next page, page 67, there is an entry dated March 18,
7     2014.  The code is AFRD and the text is affidavit rejected.
8     Do you see that?
9 A.   Yes.
10 Q.   And then beneath affidavit rejected in lower case letters it
11     says currently scheduled sale date leftovers more than 07
12     days.  Right?
13 A.   Yes.
14 Q.   Now, the phrase affidavit rejected, what does that mean?
15 A.   Sorry, I was just -- this is an indication that there is a
16     problem with -- with moving forward on the foreclosure.  This
17     is another -- these are the reviews that are completed shortly
18     before the foreclosure sale and this indicates that there is
19     at this time some -- some problem.  I'm not sure exactly what
20     this is, leftovers more than 7 days.  That is not clear to me
21     exactly what that -- what that means.
22 Q.   The term affidavit, does that refer to a document?
23 A.   No.
24 Q.   You are familiar with the term affidavit as it's ordinarily
25     used.  Right?

Page 114

1 A.   Yes, I am.
2 Q.   You are trained as an attorney.  Right?
3         MS. BAUCUS:  Objection, calls for irrelevant
4     information.  He is not here to provide legal testimony or
5     testimony in regard to his experiences as an attorney.
6 A.   Yes, I am an attorney.  I do know what the ordinary meaning of
7     affidavit is.
8 BY MR. WESTBROOK:
9 Q.   Ordinarily an affidavit bears the signature of someone.
10     Right?
11 A.   Under ordinary circumstances, yes.
12 Q.   Are you aware of any other way in which the term affidavit is
13     used?
14 A.   Yes.
15 Q.   And what does affidavit -- what does it mean in this
16     context?
17 A.   This is -- as I mentioned, this is -- these are headings that
18     are put into LSAMS and then, with the content listed below,
19     the indications from the foreclosure department.  Based on
20     documentation I reviewed indicating that this is not an actual
21     paper affidavit of any kind but, rather, an entry made by the
22     bid team that reviews this indicating that there is some
23     concern about the upcoming foreclosure sale date.
24 Q.   Other than the entry here, affidavit rejected currently
25     scheduled sale date leftovers more than 07 days, is there any

Page 115

1     information that is represented by that term affidavit?
2 A.   No.
3 Q.   In preparation for this deposition, did you speak with anyone
4     in the foreclosure department?
5 A.   No.
6 Q.   If I asked someone within the foreclosure department whether
7     affidavit referred to some other information or document that
8     is referred to here, would they tell me the same information
9     as you have told me?
10 A.   Essentially yes.
11 Q.   What would they tell me differently?
12         MS. BAUCUS:  Objection, calls for speculation, form
13     of question.
14 BY MR. WESTBROOK:
15 Q.   You said essentially yes.  I am trying to understand
16     essentially yes.
17 A.   Well, word for word I don't know if they would choose the
18     exact same words I used, but I think that the overall import
19     would be the same, yes, that the information would be the
20     same.
21 Q.   And you have testified that you are not aware of what the term
22     leftovers more than 07 days means.  Right?
23 A.   That's correct, although I am sure we could probably find
24     out.
25 Q.   Is that something you would expect someone within the

Page 116

1     foreclosure division to understand?
2         MS. BAUCUS:  Objection, calls for speculation.  Form
3     of question.
4 A.   I would surmise that they would, somebody there would probably
5     know.
6 BY MR. WESTBROOK:
7 Q.   All right.  So here we have three entries that are very
8     similar, 3-18-14, 3-19-14, 3-20-14.  Is that fair?  They are
9     all prefaced affidavit rejected?
10 A.   Yeah.  There are two more after that as well.
11 Q.   Correct.  Now, there is an entry on March 21, 2014.  The code
12     is MRSD.  Do you see that?
13 A.   Yes.
14 Q.   That begins mod related SPT docs uploaded from fax or mail.
15     Is that right?
16 A.   Yes.
17 Q.   What does this indicate?
18 A.   This -- as I mentioned earlier -- you asked me a question
19     about would I expect to see an entry around the 8th.  This is
20     that particular entry.  This indicates that mod docs were
21     received via fax or email and that they were uploaded, and the
22     docs received are listed below, RMA, 4506T, et cetera.
23     I will just read the rest.  You have started.  4506T, income
24     doc, then 1099-K, income doc, tax returns, share documents,
25     financial statement.  Right?

Page 117

1  A.  Yes.

2  Q.  That indicates these are the documents that were received

3     on -- or that were uploaded on that date, March 21st, 2014.

4     Right?

5  A.  Yes.

6  Q.  I have noticed that that entry ends with a comma.  Did you

7     notice that as well?

8  A.  I did see that, yes.

9  Q.  Does that indicate that there is more text that just doesn't

10    show up in this report?

11 A.  No.  The way these reports read you could have several more

12    lines of text that would still show up.

13 Q.  All right.  Just curious.

14 A.  For instance, there is an entry on 3-23 that has more lines of

15    text, so it's -- you could have in theory, you know, half a

16    page of additional text.  It is just going to show whatever is

17    present.

18 Q.  So that comma is very likely just a typo?

19 A.  Very likely.

20 Q.  The second entry from the bottom is dated March 24, 2014.  The

21    code is P-A-I-N.  Do you see that?

22 A.  Yes.

23 Q.  It says pass team in.  What does pass team in mean?

24 A.  I don't know.  I am not aware of its significance.

25 Q.  Is there anyone that you know of who would know what that

Page 118

1     entry means?

2  A.  TJohnson3 or RStephan or Stephan would probably know since

3     they made the entry.

4  Q.  All right.  Turning to page 68, there is an entry that is

5     dated March 25th, 2014.  It starts HMCF.  Do you see that?

6  A.  Yes.

7  Q.  Okay.  The text is HAMP FC certification complete.  Right?

8  A.  That's correct.

9  Q.  What does this entry mean?

10 A.  This is an entry that indicates that the loan was reviewed

11    within a certain time period prior to the foreclosure sale to

12    determine if there were any active or qualifying loss

13    mitigation events that would require the foreclosure sale to

14    be placed on hold and whether or not -- sorry, no, that's it.

15    That's all.

16 Q.  What department made that entry?

17 A.  I believe this is the foreclosure department.

18 Q.  All right.  And it would be either TJohnson3 or KS1034 to your

19    understanding?

20 A.  Yes.

21 Q.  Is it your understanding that HAMP FC certification represents

22    a document?

23 A.  It does not represent a document in this case.

24          (Marked for Identification: Exhibit 43.)

25 BY MR. WESTBROOK:

Page 119

1  Q.  Exhibit Number 43 which has just been handed to you is

2     entitled HAMP Foreclosure Certification by Servicer for

3     Non-GSE Accounts.  There is loan number 0596863530.  Do you

4     see that?

5  A.  I do see it.

6  Q.  Have you ever seen this document before?

7  A.  I have not.

8  Q.  Have you ever seen another document like it?

9  A.  I have seen documents like this in other cases.

10 Q.  Now, this document appears to be dated at the bottom March

11    25th, 2014.  Is that right?

12 A.  Correct.

13 Q.  It looks like it was prepared by somebody by the name of Kumar

14    Sesuraj, K-u-m-a-r, S-e-s-u-r-a-j.  Right?

15 A.  That's correct.

16 Q.  Now, looking back at Exhibit 40 we see an entry on March 25th,

17    2014.  That is the same date.  Right?

18 A.  That's correct.

19 Q.  And the employee code or assigned code includes TJohnson3, but

20    also includes KS1034.  Right?

21 A.  That's correct.

22 Q.  KS is the same as the initials of Kumar Sesuraj.  Right?

23 A.  It appears to be, yes.

24 Q.  And the entry on Exhibit 40 for March 25th, 2014 says HAMP FC

25    certification complete.  Right?

Page 120

1  A.  That's correct -- where does it say?  What are you directing

2     me to?  Sorry.

3  Q.  Exhibit 40.  That is the notes.

4  A.  Oh, yeah, sorry, the notes.  Yes, that is what it says.

5  Q.  And then this document is entitled HAMP Foreclosure

6     Certification.  Right?

7  A.  Correct.

8  Q.  Do you have any reason to believe that this document is not

9     what is referenced by HAMP FC certification in Exhibit 40?

10         MS. BAUCUS:  Objection, calls for speculation, form

11    of question.

12 A.  Based on the information that is provided, it appears to be

13    the same, the same date, the same loan.

14 BY MR. WESTBROOK:

15 Q.  All right.  So you may have been incorrect in stating that

16    HAMP FC certification doesn't refer to any documents?

17 A.  Based on my review of our electronic business records and what

18    I was able to find, I did not -- I have never seen this

19    document before, so my answer was based on my review of those

20    records and documents.  I was not able to find a -- the

21    document, Exhibit 43, so my answer that it was not -- did not

22    relate to a physical document was based on that answer.  If,

23    in fact, there is a physical document, which Exhibit 43

24    appears to be, then I would guess I would be correct -- or I

25    would be incorrect.

Page 121

1  Q.  All right.  Now we have talked about a few entries where I was
2      asking you whether these entries represent documents.
3      Right?
4  A.  Correct.
5  Q.  Was your answer regarding the items that you have said were
6      not representative of documents, were your answers based on
7      your own search for documents that appear to relate to those
8      entries?
9  A.  Yes and no.
10 Q.  Explain, please.
11 A.  Well, could you point me in the direction of which one you are
12     talking about specifically.
13 Q.  Let's say OCC checklist.
14 A.  I did look for that document.  I was not able to locate that
15     document.  Additionally I reviewed some procedure related to
16     that document that did not -- it referenced reviews that
17     needed to be completed but did not reference the filling out
18     of any documents.  It didn't reference any document
19     creation.
20 Q.  All right.  And I think you have testified to this, but you
21     didn't ask anybody, any other employees of Nationstar, whether
22     these were documents?
23 A.  Whether the OCC process involved the creation of a document?
24 Q.  Right.
25 A.  No.

Page 122

1  Q.  And you didn't ask any other Nationstar employees whether HAMP
2      FC certification referenced documents?
3  A.  No, I did not.  Now, like I mentioned before, I have seen
4      documents created for this process on other loans.  I
5      specifically qualified my answer and said in this loan I don't
6      believe that this references a document.  I am aware that this
7      document does exist and I have seen it in other loans.  I did
8      not see this document until today for this particular loan.
9  Q.  So your testimony of that HAMP FC certification, the entry
10     that shows up on Exhibit 40, was only based on the fact that
11     you weren't able to locate one?
12 A.  For this loan.  My answer was specific to this loan.
13 Q.  All right.  So your testimony is not that HAMP FC
14     certification in general doesn't reference any documents?
15 A.  That's correct.  I specifically talked about documents
16     pertaining to this loan based on the things I have discussed
17     earlier, my review, et cetera.
18        MS. BAUCUS:  We have the call to the court in about
19     10, 15 minutes.
20 A.  Okay.
21        MR. WESTBROOK:  I would like to finish up the
22     questioning about this particular document.
23        MS. BAUCUS:  Of 43?
24        MR. WESTBROOK:  Of 43, yes.
25        MS. BAUCUS:  Okay.  About five more minutes and then

Page 123

1      I need to take a break before we call the court.
2         MR. WESTBROOK:  I understand.
3  BY MR. WESTBROOK:
4  Q.  All right.  So the other things I asked about -- a couple of
5      the other things were affidavits.  You said those don't
6      represent documents.  Right?
7  A.  Well, I will stand on my answers for the specific ones you
8      have asked about.
9  Q.  Okay.  So is it your understanding that that term affidavit in
10     notes sometimes does refer to documents?
11 A.  You are going to have to point me to a specific entry that you
12     are talking about and I can do my best to answer that.
13 Q.  Are there documents called affidavits in Nationstar's
14     records?
15 A.  Sure, there are actual documents called affidavits.
16 Q.  Are there documents called affidavits that are referenced as
17     affidavits in servicing notes?
18 A.  Sure.  Generally speaking, yeah.
19 Q.  But you weren't able to locate any affidavit documents with
20     respect to this particular loan?
21 A.  We are going to have to drill down a little bit more than this
22     because there are affidavits that were executed that pertain
23     to this particular loan in a very general sense.  Now, you
24     asked me questions earlier about checklist affidavits and so
25     forth.  So the answers that I gave to those questions were

Page 124

1      specific to those types of affidavits.  And that was based on
2      information that I have reviewed prior to, prior to today.
3  Q.  When an entry says affidavit rejected, is it your
4      understanding that that never refers to documents?
5  A.  That's my understanding based on information that I have
6      received, reviewed from the foreclosure department.
7  Q.  Did you speak to anybody in the foreclosure department about
8      what that term affidavit rejected means?
9  A.  I didn't speak to anybody, no.
10 Q.  You didn't speak to them about whether affidavit rejected
11     refers to any documents.  Correct?
12        MS. BAUCUS:  Objection, asked and answered, form of
13     question.
14 A.  As I mentioned, I did not speak to anybody about that topic,
15     but I reviewed information relative to that topic.
16        MS. BAUCUS:  I'm going to have to stop the
17     deposition at this point to prepare for the hearing at 3:15.
18        (Off the record 3:03 p.m.)
19        (Conference call held telephonically with Magistrate
20        Judge Ellen Carmody and bound separately.)
21        (Back on the record 3:33 p.m.)
22 BY MR. WESTBROOK:
23 Q.  Okay.  Before we took a little break, for lack of a better
24     term, we were looking at Exhibits 40 and 43, and I wanted to
25     ask you some questions about other items that appeared to show

1    up in the servicing notes, which is Exhibit 40, that I had

2    asked you whether they represented documents or not.  Do you

3    recall that?

4  A.   Yes, I do.

5  Q.   One of the things we discussed was places in the servicing

6    notes, Exhibit 40, that reference affidavits.  Right?

7  A.   Yes.

8  Q.   And your prior testimony had been that the term affidavit in

9    these notes did not represent documents.  Right?

10  A.   In the specific entries you asked me about, yes.

11  Q.   And how do you know that those references to affidavits didn't

12    refer to documents?

13  A.   Can you please point me to the specific entry that you are

14    asking about.  That way I can be clear about the question --

15    the answer that I gave.

16  Q.   Page 67.  There are entries March 18, 2014, March 19, 2014,

17    March 20, 2014, March 21, 2014, March 24, 2014.  Each of those

18    refers to affidavit rejected.

19  A.   Yes.

20  Q.   Now, how did you know that those entries referencing the term

21    affidavit did not reference documents?

22  A.   Because I reviewed information prior to today's deposition

23    from -- and I'm almost certain it was the foreclosure

24    department that indicated that this was not an actual

25    affidavit, but a process that is completed by the bid team

1    shortly before the foreclosure, and it indicates a review

2    process that they go through before -- before the foreclosure

3    sale.

4  Q.   You said you reviewed information from the foreclosure

5    department.  Right?

6  A.   Yes.

7  Q.   What was the form of that information?

8  A.   It was in an email.

9  Q.   Who wrote the email?

10  A.   This email was part of some communication between our inhouse

11    counsel and the foreclosure department, so I don't know if

12    there is going to be any issues about me discussing those.

13         MS. BAUCUS:  Yes, object to attorney work product,

14    attorney-client privilege.

15  BY MR. WESTBROOK:

16  Q.   Other than the information contained in that email, which I

17    will not ask you about its content, did you have any reason to

18    believe that these entries, affidavit rejected, did not refer

19    to documents?

20  A.   Beyond that email I believe that I have never seen such an

21    affidavit in my review of these loan files.  Just a general

22    affidavit about the foreclosure.  I have never seen such an

23    affidavit in these loan files.

24  Q.   All right.  Now, another item that was referenced in your

25    prior testimony was the term OCC checklist.  Do you recall

1    that?

2  A.   Yes.

3  Q.   And am I correct in saying that your testimony was that the

4    term OCC checklist does not refer to documents.  Right?

5  A.   That's correct.

6  Q.   How do you know that the term OCC checklist does not pertain

7    to documents?

8         MS. BAUCUS:  Objection, asked and answered.

9  A.   The answer to that question was based on my review of -- yeah,

10    I did answer this question -- applicable procedure.  And in

11    that procedure describes -- there are -- there are

12    descriptions of, you know, the review that's completed to

13    ensure that a foreclosure does not move forward improperly,

14    but there is no reference to the creation or completion of any

15    document.

16  BY MR. WESTBROOK:

17  Q.   All right.  Do you know what that procedure is called?

18  A.   I don't know the title of it off the top of my head.

19  Q.   How did you locate that procedure?

20  A.   We maintain a database that contains all of our policies and

21    procedures and control standards.

22  Q.   Is that something that is available to you electronically?

23  A.   Yes.

24  Q.   Have you ever seen a document that is entitled OCC checklist,

25    a Nationstar document entitled OCC checklist?

1  A.   I have not.

2  Q.   Previously we discussed the term pre-sale checklist, which

3    shows up on page 66 of Exhibit 40.  Right?

4  A.   I'm sorry, page 66?

5  Q.   66, yes.  Pre-sale checklist.  I am looking at the entry dated

6    February 25.

7  A.   Yes.

8  Q.   All right.  And am I correct in characterizing your testimony

9    as that this term pre-sale checklist as it is used here

10    doesn't refer to documents?

11  A.   That's correct.  My recollection is that the pre-sale

12    checklist and this affidavit rejected were both the subject

13    content of the email between our inhouse counsel and our

14    foreclosure department.

15  Q.   Independent of that do you have any reason to believe that

16    that entry pre-sale checklist does not refer to documents?

17  A.   Do I have any reason to believe that it does not refer to a

18    document?

19  Q.   Yes, other than that correspondence that included counsel.

20  A.   No.  And, again, in my review of loans I have never come

21    across a pre-sale checklist ever that we have maintained.

22  Q.   All right.  But you have come across documents like Exhibit 43

23    HAMP Foreclosure Certification by Servicer by Non-GSE

24    Accounts.  Right?

25  A.   I have seen them in other loans.  Exhibit 43 and your

Page 129

1   production of it to me is the first time I have seen it in
2   this case.
3 Q.  All right.
4 A.  I would just like to point out that I did attempt to locate it
5   and was unable to do so.
6 Q.  What process did you go through in order to try to locate
7   it?
8 A.  I looked in our LPS system.
9 Q.  All right. Is it your understanding that ordinarily a
10   certification like this would show up in the LPS system?
11 A.  That is my understanding. It's also possible that it could be
12   housed in our FileNet system, and I will say I did not look
13   through FileNet to see if it was there. I don't typically
14   have to look to FileNet to see it, but I didn't.
15 Q.  Is that FileNet, F-i-l-e-N-e-t?
16 A.  Correct.
17 Q.  No space?
18 A.  Correct.
19 Q.  What is that system?
20 A.  FileNet is a repository, an electronic repository, in which
21   all of the imaged documents that are associated with this loan
22   are kept.
23 Q.  All right. Do you have any understanding for how long imaged
24   documents with respect to a particular loan are kept in that
25   FileNet system?

Page 130

1 A.  I know that they are kept throughout the period of time that
2   we are servicing the loan. After the loan is no longer being
3   serviced I am not sure how much longer they are kept.
4 Q.  Looking at Exhibit 43, after it states the loan number, the
5   borrower name, the co borrower name, which in this case is
6   blank, it says the undersigned mortgagee, beneficiary or
7   authorized agent verifies that: At least one of the following
8   circumstances exists, colon. Do you see that?
9 A.  Yes.
10 Q.  And let me back up. Do you have an understanding for who the
11   intended audience is for this type of certification form?
12 A.  Excuse me. My understanding is that this is part of the MHA
13   rules that were required to make such a certification. I
14   don't know who ultimately would have access to it or be able
15   to view it, so I'm not sure, per se, who the intended audience
16   is. I guess that maybe just depends on the circumstances. I
17   don't know.
18 Q.  All right. Here there are three different boxes checked. Is
19   that fair?
20 A.  Yes.
21 Q.  And, you know, with that prefatory language at least one of
22   the following circumstances exists, that's near the top of the
23   page. Right?
24 A.  Yes.
25 Q.  And then after several boxes it says and, colon, and there are

Page 131

1   two more checked boxes. Right?
2 A.  That's correct.
3 Q.  Now, with respect to that top grouping, which is one, two,
4   three, four, five, six -- seven boxes, do you have an
5   understanding for what happens if Nationstar finds that at
6   least one of the following seven circumstances does not
7   exist?
8 A.  Is your question that they would -- that they don't -- if they
9   find out one of these do not exist they do not check the box.
10   Is that what you are asking?
11 Q.  That's what I am asking, yes.
12 A.  That's a fair assessment.
13 Q.  All right. And what happens in terms of the foreclosure, if
14   anything, if Nationstar does not find that one of these
15   conditions exist?
16      MS. BAUCUS: Objection, calls for speculation, form
17   of the question.
18 A.  I don't know.
19 BY MR. WESTBROOK:
20 Q.  Do you know if Nationstar had a policy or procedure in place
21   in the early 2014 time frame that indicated what Nationstar
22   should do if none of those seven conditions exist?
23 A.  Sorry. Let me clarify my last answer. I believe that the --
24   if the certification were not able to be completed that the
25   foreclosure sale would be postponed.

Page 132

1 Q.  All right. There is one box that is checked in that first
2   grouping of seven conditions. Right?
3 A.  There is one box checked, yes.
4 Q.  And next to that box is the language the servicer has
5   established Right Party Contact, has sent at least two written
6   requests asking the borrower to supply information in
7   accordance with section 2.2.2, and has otherwise satisfied the
8   Reasonable Effort solicitation standard, and the borrower
9   failed to respond by the dates indicated in those requests;
10   and the scheduled sale date is a minimum of 30 days from HAMP
11   rejection. Do you see that?
12 A.  Yes.
13 Q.  So am I correct in stating that here Nationstar is verifying
14   that at least two written requests were sent to the borrower
15   to supply the required information?
16 A.  That's what it says.
17 Q.  Do you know if that actually occurred with respect to the Lake
18   Drive HAMP application?
19 A.  And this is where I'm not certain what qualifies for this
20   certification. I'm not familiar with this part of the MHA
21   program rules specifically. So I'm not certain if the
22   modification attempts that were done prior to the HAMP case
23   being opened in February would be included in this. If that
24   is the case, obviously there are multiple attempts over the
25   course of however long, over a year or two, to get documents

Page 133

1    and information from the borrower, and I'm not sure if that --
2    if that's what is counted in here, or if this is just the
3    HAMP, HAMP specific case that was opened in February.
4    Q.  All right.  And is it your understanding that that's -- a
5    reference to section 2.2.2 is a reference to the MHA
6    handbook?
7    A.  That would be my understanding.
8    Q.  All right.  Now, the last part of that checked section says
9    and the scheduled sale date is a minimum of 30 days from HAMP
10   rejection.  Do you see that?
11   A.  Yes.
12   Q.  Do you know if there was ever a HAMP rejection with respect to
13   the 1625 Lake Drive property?
14   A.  And that's -- again, I'm not certain what qualifies as a,
15   quote, HAMP rejection in terms of this letter.  I say that
16   only because sometimes HAMP is used sort of interchangeably
17   with loan modifications, so I -- in terms of a HAMP specific
18   rejection, there was never a HAMP specific rejection that was
19   done in this instance for the reasons I have discussed
20   earlier.  We received it within the 37 days.  But if it
21   were -- if it applies to other rejections, then obviously
22   there were other rejections that were -- were done in --
23   during the time that we were servicing the loan.
24   Q.  But it doesn't say the sale date is a minimum of 30 days from
25   any modification.  Right?

Page 134

1    A.  That is what I was clarifying or trying to clarify.  I don't
2    know if this is -- if it is specific to HAMP.  There was no
3    HAMP rejection given here.
4    Q.  Right.
5    A.  If it is not specific to HAMP, there were HAMP rejections and
6    were more than 30 days from that, so --
7    Q.  Right.  But it says 30 days from HAMP rejection.  Right?
8         MS. BAUCUS:  Objection, asked and answered.
9    BY MR. WESTBROOK:
10   Q.  Am I reading that correctly?
11   A.  Exactly.  But I just said if it -- if it is HAMP specific, if
12   this is to the letter a HAMP rejection, then there was no HAMP
13   rejection done in this instance, specifically a HAMP program
14   modification rejection.
15   Q.  Understood.  All right.  And down to the bottom there is that
16   grouping of two after the word and colon.  You see that both
17   of those boxes are checked.  Right?
18   A.  Yes.
19   Q.  Am I correct in understanding that here Nationstar is
20   verifying that both, all other available loss mitigation
21   alternatives have been exhausted and a nonforeclosure outcome
22   could not be reached, and, 2, the certification has been
23   completed no more than 7 days prior to the scheduled sale
24   date?
25   A.  That's what it says, yes.

Page 135

1    Q.  Now, it appears that this certification was generated on the
2    date on the document, March 25th, 2014.  Right?
3    A.  Yes.
4    Q.  Assuming that the scheduled sale date was April 2nd, 2014,
5    there are more than seven days between March 25, 2014 and
6    April 2nd, 2014.  Right?
7    A.  Yeah, I guess.
8    Q.  So if I'm correct that the scheduled date was April 2nd, 2014,
9    then this certification was actually completed eight days
10   prior to the scheduled sale date?
11   A.  Yeah, it looks like there is an eight day difference if this
12   is -- if this was completed on the 25th.  It's dated the
13   25th.
14   Q.  All right.  And the name at the bottom, Kumar Sesuraj, is that
15   a name that you are familiar with at all?
16   A.  I am not.
17   Q.  Do you have any idea?  Is he a Nationstar employee?
18   A.  I don't know.  I don't have any familiarity with him.
19   According to this document it appears to be that he is signing
20   or has filled this out on behalf of Nationstar, but I have no
21   independent knowledge of him or what he does at Nationstar.
22   Q.  All right.  And do you have an understanding of what division
23   within Nationstar would prepare HAMP foreclosure
24   certifications like this one?
25   A.  I believe this is part of our -- we have a document execution

Page 136

1    group I think that prepares documents like this.
2    Q.  Do you know if there is a centralized location where the
3    document execution group is located?
4    A.  I do not.  I don't believe it is all in one place.
5    Q.  I would like to just go back to Exhibit 40 if we could, back
6    to pages 64 and 65.
7    A.  Oh.
8    Q.  I just want to circle back here regarding the entries.  There
9    is several entries, and I'm looking at one starting at January
10   24, 2014 that states left message to call and appears to have
11   a phone number underneath 616-337-2565.  Do you see that?
12   A.  Yes.
13   Q.  And then on the following page, page 65, there are a number of
14   those similar entries left message to call, January 28, 2014
15   left message to call, January 29, 2014 left message to call,
16   and one, two, three -- several others.  Right?
17   A.  Uh-huh, yes.
18   Q.  Now, is it your understanding that those entries relate to
19   attempts by Nationstar to contact the borrower?
20   A.  Yes.
21   Q.  Is it your -- it's not your understanding then that those
22   messages indicate that the borrower was calling Nationstar?
23   A.  That's correct.  That would be a different type of entry.
24   Q.  What would that entry look like?
25   A.  There would be an entry indicating that a message was received

Page 137

1  from borrower to call, to call back, and there would be an
2  entry following that by someone from Nationstar returning the
3  phone call to the borrower.
4  Q.  Well, here we have an entry on January 31st, 2014 that is --
5  the code assigned to it is C005.  That is on page 65.
6  A.  Oh, I'm sorry, I am on the wrong page.
7  Q.  It's the January 31st, 2014 entry, TJohnson3, that is preceded
8  by a code C005.
9  A.  Yes.
10 Q.  This one says TEL RES, I guess, no answer.  Can you tell me
11 what that entry means.
12 A.  It means that somebody from Nationstar telephoned the
13 residence and there was no answer.  Below it is the phone
14 number they called.
15 Q.  All right.  And this doesn't indicate any message being left.
16 Right?
17 A.  That is correct.  There was no answer.
18      MR. WESTBROOK:  I would like to mark this as Exhibit
19 44, please.
20      (Marked for Identification:  Exhibit 44.)
21 BY MR. WESTBROOK:
22 Q.  Are you aware of the Making Home Affordable or MHA program
23 that was started by the U.S. Department of Treasury back in
24 2009?
25 A.  I am not familiar with the exact date, but I am familiar with

Page 138

1  the program.
2  Q.  What is your understanding of what that program is?
3  A.  Well, it's a -- it is a comprehensive program that is aimed at
4  finding ways to allow borrowers to stay in their home and
5  avoid foreclosure.
6  Q.  And I think you discussed this before, but Nationstar does
7  participate in MHA when the investor does.  Is that right?
8  A.  If the -- right, so HAMP program is administered pursuant
9  to investor guidelines.  So if the investor participates in
10 the HAMP program, then Nationstar will administer that
11 program.
12 Q.  Right.
13      Is there a benefit to Nationstar participating in
14 the MHA program?
15 A.  Yes, there is.
16 Q.  What is that benefit?
17 A.  For loans that are modified pursuant to the HAMP program,
18 there are certain cash incentives for loans that are modified.
19 Also, typically speaking, loans that are modified,
20 successfully modified, over the long run will generate more
21 income for Nationstar and, of course, the investor, as opposed
22 to a foreclosure sale.  And, depending on the individual
23 compensation arrangement with the investor, sometimes it is
24 based off of overall performance of a portfolio and in this
25 case it brings a non-performing loan back into performance and

Page 139

1  overall adds to the performance of the portfolio.
2  Q.  What is Nationstar -- let me back up.
3      Are there any requirements imposed on Nationstar as
4  a result of its participation in MHA?
5      MS. BAUCUS:  Objection.  He is not being produced
6  here as Nationstar's representative with regard to MHA in
7  general or benefits Nationstar may or may not receive or
8  overall Nationstar's participation in the program.
9      MR. WESTBROOK:  Understood.
10 BY MR. WESTBROOK:
11 Q.  I will clarify my question.  I am asking for your personal
12 understanding.
13 A.  Are there requirements as a result of participating in the
14 program, is that your question?
15      MS. BAUCUS:  Objection.  He is not being produced
16 pursuant to a subpoena.  You asked for his personal
17 understanding.  He is not a witness here pursuant to subpoena.
18 He is not going to answer only with regard to that.  He is
19 only here as a 30(b)(6) witness for Nationstar.
20      MR. WESTBROOK:  Are you instructing him not to
21 answer the question?
22      MS. BAUCUS:  Yes, that is within the topic discussed
23 with the judge not related to any policies, procedures that
24 was pursued with these two loans here, nor is it a topic
25 identified in the Rule 30(b)(6).

Page 140

1      MR. WESTBROOK:  I'm asking for his personal
2  understanding.
3      MS. BAUCUS:  Thank you for that.
4      MR. WESTBROOK:  That is within the bounds of a
5  deposition even if it is designated a 30(b)(6) deposition and
6  I object to the instruction not to answer.  It is improper and
7  I intend to file motions seeking any and all relief for this
8  failure to allow the deponent to answer the question.
9  BY MR. WESTBROOK:
10 Q.  Do you know if Nationstar is required to sign an agreement
11 with the treasury in connection with its participation in
12 MHA?
13      MS. BAUCUS:  Objection, this is not relevant.  It is
14 not within the topics identified in Rule 30(b)(6) topics.  He
15 is here to testify with regard to the topics of foreclosure
16 protections and he's not going to answer that.
17      MR. WESTBROOK:  I am going to continue to ask
18 questions relating to this topic and I would appreciate it if
19 you would develop some shorthand for that objection and
20 instruction not to answer.  For example, same objection and
21 instruction not to answer would be fine.
22 BY MR. WESTBROOK:
23 Q.  Do you know if Nationstar is required to submit certifications
24 to treasury with respect to HAMP modifications?
25      MS. BAUCUS:  Same objection.

1 BY MR. WESTBROOK:

2 Q.  Looking at Exhibit 44, which is the HAMP handbook, first of

3    all, is this a document that you are familiar with?

4 A.  I am generally familiar with this handbook.  Of course it has

5    gone through a couple of different versions over the years.  I

6    can't recall specifically if I have reviewed version 2.0, but

7    I have reviewed versions of this handbook.

8 Q.  Sure.  If you flip, please, to page 28 there is a section on

9    that page at the very top that says 3, protections against

10   unnecessary foreclosure, and then a subheading 3.1, suspension

11   of a referral to foreclosure.  Do you see that?

12 A.  Yes.

13 Q.  If you go ahead and just read that, that section 3.1, to

14   yourself and let me know when you are familiar with it.

15 A.  Okay.  Yes, I have reviewed it.

16 Q.  All right.  Now that section 3.1, the bullet points contained

17   there are similar to the checked boxes that are contained on

18   Exhibit 43.  Is that fair?

19 A.  They are very close, yes.  Similar to.

20 Q.  Do you know if, with respect to HAMP modification cases like

21   the one that was being pursued with respect to 1625 Lake

22   Drive, if Nationstar had internal policies and procedures

23   intended to ensure its compliance with the requirements of the

24   MHA program during early 2014?

25 A.  Yes, it did.

1 Q.  And were those internal policies and procedures reduced to

2    writing?

3 A.  Yes, they are.

4 Q.  Do you know what they are called?

5 A.  I don't remember the specific title of the policy or

6    procedure, but it essentially mirrors the requirements of the

7    program.

8 Q.  All right.  If you wanted to access Nationstar's policies and

9    procedures from the 2014 time frame with respect to HAMP

10   modification cases like the ones being pursued for 1625 Lake

11   Drive, how would you access the policy and procedure

12   documents?

13 A.  I would go into our policy and procedure database, and it's

14   got like a Boolean search engine, and would search for

15   either HAMP foreclosure rules or MHA foreclosure procedure or

16   something along those lines.  It usually -- I can't remember

17   the exact term I used to search for it when I reviewed it in

18   this case and -- actually, I take that back, I had -- I think

19   I had saved it from some previous case, but nevertheless, you

20   know, it will pull up a large number of documents.  Sometimes

21   you have to fish through to find the right one.  That is why I

22   can't remember.  Sometimes we don't have the

23   most obvious titles.  It is not like you just get one.  It is

24   like doing a Google search, you might have to go through a

25   couple of pages before you find the right policy or procedure

1    for what is on point for whatever you want to know.

2 Q.  Sure.  All right.

3        Moving down to section 3.3, that is entitled

4    suspension of scheduled foreclosure sale, just reading the

5    first sentence, when a borrower submits a request for HAMP

6    consideration after a foreclosure sale date has been scheduled

7    and the request is received no later than midnight of the

8    seventh business day prior to the foreclosure sale date

9    (deadline), the servicer must suspend the sale as necessary to

10   evaluate the borrower for HAMP.  Do you see that?

11 A.  I see that.

12 Q.  Do you know if during the early 2014 time frame with respect

13   to HAMP modification cases like the one being pursued for 1625

14   Lake Drive if Nationstar had internal policies and procedures

15   intended to ensure its compliance with this particular

16   requirement, 3.3, of the MHA handbook?

17      MS. BAUCUS:  Objection to the extent that there is

18   an inference that this document entitled Exhibit 44 was the

19   applicable MHA handbook for servicers during 2014 as it's

20   dated September 22nd, 2010.  Secondly, this is a handbook for

21   servicers.  It is not guidelines.

22 A.  Yeah, I -- sorry, just one second.  I'm not -- I guess the

23   policies and procedures that I reviewed relative to, you know,

24   reviewing of loan modification packets within certain time

25   frames of a foreclosure sale, the standards for completeness

1    of packet and dates don't seem to mirror what I'm reading in

2    here, so I don't know if those rules changed at some point,

3    but I don't see -- the language that I reviewed does not seem

4    to be the same as what's listed in this, at least section

5    3.3.

6 BY MR. WESTBROOK:

7 Q.  All right.  Fair enough.

8        Back to Exhibit 40, if you will.  You can set that

9    document aside.

10 A.  Sorry, Exhibit 40?

11 Q.  Yes, Exhibit 40.  I'm looking at page 68 and I'm looking at an

12   entry it's dated April 1st, 2014 and the code assigned is

13   AFRD.  It says affidavit rejected.  Underneath that it says

14   HAMP chert already completed.  Do you see that?

15 A.  Yes.

16 Q.  And what does this mean?

17 A.  I don't know, but the entry two below it appears to be

18   canceling that entry out or indicating it was some sort of

19   error, so I am not sure why it was made at that time.

20 Q.  All right.  Right.  So there is --

21 A.  Three beneath it.

22 Q.  I see.  So there are a series of entries on April 1st, 2014.

23   Right?

24 A.  Correct.

25 Q.  There is one that says affidavit rejected, HAMP chert already

Page 145

1 completed.  Right?

2 A.  Yes.

3 Q.  Underneath that one that appears to say please ignore the pre

4 notes of AFRD.  Right?

5 A.  Yes.

6 Q.  The next one still dated April 1st, 2014 says affidavit

7 rejected.  HAMP no sale is not open -- opened in LPS.  Do you

8 see that?

9 A.  Correct.

10 Q.  Do you have any understanding of what that note means?

11 A.  I do not.

12 Q.  And then there is another one April 1st, 2014.  The next one

13 down says, it looks like, please ignore the pre two notes of

14 AFRD and one CSVC.  Right?

15 A.  Correct.

16 Q.  Is there any indication that you can tell as to why there was

17 a note added to disregard the prior notes?

18 A.  No, other than to me I read that as those were entered in

19 error.  There is a -- for better or for worse when the entry

20 is made in LSAMS you can't erase it, so there is no way to

21 just take it off.

22 Q.  Sure.  Do you know if there is an indication anywhere else,

23 not in this servicing notes document, but in some other form,

24 some other document or database or system, that would tell us

25 why there was -- why these entries were made including one to

Page 146

1 ignore the prior entries?

2 A.  No.

3 Q.  Now, there is, it looks to be, an entry on April 1st, 2014

4 that says HAMP certification complete.  Do you see that?

5 A.  I do.

6 Q.  Are you aware of any document that reflects a HAMP foreclosure

7 certification dated April 1st, 2014?

8 A.  April 21st?

9 Q.  April 1st, 2014.

10 A.  No, not -- the only one I have seen is the one you have shown

11 to me.  However, I would interpret this series of entries here

12 that this HAMP certification complete would be corrective,

13 because if you look at the time frame that these entries are

14 made.  It looks -- there is this rejected entry, then there is

15 a please ignore, then another rejected, then this HAMP no

16 sale, and then a please ignore, and then one second later they

17 enter this HAMP certification complete.  So I would read that

18 as there was a series of incorrect entries here, and to

19 clarify that this certification is, in fact, complete, is the

20 way that I would interpret this series of entries.

21 Q.  The second to last entry on the page is dated 4/2/2014 and it

22 starts CLTR.  Do you see that?

23 A.  Yes.

24 Q.  The text is call transferred.  And then underneath it says

25 transfer to ABS 90 plus to get the mod and F/C info

Page 147

1 together//MS RECV D notice that the house had been sold.  Do

2 you see that?

3 A.  Yes.

4 Q.  The phrase ABS 90 plus, do you have an understanding of what

5 that means?

6 A.  I can't remember specifically what ABS stands for, but this

7 is -- so our loss mitigation teams and/or collections groups

8 are divided into levels of delinquency, so we have pre 30 days

9 delinquency, then 30 to 60, then 60 to 90, then 90 plus.  I

10 read this as going to the 90 plus delinquency group that

11 the -- well, first of all, that this is indicating -- if you

12 look at the entries together, the 4-2 entries together, you

13 can see that Ms. Craigie is calling in and that she is wanting

14 to know the status of the mod papers that she had sent in, and

15 that her call was transferred to this ABS 90 plus group to get

16 the info on the mod and foreclosure together.  And she

17 indicated that she received a note that her house had been

18 sold.

19 Q.  Do you have an understanding of why this ABS 90 group would be

20 pulling together modification and foreclosure information if

21 the house had already been sold?

22 A.  Well, she had questions about the modification, you know, docs

23 that she had sent in and about the foreclosure, so this would

24 be a person who could look at those, pull those documents

25 together, take a look at them and give them -- give her some

Page 148

1 sort of updated status on what was happening.

2 Q.  Turning a couple of pages to page 70.  The second entry from

3 the top is dated April 2nd, 2014.  Do you see that?

4 A.  Yes.

5 Q.  And the entry is affidavit rejected.  Underneath it says rush

6 - HAMP chert already completed.  Do you see that?

7 A.  Yes.

8 Q.  What does this entry mean?

9 A.  I'm not sure why it has the heading affidavit rejected.  I

10 just read this that there is -- that the HAMP certification

11 has already been completed.  I am not sure why it is listed

12 under the heading of affidavit rejected.

13 Q.  Is there a general meaning that is afforded to that entry

14 affidavit rejected that you know of?

15 A.  Again, my information is limited just to that.  This is part

16 of the foreclosure review process and ensuring that there is

17 nothing impeding the foreclosure from moving forward.

18 Q.  And the term rejected means what?

19        MS. BAUCUS:  Objection, asked and answered with

20 regard to this term numerous times.

21 A.  As I indicated this -- I don't know why this -- why it says

22 affidavit rejected in this context.  I can't explain why that

23 is.  I don't know.

24 BY MR. WESTBROOK:

25 Q.  All right.  The same date, but at the very bottom of the page

Page 149

1   is an entry that is dated April 2nd, 2014.
2  A.  Yes.
3  Q.  There is a code TLRC and the narrative says timeline review
4      complete.  Do you see that?
5  A.  Oh, at the very bottom?
6  Q.  Yes.
7  A.  Yes.
8  Q.  And what is a timeline review?
9  A.  I know that the foreclosure counsel will submit a timeline to
10     our foreclosure department to review that includes the
11     timeline of the foreclosure.
12 Q.  All right.  And someone at Nationstar will review that.  Is
13     that right?
14 A.  That's correct.
15 Q.  And that's what this entry means then, timeline review
16     complete, someone at Nationstar has reviewed the timeline
17     foreclosure timeline?
18 A.  That's correct.  I would read this entry to indicate that that
19     is the case.
20 Q.  All right.  Do you know what the purpose of a timeline review
21     is?
22 A.  No, I have never looked at one myself.  I would only be
23     guessing as to why somebody would want to look at one.  I have
24     never been told specifically why they would want to review
25     it.

Page 150

1  Q.  All right.  Looking at page 71, near the middle of the page
2      about a third of the way down there is an entry dated April 4,
3      2014, another code AFRD.  Affidavit rejected.  Underneath that
4      it says sale scheduled date was past.  Do you know how to
5      interpret that entry?
6  A.  No, also in this context I cannot understand why that is
7      there.  This is post foreclosure sale, so it is not real clear
8      to me why that -- why that is there in that context.
9  Q.  Is there a context in which you would expect to see an entry
10     like this?
11 A.  I would expect to see -- yeah.  As I testified earlier, I
12     would expect it in a pre-foreclosure setting, especially if it
13     was discussing, you know, any delays or holds on the file
14     pre-foreclosure.  It is not clear to me why it's on here post
15     foreclosure.
16 Q.  All right.  A similar entry on April 7th, 2014, again, the
17     code is AFRD.  The text says affidavit rejected.  The next
18     line process closed - HAMP chert was completed and sale held.
19     Do you have any understanding as to what that entry means?
20 A.  Again, I'm not certain why this person has chosen to use this
21     affidavit rejected heading, but the process closed -- well,
22     actually I have some idea why.  Okay.  In terms of the
23     affidavit rejected I am not sure why that heading was used,
24     but in terms of the process closed - HAMP certification was
25     completed and sale held, I did review information that would

Page 151

1      explain why that entry was there, but that information was
2      contained in LPS.  I don't know if I am allowed to answer that
3      question or not, but that is what that is.
4  Q.  All right.  Do you know what the phrase process closed
5      means?
6  A.  Yes.
7  Q.  What does it mean?
8  A.  It has to do with how things work in LPS.  Processes are
9      opened and processes are closed.  And depending on who opens
10     the process and what the process is for, the same process may
11     be opened and closed by somebody, it may be opened by one
12     person and closed by another, but essentially it's to --
13     somebody essentially creates a task that has to be done and
14     then the task is completed and then the process would be
15     closed.
16 Q.  All right.  Do you know if foreclosure counts as a process?
17 A.  It is not as simple as one process.  Foreclosure may have 40
18     processes within it just depending on individual
19     circumstances, how many times the process has been stopped and
20     started, any number of other factors.
21 Q.  What is the final process in a foreclosure?
22 A.  In LPS system I don't think there is a set last process.
23     There are processes that are common to see at the end of the
24     foreclosure period, but, you know, things like attorneys fees
25     and things like that are also processes that are built in

Page 152

1      there, so you need -- you know, that may be on, that may be
2      happening.
3          MS. BAUCUS:  Objection to the extent it's seeking
4      information about attorney input into LPS with regard to
5      processes related to foreclosure.
6  A.  I just -- I can't say that there is a uniform last process.
7  BY MR. WESTBROOK:
8  Q.  Understood.
9          Do you know what process was being referred to in
10     this entry?
11 A.  The HAMP certification process.
12 Q.  All right.  Do you know if there was ever a review of the HAMP
13     certification that was Exhibit 43 to determine whether it was
14     accurate or not?
15 A.  I was -- well, there is a HAMP certification process in LPS
16     that -- but it does not indicate whether or not this document
17     was reviewed, and it does not contain this document.  As I
18     mentioned earlier I was unable to locate it.
19 Q.  Sure.
20         Looking at page 73, about halfway down the page
21     there is an entry dated April 24, 2014 and the code is LRVW.
22     Are you with me?
23 A.  I am.
24 Q.  And the personnel on here look like TJohnson3 and IRump.  Is
25     that right?

Page 153

1 A. Correct.

2 Q. Loan reviewed by manager. See comments. Underneath it says
3     borrower claiming we must rescind the sale - based of the
4     level of -- I take it that is shorthand for delinquency. Is
5     that fair?

6 A. That's fair.

7 Q. It says five years behind in parens. Cases in the past never
8     completed, and after reviewing the most recent case - we are
9     still incomplete and missing docs. The sale will stand. No
10    rescission will be approved by management. Did I interpret
11    that correctly?

12 A. Yes.

13 Q. Is it your understanding that after the date of the
14    foreclosure sale that Nationstar can choose to rescind the
15    foreclosure sale?

16 A. Depending on what occurred at the foreclosure sale and
17    depending on individual investor rules and things like that,
18    it is possible under certain circumstances for Nationstar to
19    rescind a foreclosure sale, yes.

20 Q. All right. Let's take an instance like the one that took
21    place here, 1625 Lake Drive, where at the foreclosure sale
22    there was a credit bid.

23 A. Uh-huh, yes.

24 Q. Is that potentially a situation in which a foreclosure sale
25    could be rescinded?

Page 154

1 A. Yes.

2 Q. Are there policies and procedures?

3 A. Well, sorry, can I clarify.

4 Q. Okay.

5 A. So we are talking about -- how far out past the sale are we
6    talking about? As of the date of this entry, yes.

7 Q. Yeah. Let's say within the redemption period.

8 A. Sure.

9 Q. Is it a shorter period than the full redemption period?

10 A. And I'm not familiar with the redemption period in the State
11   of Michigan. I think -- is it six months or something? And
12   so I -- that may -- I don't know what bearing that has on it,
13   but I guess since you could redeem it's conceivable that it
14   could be rescinded during that time period.

15 Q. Okay. Do you know if there are policies and procedures at
16   Nationstar that would have followed at this time in the spring
17   of 2014 regarding rescission of sheriff sales under conditions
18   like these? And by conditions like these I mean there is a
19   credit bid, Bank of New York Mellon is the investor.

20 A. I don't know. I did not make any attempt to review any
21   policies and procedures relative to the issue of rescission.
22   That's the best I can tell you.

23 Q. All right. Do you know if any of those policies and
24   procedures exist?

25      MS. BAUCUS: With regard to what?

Page 155

1 BY MR. WESTBROOK:

2 Q. With regard to what we just discussed.

3      MS. BAUCUS: Objection, the question is vague, form
4   of question.

5 A. Again, I haven't looked to see what exists or what doesn't
6   exist, so I hate to speculate as to what is out there. I
7   would say I would expect to see something on the issue of
8   rescission, rescission of a foreclosure sale, but, again, I
9   have not made any attempt to search or locate those documents
10   and I haven't had an occasion to review those in any other
11   cases.

12 BY MR. WESTBROOK:

13 Q. Understood.

14      MS. BAUCUS: Objection to the extent that the
15   witness' testimony is being sought as to a legal opinion with
16   regard to redemption/rescission because he is not being
17   produced as an attorney for legal opinions under Michigan law
18   with regard to Nationstar's policies and procedures when it
19   may or may not set aside the sheriff sale.

20      MR. WESTBROOK: He has already answered the
21   question.

22 BY MR. WESTBROOK:

23 Q. Two pages later, page 75 of Exhibit 40, it looks like the
24   fourth entry down is dated May 22nd, 2014. The code assigned
25   is SLKB. Do you see that?

Page 156

1 A. SLKB, yes.

2 Q. It says second look kickback to UW. Next line, unable to
3   determine why rep rejected case for no information. FINS is
4   on file. Do you see that?

5 A. Yes.

6 Q. Do you have an understanding of what that entry means?

7 A. Yeah. So it's kind of an odd situation because what has
8   occurred is you have this HAMP case opening in February and
9   the document submission, then you have the foreclosure sale
10   occurring, and then what you have after this is sort of this
11   case that is still just hanging open. And as far as I can
12   tell, I can't remember what the last status was on this, but
13   in terms of what was left on the underwriting status for the
14   loan modification application I believe it was -- I don't
15   remember what it was, but this second look back, this is
16   basically a hey, what happened with this loan modification,
17   unable to determine why it says the case was rejected for no
18   information because we have financial documents on hand. But
19   essentially it was nobody showed at the time, it appears to
20   me, to close this process out after the foreclosure sale. So
21   it was sort of lingering there for a month until somebody came
22   and closed it out.

23 Q. All right. The kick back to UW, does UW indicate underwriting
24   there?

25 A. Yes.

Page 157

1  Q.   And do you know what the purpose of a second look kick back
2       to underwriting?
3  A.   I know that they -- I will have to think for just a second.
4       It has to do -- I don't remember specifically, but generally
5       speaking it has to do with completeness of loan modification
6       documents and the review process, and I can't remember if it
7       has to do with the initial look to see if the documents are
8       complete or if it is underwriting taking a more comprehensive
9       look at the file, but it has something to do with that
10      process. And my understanding is that it is meant to speed up
11      and make the process more efficient. In this case, I mean, we
12      are all kind of in moot point land. I mean, this is post
13      foreclosure sale. There is nothing that's going to happen
14      with this mod at this point. Somebody just basically didn't
15      close the process out. It was kind of lingering out here. So
16      I am not -- this doesn't really make a whole lot of sense to
17      me out here in this particular context other than somebody was
18      going back and looking at the open modification process.
19 Q.   Is it your understanding then that there was not a -- there
20      was no potential for a modification to be completed or
21      accepted with respect to this loan after the foreclosure sale
22      had been completed?
23 A.   Yes, that's correct.
24 Q.   The next entry down is dated the same date, May 22nd, 2014.
25      CSVC is the code. It says as of -- it has a couple of greater

Page 158

1       than symbols and then it says disregard SLKB. Does that refer
2       to the line above it, the second look kickback line?
3  A.   Yes. I didn't look to see what the next one was, but that
4       would make sense that they would because this -- this really
5       doesn't make any sense in the context of a post foreclosure
6       loan mod review. We don't do post foreclosure loan mod
7       reviews, so it would make sense that somebody had this as a
8       disregard. Maybe this person realized after this entry was
9       made that we are talking about a post foreclosure property
10      here so this doesn't make any sense. I don't know that
11      because they didn't write it, but there was a disregard there
12      and it appears to be referring to that entry.
13 Q.   All right. And moving down to the next line also dated May
14      22nd, 2014, the code is LOOK, and then the narrative is
15      independent mod review complete. Case is in post sale and it
16      looks like shorthand for property. Do you see that?
17 A.   Yeah.
18 Q.   Do you have an understanding of what that entry means?
19 A.   Yeah, so our quality assurance folks do audits of various
20      processes within Nationstar. One of those is, you know, our
21      loan modification group, and this indicates to me that
22      somebody from quality assurance went in to do an independent
23      mod review this day and realized that the -- that the property
24      has already been sold.
25 Q.   The third entry from the bottom on the same page there is an

Page 159

1       entry June 5th, 2014. The code is CFOD. Do you see that?
2  A.   Yes.
3  Q.   It says collateral file ordered. The next line ordered
4       collateral file as we need loan modification. Do you see
5       that?
6  A.   I do.
7  Q.   Do you have an understanding of what that entry means?
8  A.   I know what a collateral file is and I know what it means to
9       order a collateral file. I'm not completely certain why this
10      entry was made because -- I'm sorry, I am not completely
11      certain why this was made because, 1, we would have already
12      been in possession of the collateral file. Number 1. Number
13      2, unless -- I guess it's possible that the collateral file
14      could have been sent to our REO department, but otherwise we
15      would be in possession of the collateral file. So I'm not
16      really quite sure what that's all about.
17 Q.   Do you have any understanding of what department would have
18      made this entry?
19 A.   It's unable -- I can't tell from what's in here.
20 Q.   Next entry down, June 5th, 2014 still, the code is CPYC. It
21      says copy request complete. Next line, collateral file
22      ordered. Step reprojected in LPS. Do you see that?
23 A.   Yes.
24 Q.   What does reprojected mean?
25 A.   It is actually reprojected. But it's -- so when -- as I

Page 160

1       mentioned earlier LPS is basically a list of tasks that have
2       to be completed. Right. And there is a time frame in which
3       they are to be completed. And so in LPS if -- when a task is
4       completed the person who creates the task sets a timeline by
5       which the task must be completed, that's a projection date,
6       and if for some reason things change for whatever reason you
7       can reproject the completion date in LPS.
8  Q.   All right. Do you know if step refers to the ordering of the
9       collateral file or something else?
10 A.   Step is -- not to get too technical here, but so the actual
11      sort of insider jargon that is used for LPS is each of those
12      processes is called a rail, and a rail is made up of steps.
13      So to complete the full rail you have to complete all of the
14      steps within that rail. Okay. So --
15      MS. BAUCUS: Object to the extent there is any
16      specific request for communications within LPS.
17 A.   So a step is a part of that rail process. So somebody has
18      reprojected the timeline in which that step must be
19      completed.
20 BY MR. WESTBROOK:
21 Q.   Okay. Do you know if that step that is referred to here is an
22      ordering of the collateral file or something else?
23 A.   I can only tell you what it says, which was collateral file
24      ordered. I would interpret that to mean that that is -- that
25      that is the step that it's referring to.

Page 161

1  Q.  I'm looking at page 81.  There is an entry that is dated
2      October 17, 2014.  The code is ARCR.  Do you see that?
3  A.  Yes.
4  Q.  The narrative is account viewed by customer relations.  The
5      next line Re-cap Nationstar/MHA help reconciliation conference
6      call 10-17-14.  Currently still proceeding and pending, it
7      looks like, recession.  Do you see that?
8  A.  Yes.
9  Q.  Do you have an understanding of what this entry means?
10 A.  No, I am not familiar with any conference calls that were
11     completed between Nationstar and this MHA Help Reconciliation
12     Conference.  Again, it was -- none of that was listed under
13     topics.
14 Q.  Is customer relations a department within Nationstar?
15 A.  Yes, it is.  It's kind of like customer service basically.
16     MR. WESTBROOK:  I would like to mark this Exhibit
17     45, please.
18         (Marked for Identification: Exhibit 45.)
19 BY MR. WESTBROOK:
20 Q.  You have just been handed Exhibit 45 which is dated March 5,
21     2015.  It appears to be a letter on Nationstar letterhead.  Do
22     you see that?
23 A.  Yes.
24 Q.  Is this a document you have seen before?
25 A.  Yes, it is.

Page 162

1  Q.  Did you review it in connection with your preparation for the
2      deposition?
3  A.  Yes, I did.
4  Q.  Are you familiar with the Nationstar employee named Langley
5      Chatman?
6  A.  No, I'm not.
7  Q.  The heading of this letter appears to reference loan number
8      596863530.  Do you see that?
9  A.  Yes.
10 Q.  That's the 1625 Lake Drive property.  Right?
11 A.  That's correct.
12 Q.  It's addressed to Barbara Craigie.  If you will bear with me I
13     will read the second full paragraph.  It says we conducted an
14     investigation based on the concerns raised and determined
15     Nationstar is currently working through a settlement with all
16     parties involved in order to remediate this matter.  According
17     to our records an incomplete modification application was
18     received on March 8, 2014; however, due to an oversight, the
19     application was not uploaded into our system until March 21,
20     2014.  An error occurred prior to the foreclosure sale in that
21     you were not at least verbally notified of the missing
22     documents needed in order to review the account for payment
23     assistance.  Please note the application was not reviewed due
24     to the foreclosure sale scheduled for April 2, 2014.  The
25     foreclosure sale was completed on April 2, 2014.  Did I read

Page 163

1      that correctly?
2  A.  Yes.
3  Q.  Do you know why the March 8, 2014 modification documents were
4      not uploaded into Nationstar's system until March 21, 2014?
5  A.  I do not.
6  Q.  Did Nationstar have policies and procedures in place in March
7      2014 regarding the timing of review of modification documents
8      in connection with HAMP modification cases?
9  A.  Yes.
10 Q.  Have you reviewed those policy and procedure documents?
11 A.  Yes.
12 Q.  Did you review them in preparation for this deposition?
13 A.  Yes, I did.
14 Q.  Do you know what they are called?
15 A.  Again, I don't remember the name of the particular heading on
16     the policy and procedure.
17 Q.  Well, what do these policies and procedures provide with
18     respect to the timing of review of modification documents?
19 A.  They describe a number of situations and requirements that
20     Nationstar is subject to depending on when it receives the
21     packet of information from the borrower.  My recollection is,
22     again, this is something that we have talked about already,
23     but when a packet is received within 37 days of the
24     foreclosure sale and then it describes review of and the
25     timeline for review when the documents are received outside of

Page 164

1      the 37-day period before the foreclosure sale.
2  Q.  All right.  And part of that paragraph I read said an error
3      occurred prior to the foreclosure sale in that you were not at
4      least verbally notified of the missing documents needed in
5      order to review the account for payment assistance.  Right?
6  A.  That's what it says.
7  Q.  Do you have any idea why this letter characterizes that
8      failure to verbally notify the borrower of the missing
9      documents as an error?
10 A.  I don't know why it is characterized that way.  I don't see
11     that that is inconsistent with the rules that govern receipt
12     of these documents and the review time period.  I do know
13     though that we generally as a practice strive to review these
14     within a very short time period of being received, usually two
15     or so days.  It's pretty rare that this type of thing would
16     have happened.  It is not, you know, our normal business
17     practice.
18 Q.  Is it your understanding that there is a policy and procedure
19     that dictates a time frame for responding to the borrower that
20     the modification package is not complete?
21 A.  Yes, there is such a procedure or policy.
22 Q.  All right.  And that's in a written policy or procedure
23     document?
24 A.  Yes.
25 Q.  Are you aware of what that procedure is or what that policy

Page 165

1    is?
2 A.   I feel like we have already talked about this like ten times.
3    Again, it depends on the time frame we are talking about.
4    Within 37 days of the foreclosure sale?
5 Q.   Oh, let me stop you.  I think my question is different.
6 A.   Okay.
7 Q.   My question is a different one.
8 A.   Okay.  Fire away.
9 Q.   The question is about notifying the borrower.
10 A.   I see.
11 Q.   The question is not about, you know, forestalling the
12    foreclosure sale.  We did talk about that.  What I want to
13    know is whether there is a policy or a procedure that you know
14    of that dictates a response time for the borrower to tell them
15    that documents are missing.
16 A.   Yes.  I believe to the best of my recollection that that is
17    also governed by the same time periods we discussed and I
18    believe it's within -- within 37 days I'm not certain that
19    there are any requirements.  Outside of the 37 days but inside
20    of 45 days there are -- there is one set of rules for
21    responding.  And then outside of 45 days my recollection is
22    that there is another set of rules governing responding to the
23    completeness of a packet.
24 Q.   All right.  Is that something --
25 A.   Unfortunately I just can't remember what those are off the top

Page 166

1    of my head.
2 Q.   That is something that the documents would show us?
3 A.   Yeah.
4    MR. WESTBROOK:  Let's mark this Exhibit 46.
5    (Marked for Identification:  Exhibit 46.)
6    MS. BAUCUS:  How are you doing, Aaryn, do you need
7    to take a break?
8    THE WITNESS:  Oh, I'm okay, just having a good time
9    over here.
10    MR. WESTBROOK:  I'm doing my best.
11    THE WITNESS:  I will take a Rolo.  Actually --
12 BY MR. WESTBROOK:
13 Q.   All right.  Going all of the way back to Exhibit 39, which is
14    the notice, you don't have to look at it, I will read what it
15    says.  I am looking at topic 15.  It says Nationstar's efforts
16    and extent of investigation in responding -- actually, check
17    that.  I'm looking at number 14.  Nationstar's efforts and
18    extent of investigation in responding to plaintiffs' first set
19    of written discovery requests.  Is that a topic that you were
20    asked by Nationstar to prepare to testify regarding?
21 A.   I don't remember.  I will have to look at your notice.
22 Q.   It's number 14.
23    MS. BAUCUS:  I would reiterate the objection that we
24    made in our written objections.  It's overbroad, unduly
25    burdensome, subject to attorney work product, attorney-client

Page 167

1    privilege, and doesn't identify with reasonable particularity
2    the matter for examination.
3    MR. WESTBROOK:  I would respond to that by again
4    noting my response to the original objection, which is that it
5    is untimely and lacks merit.
6 BY MR. WESTBROOK:
7 Q.   Let's go ahead.  Is that a topic that you were asked by
8    Nationstar to testify regarding on its behalf?
9 A.   I guess subject to the objection, sure.
10 Q.   All right.  Did you do some investigation of Nationstar's
11    response to that discovery request?
12 A.   I am generally familiar -- well, I should say that these
13    investigations, if you will, are pretty uniform with some
14    exceptions, and my understanding was that the typical process
15    and procedure was followed with regards to answering these
16    questions, and to the extent that it deviated from that I
17    believe I was aware of that deviation.
18 Q.   Other than counsel inside or outside, did you speak with
19    anyone else about the process of responding to the discovery
20    requests?
21 A.   No.
22 Q.   Did you have a chance to review the discovery requests and
23    responses themselves?
24 A.   Yes, I did.
25 Q.   Looking at Exhibit 46, I will represent to you that this is an

Page 168

1    answer provided by Nationstar's counsel to plaintiffs' first
2    set of discovery requests, in looking at page 11, number 5,
3    the request reads produce any and all documents relating in
4    any way to either or both of the foreclosures, and
5    foreclosures was defined as the 1625 Lake Drive foreclosure
6    and the Scenic Drive foreclosure --
7 A.   Okay.
8 Q.   -- including but not limited to any and all documents
9    evidencing, referencing or relating to any notice of sheriff's
10    sale, postponement of sheriff's sale and rescission of
11    sheriff's sale.  Do you see that?
12 A.   I do.
13 Q.   Do you know if there were efforts undertaken to search for
14    documents responsive to that request?
15 A.   To my knowledge, any of those documents that we would be in
16    possession of would be routinely copied and transmitted to our
17    counsel.
18 Q.   All right.  We know that the servicing notes were produced.
19    That's fair to say.  Right?
20 A.   Yes.
21 Q.   How were the servicing notes obtained in order to produce
22    them?
23 A.   They are converted into a printed format and scanned into a
24    PDF document and sent through a portal system to our
25    counsel.

1  Q.  All right.  Do you know who actually did that work of

2      converting the information to a printable format?

3  A.  It would be a paralegal in our legal department.

4  Q.  All right.  Now, I think you mentioned this, but is it correct

5      to say that FileNet's system was not searched to look for

6      information responsive to the requests?

7  A.  No, that's not a fair assessment.

8  Q.  The FileNet system was searched?

9  A.  I personally did not search the FileNet system and that was --

10     I referenced that earlier today, but part of our document

11     production procedure it pulls the documents out of the FileNet

12     system and places them into the portal system for our outside

13     counsel.

14  Q.  All right.

15  A.  It's an automated procedure.

16  Q.  Now, you know, we have discussed at some length Exhibit 43,

17     which is the HAMP certification document.  Do you recall

18     that?

19  A.  Yes.

20  Q.  And is that a document that would show up in the FileNet

21     system?

22  A.  If somebody imaged it, yeah.  If it was imaged and uploaded

23     into FileNet I would find it there.

24  Q.  Are there procedures that govern whether documents are imaged

25     and sent to FileNet or not?

1  A.  There are procedures that govern imaging of documents, yes.

2  Q.  Would you expect that a document like a HAMP

3      certification would be imaged and sent to FileNet?

4  A.  Typically, yes.

5  Q.  If a document like a HAMP certification were imaged and put

6      into FileNet, is that something that would have been made

7      accessible to counsel?

8          MS. BAUCUS:  Objection, calls for speculation, form

9   of the question.

10  A.  I can't imagine why it would not have been.  As I mentioned

11     before, I routinely have seen these in other cases.

12         MS. BAUCUS:  Do you need us to speak up?

13         THE REPORTER:  Yes, please.

14         MS. BAUCUS:  It's 5:00.  Let's take five.

15         (Off the record 4:57 to 5:07 p.m.)

16         (Ms. Lintemuth now present.)

17  BY MR. WESTBROOK:

18  Q.  Okay.  We were talking a little bit about our topic number 14,

19     which was related to efforts to supply documents in response

20     to the plaintiffs' request, and my question was with respect

21     to that category number 5, page 11 of Exhibit 46, which is

22     production of documents relating to the foreclosures, et

23     cetera.  Do you know if any documents were produced from the

24     Remedy system?

25  A.  No.

1  Q.  They were not or you don't know?

2  A.  To my knowledge, they were not.

3  Q.  Do you know if any documents were produced from the LPS

4      system?

5  A.  To my knowledge, no.

6  Q.  We discussed a little bit some Nationstar policies and

7      procedures with respect to the HAMP program.  Right?

8  A.  Yes.

9  Q.  I would like to sort of switch gears and ask some similar

10     questions about the BoNY Modification Program that the

11     Craigies had applied for.

12  A.  Okay.

13  Q.  In 2013 or the late 2013, early 2014 time frame did Nationstar

14     have policies and procedures regarding the BoNY Modification

15     program -- that BoNY Modification Program?

16         MS. BAUCUS:  I am going to put a continuing

17     objection consistent with my argument before the court today

18     and our written objections in our prior motion to compel.

19     Subject to those objections, go ahead and answer.

20  A.  It is a very general question and so I would say yes, there

21     are multiple policies and procedures that would cover that

22     broad area.

23  BY MR. WESTBROOK:

24  Q.  All right.  Meaning there are some documents that provide or

25     define what Nationstar did to process those BoNY Modification

1      cases in that time frame, 2013, 2014?

2  A.  Okay.

3          MS. BAUCUS:  Objection to the extent that receiving

4      information about policies and procedures in relation to

5      all Bank of New York investor cases because not all loans are

6      similar to the ones at issue in this lawsuit.

7  A.  Maybe it would be helpful if I step back for a minute because

8      I feel like this might just get us to the same place a little

9      bit faster.  These BoNY loan modifications -- so there is sort

10     of a layer of policies and procedures that intersect and

11     overlap that cover the issue of consideration for a loan

12     modification, one of these BoNY loan modifications.  Some of

13     them are generic, they apply to both BONY modifications and

14     other types of modifications.  There are -- insofar as there

15     are policies and procedures that apply specifically to

16     processing these BoNY Trial Plan Modifications, I did not

17     review any of those policies and procedures.  I am only

18     familiar with some of our more general policies and procedures

19     that govern more than this type of loan modification.  But

20     insofar as the ones specific to this modification, I have not

21     reviewed those.

22  BY MR. WESTBROOK:

23  Q.  All right.  Do you know if there was more than one BoNY Trial

24     Modification framework at that time, 2013, 2014?

25  A.  Not that this borrower was eligible for.

Page 173

1  Q.  Right.  My question is:  Were there other BoNY modification
2      programs, other than the one that this borrower was evaluated
3      for.
4  A.  I don't know.  I only know that there was one that this
5      particular borrower was eligible for and was -- well, that the
6      case was opened for --
7  Q.  All right.
8  A.  -- put it that way.
9  Q.  Is it your understanding that there are policies and
10     procedures applicable specifically to that BoNY modification
11     program?
12 A.  Again, I have not attempted to review those or locate those.
13     I would expect there to be something, but I didn't -- I didn't
14     see that on the list, so I didn't go hunting for it, so I'm
15     not certain.
16 Q.  All right.  So there are layers.  There are policies and
17     procedures that are throughout Nationstar.  Right?
18 A.  You are going to have to be -- yes, that is true.  There are
19     some that go throughout Nationstar.
20 Q.  I'm talking about with respect to modification programs.
21 A.  Okay.  Yes, there are ones that apply to more than one
22     modification program, right.
23 Q.  Right.  And then, drilling down, there may be more specific
24     policies and procedures that apply to specific types of
25     modification?

Page 174

1  A.  Precisely.
2  Q.  Of which a BoNY Trial Period that the Craigies had applied for
3      is one?
4  A.  Correct.
5  Q.  You're not particularly familiar with that particular BoNY
6      modification program?
7  A.  Correct.
8          MR. WESTBROOK:  Let's go off the record for a few
9      minutes.
10         MS. BAUCUS:  Sure.
11         (Off the record 5:14 to 5:17 p.m.)
12 BY MR. WESTBROOK:
13 Q.  We talked about the fact that the foreclosure sale with
14     respect to the 1625 Lake Drive property had been scheduled for
15     April 2nd, 2014.  Do you recall that?
16 A.  Yes.
17 Q.  And the sale was actually carried out on that date, April 2nd,
18     2014.  Right?
19 A.  Right.
20 Q.  Once a foreclosure was scheduled with respect to a borrower's
21     property did Nationstar have a policy or procedure in the 2014
22     time frame of notifying the borrower if the scheduled sale
23     date was going to be adjourned?
24         MS. BAUCUS:  Objection to the extent it calls for
25     legal obligations with regard to notifying borrowers of

Page 175

1      adjournments of foreclosure sales pursuant to Michigan law.
2  BY MR. WESTBROOK:
3  Q.  I wasn't asking about Michigan law.  I was asking whether
4      Nationstar had a policy or procedure about notifying the
5      borrower if the sale was going to be adjourned.
6  A.  I don't know.
7  Q.  Do you know of anyone else who would know?
8  A.  No.
9  Q.  Do you know if Nationstar ever actually communicated to
10     Barbara or Bruce Craigie that a foreclosure sale for Lake
11     Drive would be held on April 2nd, 2014?
12 A.  I would have to look at the collection history notes.
13 Q.  Okay.  Please do.
14 A.  I know that she received a notice that it had been sold.
15         I'm sorry, just one second.  In terms of any written
16     correspondence that came directly from Nationstar, it doesn't
17     appear -- I don't see any notations that reference the notice
18     of advisal of the changing of the foreclosure sale date to
19     April 2nd.  I know that there were a lot of phone call
20     attempts in here for like a couple of months, so I don't know
21     if there was an attempt to advise during that time period.
22     However, based on my experience I know that oftentimes in
23     these situations foreclosure counsel is responsible for
24     sending those notices and communications to the borrower
25     regarding postponements of sale dates, and those are typically

Page 176

1      not notated in the LSAMS system as foreclosure counsel does
2      not have access to the LSAMS system.
3  Q.  Sure.
4  A.  So to answer your question I can't see any notations regarding
5      that in the collection history profile, but I don't know
6      necessarily if the notice was given or not.
7  Q.  All right.
8  A.  I didn't review the correspondence between foreclosure counsel
9      and the borrower.
10 Q.  Right.  If foreclosure counsel had given a notice of that sale
11     date, April 2nd, 2014, is that something that would show up in
12     any of Nationstar's records?
13 A.  I would expect that to be housed in Nationstar's records.
14 Q.  You would not or you would?
15 A.  I would.
16 Q.  Where in Nationstar's records?
17 A.  Probably in -- probably our FileNet system.
18 Q.  All right.  But it wouldn't be on -- in the notes
19     (indicating)?
20 A.  As I indicated, correspondence between foreclosure counsel and
21     the borrowers is typically not notated in the collection
22     history profile.
23 Q.  All right.  Looking at Exhibit 39, which, again, is our notice
24     for today, the second numbered page, which is the one you are
25     on, in looking at topic 8 it says number of residential home

Page 177

1    loans referred by Nationstar to foreclosure from 2014 to
2    present, where a foreclosure sale took place less than 30 days
3    after a Home Affordable Modification Program, HAMP, rejection.
4    Do you see that?
5  A.   Yes.
6  Q.   Is that a topic that you were asked by Nationstar to be
7    prepared to testify on its behalf regarding?
8  A.   No.
9  Q.   Did you actually prepare to testify regarding that topic?
10 A.   No.
11 Q.   Do you have any independent knowledge regarding information
12    related to that topic?
13        MS. BAUCUS:  Objection to the extent that you are
14    asking the witness of knowledge outside of testimony of a
15    30(b)(6) prepared witness.
16 A.   Good luck finding the person that could answer that question.
17 BY MR. WESTBROOK:
18 Q.   Topic number 9, number of residential home loans referred by
19    Nationstar to foreclosure from 2014 to present, where the
20    borrower submitted a HAMP application and a foreclosure took
21    place prior to any decision on the HAMP application.  Do you
22    see that?
23 A.   I do.
24 Q.   Is that a topic that you were asked by Nationstar to be
25    prepared to testify on its behalf regarding?

Page 178

1  A.   No.
2  Q.   Did you, in fact, do any preparation, preparation to testify
3    on that topic?
4  A.   I did not.
5  Q.   Do you have any independent knowledge regarding that topic?
6        MS. BAUCUS:  Same objection as the last objection
7    noted on the record.
8  A.   I would give you the same answer.  I don't know if anybody
9    would be able to be prepared to answer that question.
10 BY MR. WESTBROOK:
11 Q.   But you don't know?
12 A.   I don't know.
13        MS. BAUCUS:  For clarification of the record, we are
14    pushing on seven hours of the deposition so the witness is
15    being a little bit sarcastic, but it is understandable.
16        THE WITNESS:  Humor intents only.
17        MR. WESTBROOK:  No offense is taken, I promise
18    you.
19 BY MR. WESTBROOK:
20 Q.   Topic number 10, number of residential home loans referred by
21    Nationstar to foreclosure from 2014 to present, where
22    Nationstar completed a HAMP foreclosure certification stating
23    that the HAMP foreclosure certification had been completed no
24    more than 7 days prior to the scheduled sale date, but the
25    actual foreclosure sale was held more than 7 days after the

Page 179

1    certification date.  Do you see that?
2  A.   Yes, I see it.
3  Q.   Were you asked by Nationstar to be prepared to testify on its
4    behalf regarding this topic?
5  A.   No.
6  Q.   Did you do any preparation to testify regarding this topic?
7  A.   No.
8  Q.   Do you have any independent knowledge regarding information
9    relating to that topic?
10        MS. BAUCUS:  Same objection as the last objection
11    noted on record.
12 A.   And no.
13 BY MR. WESTBROOK:
14 Q.   Do you know of anyone who would know?
15 A.   No, I do not.
16 Q.   We talked a little bit about this, but I want to make sure
17    that I have your answers regarding Nationstar's document
18    retention policies 2011 to present.  In looking at topic
19    number 13 on the notice it says Nationstar's document
20    retention policies in place between 2011 and the present.  Do
21    you see that?
22 A.   Yes.
23 Q.   Is this a topic that you were asked by Nationstar to testify
24    on its behalf regarding?
25 A.   Subject to whatever objections we had to this topic, yes.

Page 180

1  Q.   Did you do anything to prepare to testify regarding that
2    topic?
3  A.   No, I did not.
4        MS. BAUCUS:  The objection, which I will place on
5    the record, which is already in the written objections, is
6    that Nationstar would provide testimony subject to objections,
7    however, the general request was overbroad and there needed to
8    be a limitation or explanation of what type of documents were
9    being referred to so that a witness could properly prepare for
10    this topic.
11 BY MR. WESTBROOK:
12 Q.   Do you have any understanding for how long Nationstar keeps
13    foreclosure-related documents?
14 A.   I have some understanding.
15 Q.   What is your understanding?
16 A.   My understanding is that Nationstar retains all of these
17    documents throughout the time that it is sourcing the loan and
18    for at least some period of time after the loan is no longer
19    being serviced by Nationstar.  I am not exactly sure how long
20    that period of time is.
21 Q.   All right.  Do you know if anything was done to preserve
22    evidence relating to the plaintiffs' properties, the Lake
23    Drive property and the Scenic Drive property, since February
24    of 2015?
25 A.   If anything was done to preserve documents?

Page 181

1  Q.  Yes.

2  A.  I don't know of any particular act that was taken to

3      additionally preserve documents outside of just our normal

4      document retention system, documents being imaged, placed into

5      FileNet and kept there.

6  Q.  Was a litigation hold put in place?

7  A.  Was a litigation hold put in place at what time?

8  Q.  Let's say at the time of the filing of the complaint in this

9      case.

10       MS. BAUCUS:  Objection to the extent that the

11     question is asking for attorney-client privileged

12     communications between outside counsel or inhouse counsel and

13     Nationstar.

14 A.  Maybe I can ask a clarifying question.  Could you tell me what

15     you mean by litigation hold?

16 BY MR. WESTBROOK:

17 Q.  What I mean is an instruction to halt the ordinary destruction

18     of documents or information as a result of litigation.

19 A.  Okay.  So --

20       MS. BAUCUS:  Objection, I believe you just testified

21     that documents are retained throughout the servicing of the

22     loan.

23 BY MR. WESTBROOK:

24 Q.  My question is with respect to whether there was any attempt

25     to -- let me just back up and say what I mean when I say

Page 182

1      litigation hold is an order to stop the routine destruction of

2      information because of its possible relevance to litigation.

3      Now, taking that definition, do you know if a litigation hold

4      was put into place with respect to documents relating to the

5      Craigies?

6        MS. BAUCUS:  Objection, assumes facts not in

7      evidence as it was testified to today that there is not

8      routine destruction of servicing notes but they are

9      retained.

10 A.  That actually was the point I was about to make.  There was no

11     routine destruction of these documents that I am aware of, so

12     I am not aware of any necessity to put any sort of hold on any

13     document destruction because there is no document destruction.

14     As long as particularly this loan remains in our servicing or

15     as part of our REO or is involved in litigation nothing is

16     changing with regards to our records for this loan.

17 BY MR. WESTBROOK:

18 Q.  Okay.  Do you know if any documents or electronic information

19     related to the plaintiffs' accounts was destroyed -- were

20     destroyed after February 2013?

21 A.  I'm not aware of the destruction of any documents relative to

22     this loan.

23       MR. WESTBROOK:  I have no further questions.

24       MS. BAUCUS:  Take a five-minute break.

25       (Off the record 5:31 to 5:34 p.m.)

Page 183

1        MS. BAUCUS:  All right.  Laura Baucus, counsel for

2      Nationstar in the pending litigation.  For purposes of the

3      record I have referenced many times to opposing counsel a

4      document entitled Objections to Topics Related to Re-notice of

5      Rule 30(b)(6) of Defendant Nationstar Mortgage, LLC, which is

6      dated April 22nd, 2016.  This deposition testimony was

7      provided by Nationstar's representative subject to such

8      oppositions, so we are marking it as Exhibit 47.

9        (Marked for Identification:  Exhibit 47.)

10       MS. BAUCUS:  I have no further questions at this

11     time.

12     (Whereupon this deposition was concluded at 5:34 p.m.)

Page 184

1                    CERTIFICATE

2

3 STATE OF MICHIGAN   )

4                     )

5 COUNTY OF KENT      )

6

7        I, LORI J. COPE, Certified Shorthand Reporter and

8      Notary Public, do hereby certify that the foregoing matter was

9      taken before me at the time and place hereinbefore set forth.

10       I FURTHER CERTIFY that this matter was taken in

11     shorthand and thereafter transcribed by me and that it is a

12     true and accurate transcript.

13       IN WITNESS WHEREOF, I have hereunto set my hand this

14     28th day of April of 2016, at Fremont, Michigan.

15

16     _____

17     LORI J. COPE, CSR-4113, RPR

18     Notary Public for Newaygo County

19     My Commission Expires:  3-25-2021

20

21

22

23

24

25